# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                              No. CR 09-2439 JB

JOSEPH MARTINEZ,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed September 9, 2009 (Doc. 17).  The Court held an evidentiary hearing on October 29, 2009.  The primary issues are: (i) whether the police were justified, pursuant to the exigent-circumstances exception to the warrant requirement, to enter Defendant Joseph Martinez' home to check for individuals who might be injured or in need of assistance; (ii) whether the scope of the search conducted by the police officers was reasonable under the circumstances; (iii) whether, if the entry and/or search were unconstitutional, the Court should suppress the evidence seized in the house; (iv) whether the subsequently obtained search warrant was valid; and (v) whether the second, warrant-authorized search of the house eliminates the need to exclude the evidence seized in the house.  The Court concludes that: (i) the police did not have an objectively reasonable basis to believe that there was an immediate need to protect the life or safety of someone in the Martinez home; (ii) because the Court decides that the entry and search violated the Fourth Amendment, the Court need not decide whether the police executed the search in a manner that was reasonable under the circumstances; and (iii) the warrant affidavit, however, excluding any information garnered from

the initial, warrantless search, established probable cause to search Martinez' home.  Based on the limited question that Martinez asks the Court to resolve in this motion, the Court will deny the motion and decline to suppress the challenged evidence at this time.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      Martinez resides at 10 Dairy Lane, Tijeras, New Mexico.  See Transcript of Hearing at 221:18-23 (taken October 29, 2009)(Rees, Hartsock)("Tr.")[1]; Transcript of Hearing at 27:21-24 (taken October 14, 2009)(Hartsock)("Detention Tr.").

2.      Martinez' residence is a two-story dwelling that sits off the road on a couple of acres of land.  See Tr. at 54:11 (Lind); Detention Tr. at 34:25-35:4 (Hartsock); Government Exhibit 59.

3.      The residence is approximately 3,000 to 4,000 square feet.  See Tr. at 67:19-20

---

[1] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

(Lind); id. at 181:20-21 (Torrez, Kmatz).

4.      On Friday, April 14, 2009, at approximately 1:30 p.m., the Bernalillo County Emergency Communication Center ("911") received a call from the residence at 10 Dairy Lane that was an "open line" -- a call in which the dispatcher answers and there is nobody on the other end of the call.  Id. at 47:24-48:3, 48:19-49:4 (Rees, Lind); Government Exhibit 2 ("MARTINEZ, JOSEPH . . . 09/04/14 13:27 STATIC . . .").

5.      No person initiated the 911 call from Martinez' home.

6.      According to Bernalillo County Emergency Communications Center Standard Operating Guidelines § 7.2.10:

> If a 9-1-1 call results in a hang-up or is disconnected before the ECO [Emergency Communications Operator] can determine the reason for the call, the ECO will obtain the caller's number from the ANI display, dial that number to attempt to contact and inquire if an emergency exists.  If a satisfactory answer is not received, or there is no answer, or if the line is busy, the ECO will dispatch the appropriate law enforcement agency to the location to check the welfare of the person(s) there and/or notify the appropriate agency.

Response Exhibit A, at 5, filed September 21, 2009 (Doc. 23-2).

7.      In the open-line call, the 911 dispatcher who received the call heard only static, and no one verbally responded to the dispatcher.  See Tr. at 97:21-99:8 (Bregman, Lind); id. at 199:10-200:1 (Bregman, Kmatz); Government Exhibit 2, at 1.

8.      The dispatcher disconnected the line and called back to the residence.  See Tr. at 49:2-8 (Rees, Lind); id. at 199:10-200:1 (Bregman, Kmatz).

9.      When the dispatcher returned the call, she heard only static and received no answer. See id. at 49:2-8 (Rees, Lind); id. at 199:10-200:1 (Bregman, Kmatz).

10.      When no one answered, the dispatcher dispatched and sent, at approximately 1:36 p.m., Sergeant Robert Lind and Deputy Nathan Kmatz, both with the Bernalillo County

Sheriff's Office, to Martinez' residence at 10 Dairy Lane, from which the 911 call originated.  See id. at 49:18-49:25 (Lind); id. at 172:24-176:4 (Torrez, Kmatz).

11.     The dispatcher conveyed to the responding officers that the 911 call had consisted solely of static.  See id. at 98:12-99:5 (Bregman, Lind); id. at 161:13-17 (Court, Lind); id. at 199:10-200:1 (Bregman, Kmatz).

12.     Roughly half of the open-line or hang-up 911 calls to which Lind has been dispatched have turned out to involve no emergency.  See id. at 165:17-23 (Court, Lind).

13.     In responding to 911 calls, Bernalillo County Sheriff's Deputies do not distinguish between hang-up/incomplete-information calls and open-line static calls.  See id. at 160:24-161:12 (Court, Lind); id. at 163:4-8 (Lind); id. at 236:7-11 (Rees, Hartsock).

14.     Lind knew that line problems or bad weather can sometimes cause static-only calls.  See id. at 99:11-22 (Bregman, Lind).

15.     Officers in the Bernalillo County Sheriff's Department were generally aware that bad weather or line problems sometimes cause static-only calls.  See KOB.com: Phantom 911 Calls Blamed on Rain, http://www.kob.com/article/stories/ s1239088.shtml (last visited Nov. 11, 2009).[2]

16.     The responding officers went to Martinez' home.  See Tr. at 50:20-25 (Lind); id. at 99:24-100:1 (Bregman, Lind); id. at 174:7-176:9 (Torrez, Kmatz).

---

[2] On November 10, 2009, Martinez submitted a November 6, 2009 article from KOB.com. See Letter from Eric Loman, attorney for Martinez, to the Court (dated November 10, 2009), filed November 10, 2009 (Doc. 40)("Loman Letter").  The article reports that Bernalillo County officials, including members of the Bernalillo County Sheriff's Department, know that these "phantom 911 calls" occur, and that they are most frequent in the East Mountains near Martinez' home.  Loman Letter at 3.  While Lind and Kmatz did not know about the article -- indeed, it had not yet been written -- when they testified at the October 29 hearing, and the article is not direct evidence that Lind and Kmatz knew about what caused static-only calls, the Court believes it is circumstantial evidence of a point that the United States does not dispute.

17.     The 911 call was not a priority call.  <u>See</u> <u>id.</u> at 176:14-16 (Kmatz).

18.     Priority calls are ones that involve situations in which a person's life may be in immediate danger, such as felonies in progress, or when the 911 dispatcher hears screams or gunshots during the 911 call.  <u>See</u> <u>id.</u> at 205:22-206:7 (Kmatz).

19.     The responding officers traveled to the Martinez home at the speed limit, obeying traffic laws, and without lights or sirens.  <u>See</u> <u>id.</u> at 176:14-16 (Kmatz); <u>id.</u> at 205:16-206:7 (Court, Kmatz).

20.     The officers did not have a subjective belief that anyone at 10 Dairy Lane was in immediate need of protection.  <u>See</u> <u>id.</u> 108:21-109:5 (Bregman, Lind)("Q: So now . . . do you actually come to the conclusion that because I see a TV box there's an emergency?  A: This whole time I have thought there is a possibility of emergency situation yes, sir.  Q:  A possibility.  But at that time . . . do you actually believe that there is an emergency?  A: I believe there is a probability there is something going on; probably there's a possible emergency at that point.  Q: Probably there's a possible emergency.");  <u>id.</u> at 167:19-23 (Court, Lind)("THE COURT: Now, looking at . . . the Bernalillo County Sheriff's policy, when did you believe, if you did, that you . . . needed to enter to save a life?  THE WITNESS: We needed to enter to check to make sure that nobody in that house was hurt . . . .");  <u>id.</u> at 167:22-168:4 (Lind)("I didn't have evidence that somebody was hurt, but I didn't have any evidence to the contrary, either.");  <u>id.</u> at 168:5-9 (Court, Lind)("THE COURT: So was it your belief that it could be either way at that point?  It could be that you needed to safe a life or it may be something else?  THE WITNESS: Yeah it could be we could also need to catch the individual that was burglarizing the residence.");  <u>id.</u> at 206:8-12 (Court, Kmatz)("THE COURT: So just with the information . . . that you had a static call, that wasn't enough for you to believe that a life was in danger, correct?  THE WITNESS: Correct.").

21.     Lind and Kmatz arrived at the residence at approximately 1:56 p.m.  See id. at 50:8 (Lind); id. at 176:5-9 (Torrez, Kmatz); Government Exhibit 2.

22.     Upon arrival at the residence, the officers found the gate to the property closed.  See Tr. at 50:20-25(Lind); id. at 176:23-24 (Kmatz).[3]

23.     The officers found an opening onto the property, however, that any person could enter.  See id. at 51:1-5 (Rees, Lind); id. at 176:23-177:3 (Kmatz).

24.     The officers approached the front door, repeatedly knocked and announced their presence, but received no answer.  See id. at 56:6-23 (Rees, Lind); id. at 104:6-105:15 (Bregman, Lind); id. at 177:4-178:9 (Kmatz).

25.     When no one answered, the officers walked around the house's perimeter and searched the outside of the house.  See id. at 57:6-58:11 (Rees, Lind); id. at 178:10-23 (Torrez, Kmatz).

26.     In walking the perimeter of the house, and looking in through windows, the officers found no signs of forced entry, and neither saw nor heard anybody inside.  See id. 101:17-102:25 (Bregman, Lind).

27.     Lind and Kmatz found an unlocked, sliding-glass door on the second-story balcony.

---

[3] In a letter dated November 10, 2009, Charlyn Rees, counsel for the United States, described subsequent static 911 calls coming from the Martinez house.  See Letter from Charlyn Rees, Assistant United States Attorney, to Court (dated November 10, 2009), filed November 10, 2009 (Doc. 42)("Rees Letter").  In describing a static call on August 3, 2009, Ms. Rees states that the officers found "the gate secure," but that Lind and Kmatz found an "unsecured gate" when they investigated on April 14, 2009.  Rees Letter at 3.  The Court, however, understood the testimony of Kmatz and Lind to be that the gate was closed when they arrived on April 14, 2009.  Whatever may be the difference between a "closed" gate and a "secured" gate, the Court understood from Ms. Rees' argument in the hearing and Lind's and Kmatz' testimony that neither the officers nor the United States considered the status of Martinez' gate on April 14, 2009 to be a significant factor in the totality of circumstances.  Likewise, the Court does not consider it to be a significant factor.

See id. at 58:3-13 (Rees, Lind); id. at 86:11-12 (Rees, Lind); Government Exhibit 16.

28.     Through the sliding-glass door on the second-story balcony, the officers saw that the house looked disheveled and that there were some electronics boxes near the door.  See Tr. at 110:12-16 (Bregman, Lind); id. at 167:11-18 (Court, Lind); id. at 178:14-23 (Torrez, Kmatz).

29.     While untidy, the house did not appear ransacked or as if a struggled had occurred. See Government Exhibits 16-58.

30.     The unlocked back door raised the officers' concern, because intruders tend to enter residences through back doors as opposed to front doors.  See Tr. at 59:25-60:20 (Rees, Lind); id. at 178:14-179:10 (Rees, Lind).

31.     The officers believed that the 911 call, with an unlocked door and a messy house, provided exigent circumstances justifying a warrantless entry.  See id. at 109:15-24 (Bregman, Lind); id. at 198:11-199:8 (Bregman, Kmatz); id. at 202:4-14 (Bregman, Kmatz).

32.     The officers would not have entered if all doors had been locked.  See id. at 110:24-111:10 (Bregman, Lind); id. at 201:1-4 (Bregman, Kmatz).

33.     If all of the doors -- rather than only one -- had been unlocked, the officers would still have entered the premises.  See id. at 154:1-6 (Rees, Lind).

34.     The officers opened the sliding-glass door on the second-story balcony and again announced their presence.  See id. at 60:21-61:5  (Rees, Lind).

35.     The officers continued to receive no response.  See id. at 61:6-7 (Rees, Lind).

36.     Once the door was opened, the officers again observed that the inside of the house was in disarray.  See id. at 61:25-62:6 (Rees, Lind).

37.     The standard procedure and training of the Bernalillo County Sheriff's Office regarding emergency searches/exigent circumstances permits deputies to:

make a warrantless entry of anything, whether personal belongings, a vehicle, or building, anytime that Deputies have good reason to believe it is necessary to save a life or prevent injury (i.e., cries for help from inside of a building, assisting the Fire Department on a fire, to check on the welfare of the suspected abused child). However, once the emergency has passed, Deputies may not continue to search without obtaining a warrant.

Response Exhibit B at 1, filed September 21, 2009 (Doc. 23-3).

38.     The officers had developed their own guideline or categorical rule that any 911 call plus an unlocked door meant that the officers could enter to do an investigative sweep to look for persons in need of assistance.  See Tr. at 109:12-110:4, 112:8-11 (Bregman, Lind); id. at 198:21-199:5 (Bregman, Kmatz); id. at 202:4-14 (Bregman, Kmatz).

39.     Prior to the incident at Martinez' residence, Lind had, on numerous occasions, entered a residence based only on a 911 static call and an unlocked door.  See id. at 148:15-25 (Lind).

40.     The officers did not believe an open-line 911 call, alone, justified entry into a residence.  See id. at 45:4-46:4 (Rees, Lind).

41.     The officers entered the house through the unlocked door that they had found on the second floor.  See id. at 63:3-9 (Rees, Lind); id. at 180:19-181:3 (Torrez, Kmatz).

42.     The officers then went inside the residence to ensure no one was injured, unconscious, or deceased pursuant to the emergency-aid/exigent-circumstance exception to the Fourth Amendment's search warrant requirement.  See id. at 64:17-65:3, 70:18-22 (Rees, Lind); id. at 82:20-22 (Lind).

43.     The officers did not have a warrant.  See id. at 82:20-22 (Lind).

44.     The officers did not have a subjective belief that anyone was in the house; rather, the officers could not eliminate the possibility that someone was in the house.  See id. at 46:24-47:3

(Rees, Lind)("Q: Anything about the information you were given about the call, the fact that it was . . . static, make you believe no emergency existed?  A: No, ma'am.  We have to assume that there is a person there."); id. at 56:24-57:2 (Rees, Lind)("Q: . . . did you know if an emergency existed or not.  A:  No ma'am.  We at that point have to continue checking the house and assume that someone might still need aid inside the house."); id. at 61:8-9 (Rees, Lind)("A:  We did not hear anything.  Q:  Anything about that make you believe that an emergency doesn't exist? A:  No.  We still assume that there is something."); id. 69:3-8 (Rees, Lind)("Q:  Does the fact that you didn't see a phone off the hook, did that mean based on your training and experience that an emergency doesn't exist?  A:  No, ma'am there is still an opportunity for an emergency there.").

45.     The officers did not have a subjective belief that anyone in the house was in immediate need of assistance; rather, the officers could not eliminate the possibility that someone was in the house who needed immediate assistance. See id. at 46:24-47:3 (Rees, Lind); id. at 56:24-57:2 (Rees, Lind); id. at 61:8-9 (Rees, Lind); id. 69:3-8 (Rees, Lind); id. at 167:19-23 (Court, Lind)("THE COURT: Now, looking at . . . the Bernalillo County Sheriff's policy, when did you believe, if you did, that you . . . needed to enter to save a life?  THE WITNESS: We needed to enter to check to make sure that nobody in that house was hurt . . . ."); id. at 167:22-168:4 (Lind)("I didn't have evidence that somebody was hurt, but I didn't have any evidence to the contrary, either."); id. at 168:5-9 (Court, Lind)("THE COURT: So was it your belief that it could be either way at that point?  It could be that you needed to safe a life or it may be something else?  THE WITNESS: Yeah it could be we could also need to catch the individual that was burglarizing the residence."); id. at 206:8-12 (Court, Kmatz)("THE COURT: So just with the information . . . that you had a static call, that wasn't enough for you to believe that a life was in danger, correct?   THE WITNESS:

Correct.").[4]

46.     The officers did not have a subjective belief that anyone in the house was in immediate need of protection of his or her life or safety; rather, the officers could not eliminate the possibility that someone in the house was in immediate need of protection of his or her life or safety. See id. at 46:24-47:3 (Rees, Lind); id. at 56:24-57:2 (Rees, Lind); id. at 61:8-9 (Rees, Lind); id. 69:3-8 (Rees, Lind); id. 108:21-109:5 (Bregman, Lind); id. at 167:19-23 (Court, Lind); id. at 167:22-168:4 (Lind); id. at 168:5-9 (Court, Lind); id. at 206:8-12 (Court, Kmatz).

47.     The officers did not have reasonable grounds to believe that there was an immediate emergency necessitating entry into Martinez' residence. See Tr. at 167:22-168:4 (Lind)("I didn't have evidence that somebody was hurt, but I didn't have any evidence to the contrary, either.").

48.     Upon entering the house, to ensure that no person inside was in peril, the deputies performed a detailed search. See id. at 69:23-80:6 (Rees, Lind).

49.     The officers conducted a warrantless search of Martinez' home. See id. at 82:20-22

---

[4] One important exchange on which the Court relies for this finding went as follows:

Q:  So now . . . do you actually come to the conclusion that because I see a TV box there's an emergency?

A:  This whole time I have thought there is a possibility of emergency situation yes, sir.

Q:  A possibility.  But at that time . . . do you actually believe that there is an emergency?

A:  I believe there is a probability there is something going on; probably there's a possible emergency at that point.

Q:  Probably there's a possible emergency?

Tr. at 108:21-109:5 (Bregman, Lind).

(Lind).

50.     The officers immediately smelled marijuana.  See id. at 69:9-12 (Lind).

51.     As the officers looked in the upstairs portion of the residence for people needing emergency assistance, they saw pornography DVD cases in plain view on a pool table.  See id. at 70:13-15, 71:20-72:7 (Rees, Lind);  id. at 183:3-24 (Kmatz).

52.     The officers also saw, in plain view, a camcorder on a tri-pod pointed toward the pool table and stacks of VHS tapes with handwritten labels.  See id. at 70:2-15 (Lind); id. at 183:3-13 (Kmatz).

53.     The officers examined a microwave oven and could see a clear bag containing a large quantity of marijuana inside.[5]  See id. at 73:19-25(Lind); id. at 87:19-24 (Lind); Government Exhibit 22.

54.     The officers saw, in plain view, a plate containing a white powdery substance, which they believed to be cocaine, on the kitchen table.  See Tr. at 73:9-14 (Lind); id. at 181:5-16 (Kmatz); Government Exhibit 25-29.

55.     Next to the plate, they noticed a straw and residue baggy also in plain view.  See Government Exhibit 28.

56.     In the upstairs bedroom, while looking for persons, the officers saw marijuana on the bed and numerous glass pipes consistent with smoking illegal narcotics in plain view.  See Tr. at

---

[5] Lind testified only that he saw "something" in the microwave: "[W]hat I noticed was there was something weird in the microwave, like a box.  It could have been food it could have been anything, but through the glass it kind of looked like it was a bag of something inside the microwave."  Tr. at 73:4-7 (Lind).  When pressed, he stated that he did not form a belief as to what was in the microwave.  "I looked in [the microwave] and it registered to me that looks like it could be a bag of something, bag of marijuana, bag of brownies, bag of hay. After I finished clearing the residence, it kind of registered with me the fact that I was finding little bits of marijuana throughout the house that that could be marijuana inside the microwave."  Tr. at 73:19-25 (Lind).

74:10-19 (Lind); id. at 90:16-20 (Lind); Government Exhibit 30.

57.     The officers also saw, in plain view, a box on the bed that was filled with DVDs and a stack of Polaroid photographs.  See Tr. at 75:3-14 (Lind); id. at 183:3-184:6 (Torrez, Kmatz); Government Exhibits 29-31, 33, 34.

58.     The officers looked at the contents of a box that was on top of the bed.  See Tr. at 75:7-22 (Lind); id. at 183:3-184:6 (Torrez, Kmatz).

59.     The box was on the bottom, left-hand corner of the bed, near the foot of the bed.  See id. at 206:13-16 (Court, Kmatz); Government Exhibits 29, 30.

60.     The officers had to lean over to see the photograph at the bottom of the box.  See Tr. at 142:16-20 (Lind).[6]

61.     The photograph inside the box is not a clear picture of child pornography; rather, it must be studied to discern what is going on in the picture.  See Government Exhibits 30, 31.

62.     The picture visible to the officers depicted a young teenage male under the age of eighteen receiving fellatio from an older Hispanic male.  See Tr. at 75:15-20 (Lind); id. at 183:3-184:6 (Torrez, Kmatz); Government Exhibits 30, 31.

63.     The officers did not observe the photographic evidence in plain view while looking for persons needing emergency assistance.  See Tr. at 142:16-145:7 (Bregman, Lind); Government Exhibits 29, 33, 34.

--------

[6] Lind admitted that he probably had to lean over a little bit to see the photograph at the bottom of the box.  See Tr. at 142:16-20 (Lind).  Kmatz, on the other hand, testified that he could see the photograph without bending over.  See id. at 207:1-7 (Court, Kmatz).  He testified, however, to being the same height as Lind.  See id. at 207:8-9 (Court, Kmatz).  Also, the United States offered two photographs, see Government Exhibit 30 and 31, that show the child pornography at different angles in the box.  Given the photographic evidence and likely positions of the officers while "sweeping" the residence, the Court finds that the officers had to lean over to see the photographs at the bottom of the box of DVDs.  See Government Exhibit 29.

64.      In the upstairs bedroom, the officers found a closet large enough to conceal a person. See Tr. at 34:20-25 (Lind); Government Exhibits 39-40.

65.      Inside the closet, the officers saw a scale and a bag containing marijuana in plain view.  See Tr. at 34:20-25 (Lind); Government Exhibits 39-41.[7]

66.      In the residence's downstairs portion, there was what appeared to be one sleeping area.  See Tr. at 77:4-10, 78:4-8 (Lind).

67.      In this room, while searching for persons needing emergency attention, the officers saw numerous children's toys in plain view.  See id. at 77:4-10, 78:4-8 (Lind).

68.      While looking for persons, the officers saw numerous pornography videos throughout the residence in plain view, some of which had pictures on their covers of what appeared to be males under the age of eighteen.  See id. at 71:20-72:7; 79:2-7 (Rees, Lind).

69.      The deputies found no persons inside the Martinez residence.  See id. at 124:22-25 (Lind); id. at 181:22-24 (Kmatz).

70.      The deputies determined during their sweep of the house that no emergency existed. See id. at 124:22-125:1 (Lind); id. at 125:9-15 (Bregman, Lind).

71.      Once the officers ensured no one inside the residence needed emergency attention, the officers promptly exited the residence and secured the house. See id. at 80:5-8 (Rees, Lind); id. at 124:22-125:1 (Lind).

72.      The officers spent approximately five minutes clearing the house for persons needing emergency assistance.  See id. at 68:10-11 (Lind); id. at 184:24-185:2 (Torrez, Kmatz).

73.      The officers' initial entry into the house was not made for the purpose of preserving

───────────────────

[7] It is unclear from the hearing testimony whether the officers had to open the closet.

evidence.

74.     Lind then called Detective Kyle Hartsock with the Bernalillo County Sheriff's Office to prepare a search warrant for the controlled substances, drug paraphernalia, and child pornography observed during the officers' search for persons needing emergency help.  See id. at 80:10-83:16 (Rees, Lind); id. at 212:11-23 (Rees, Hartsock).

75.     Hartsock arrived at the residence to take a physical description for purposes of the search-warrant application.  See id. at 212:18-24 (Hartsock); id. at 226:7-11 (Hartsock).

76.     Hartsock noticed a truck registered to "AccuStripe" parked in a dead-end cul-de-sac near the property and placed a telephone call to "AccuStripe" to learn who primarily drives the vehicle.  See Affidavit for Search Warrant at 4 (dated April 16, 2009), filed September 21, 2009 (Doc. 23-4).

77.     In the meantime, Martinez arrived home.  See Tr. at 219:9-20 (Rees, Hartsock); Affidavit for Search Warrant at 4.

78.     Officers transported Martinez to the John Price Law Enforcement Center at 400 Roma NW, Albuquerque, New Mexico, for an interview with Hartsock.  See Tr. at 219:9-20 (Rees, Hartsock); Affidavit for Search Warrant at 4.

79.     After he was advised of his Miranda[8] rights, Martinez indicated that he did not want an attorney and agreed to speak with Hartsock.  See Tr. at 219:21-220:7 (Rees, Hartsock); Government Exhibit 3.

80.     Martinez admitted the drugs in the house were for personal use, and that the officers

---

[8] Miranda v. Arizona, 384 U.S. 436, 444 (1966)("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

would find approximately two ounces of marijuana and a small amount of cocaine.  See Tr. at 220:18-221:6 (Rees, Hartsock); Affidavit for Search Warrant at 4.

81.     Martinez also admitted he had dozens of pornographic videos and as many as four that involved him having oral sex with a sixteen-year-old male approximately twenty years ago. See Tr. at 221:7-21 (Rees, Hartsock); Affidavit for Search Warrant at 4.

82.      Martinez provided a false name of the sixteen-year-old male.  Compare Affidavit for Search Warrant at 4 (testifying that Martinez stated that the 16-year-old child's name is Eric) with Detention Tr. at 46:20-23 (Loman, Hartsock)(testifying that the 16-year-old child's name is Eddie).

83.     Hartsock used the information that he had received, including the items seen in plain view and Martinez' statements, to secure a search warrant from the Honorable Albert S. Murdoch, District Judge, Second Judicial District, Bernalillo County.  See Tr. at 222:13-21 (Rees, Hartsock); Affidavit for Search Warrant; Search Warrant at 1 (dated April 16, 2009), filed September 21, 2009 (Doc. 24-3).

84.     The evidence that the officers saw at the residence provided probable cause for the later acquired search warrant.  See Tr. at 222:13-21 (Rees, Hartsock); Affidavit for Search Warrant at 1-5; Search Warrant at 1.

85.     The authorized search warrant permitted seizure of drugs, drug paraphernalia, and videos and photographs containing child pornography from Martinez' residence.  See Tr. at 221:25-222:8 (Hartsock); Search Warrant; Affidavit for Search Warrant at 1-2; Detention Tr. at 26:25-27:6 (Rees, Hartsock).

86.     The officers seized mini cassettes, VHS tapes, camcorders, Polaroid pictures, marijuana, pipes, and other drug paraphernalia pursuant to this warrant.  See Tr. at 222:23-223:4

(Rees, Hartsock); Detention Tr. at 28:9-29:19 (Rees, Hartsock); Government Exhibit 4.

87.     Hartsock reviewed the evidence and discovered ten VHS videos, twelve 8 mm videos, four mini DVDs, and twenty-nine Polaroid photographs depicting a minor engaged in sexually explicit conduct.  See Detention Tr. at 24:7-34:8 (Rees, Hartsock).

88.     Hartsock later identified one of the photographed child victims and interviewed him regarding his sexual abuse that occurred for eleven years.  See id. at 37:24-39:17 (Rees, Hartsock).

89.     Hartsock's search warrant affidavit included the following information that he acquired from Lind and which Lind learned from his initial sweep of the Martinez' residence:

> At 1336 hours [Lind] and Deputy N. Kmatz were dispatched to 10 Dairy Ln, in Tijeras, NM, in reference to the Bernalillo County Sheriff's Department Communication Center receiving a 911 call that was an open line, where only static was heard on the line, and no one responded.  The line was disconnected and called back by the dispatcher, and no one answered the telephone.  Sergeant Lind and Deputy Kmatz arrived at the house at 1356 hours and found the gate closed to the property, with an opening they could walk around on the side and knocked on the door to the house.  No one answered the door and they began to walk around the perimeter of the house and found a door on the second floor balcony that was not locked.  They opened the door and made announcements inside of who they were, and no one answered.  Due to the 911 call, and the standard procedure and training of the Bernalillo County Sheriff's Department they entered the residence at 1600 hours to see if anyone was inside that needed help.

> As they first searched the upstairs portion of the house, they found pornographic DVD cases on a pool table, with a camcorder on a tri-pod pointed at the pool table.  They could immediately smell marijuana in the upstairs kitchen area, and could see in a microwave window a clear plastic ziplock bag containing a large amount of marijuana.  On the kitchen counter was a red plate with a white powdery substance believed to be cocaine, and a straw and empty baggie next to it, with what appears to be residue on the baggie.  They continued searching and in an upstairs bedroom found a plate on a bed containing a small amount of marijuana, and hundreds of glass pipes commonly used to inhale and consume illicit narcotics.  On the bed there was also a box containing a large amount of DVD movie's [sic] with a stack of Polaroid pictures in the middle of them facing up.  The top picture was of a young teenage white male sitting in a chair receiving fellatio from an older Hispanic male.  In the upstairs bathroom, there is a closet connected to it and there are shelves that are open to the door, and on one of the shelves was a medium sized beige scale with a clear plastic bag containing marijuana inside

In the downstairs portion of the house on the kitchen counter was a black plate with a white powdery substance and a straw that had been cut to approximately 2-3" long, and the substance appeared to be cocaine.  Sergeant Lind also stated that there were many pornographic DVD's in the house, and of the few that were laying face up on the top of boxes, it looked to be that there were males under the age of eighteen on the covers.

He also noted that the house appeared to have only one sleeping area, which was a large bed, and there were dozens, if not hundreds of kids toys around the house, ranging from small toys to play with to video game systems.  There was also a stack of approximately twenty VHS tapes on a pool table near the door they entered that had labels on them, with hand written initials marked on the labels only.  He noticed no rooms that children lived in.

No one was found inside the residence and at that point Sergeant Lind secured the house and called me.

Affidavit for Search Warrant at 4 (emphasis added).

90.     Excluding any information that Hartsock received from Lind, Hartsock's search warrant affidavit included sufficient information to establish probable cause to search Martinez' home for child pornography, based on the following paragraph:

Joseph was brought to the John Price Law Enforcement Center at 400 Roma Rd NW and affiant spoke with him.  He stated the drugs in the house are for personal use, and that we would find approximately one to two ounces of marijuana, and a very small amount of cocaine that he had just purchased on Easter Sunday (two days ago).  He stated that he has dozens of pornographic VHS tapes that he dubbed from rentals for his personal use, and **owns at least two VHS tapes, and as many as four, that involve him having oral sex with a sixteen year old boy approximately twenty years ago (his age at that time would be approximately thirty).  He stated he also has approximately four photographs of the same sixteen year old boy doing sexual acts with him.**  He states that he has showed one of the tapes to a friend named "Ed" that he associates with at a local bar, Sidewinders, in Albuquerque.  He stated one of the tapes is labeled "STE", which stands for "Show to Ed," and the second tape is marked "ENI", which stands for "Eric and I."  He stated Eric was the name of the sixteen year old.

Affidavit for Search Warrant at 4 (emphasis added).

91.     The materials that the deputies seized during their comprehensive search of the home form the basis for the charges against Martinez.

92.     After the April 14, 2009 static 911 call, 911 dispatch received at least 8 more static 911 calls from 10 Dairy Lane.  They occurred on June 12, 2009, July 26, 2009, July 28, 2009, July 29, 2009, August 3, 2009, August 4, 2009, August 30, 2009, and September 18, 2009.  See Defendant's Exhibits H, I.

93.     The April 14, 2009 call was the first 911 call to originate from 10 Dairy Lane since the year 2000.  See Tr. at 223:5-20 (Rees, Hartsock).

94.     Since April 14, 2009, 911 calls from 10 Dairy Lane have become a chronic problem.  See Rees Letter at 4.

## PROCEDURAL BACKGROUND

A federal Grand Jury indicted Martinez with two counts of Production of a Visual Depiction of a Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2251(a) and 2256.  See Indictment at 1-2, filed August 25, 2009 (Doc. 1).  Martinez moves the Court to suppress all evidence seized inside his home, contending that Lind and Kmatz executed the search of his home in violation of the Fourth Amendment of the United States Constitution.  See Motion at 1.  In the Brief in Support of Defendant's Motion to Suppress, Martinez again asks the Court to suppress all evidence seized inside his home.  See Brief in Support of Defendant's Motion to Suppress at 1, filed September 9, 2009 (Doc. 18)("Martinez' Brief").

On September 21, 2009, the United States responded to Martinez' motion, alleging: (i) the emergency-aid exception to the warrant requirement justified the initial entry into Martinez' residence; and (ii) the search in which the police seized its evidence was made in good-faith reliance on a warrant that appeared to be based on probable cause.  See United States' Response to Defendant's Motion to Suppress (Docs. 17 and 18) at 6-19, filed September 21, 2009 (Doc. 23)("Response").  The United States requests that the Court deny Martinez' motion to suppress.  See

Response at 19.  In his Reply, Martinez reiterates his request that the Court suppress all evidence seized as a result of the allegedly unlawful search.  See Defendant's Reply to Government's Response to Defendant's Motion to Suppress at 4, filed September 29, 2009 (Doc. 25).

The Court held a hearing on October 29, 2009.  During the hearing, three witnesses testified for the United States: Lind and Kmatz, who performed the initial sweep of Martinez' house, and Hartsock, who sought the search warrant and performed the second search of the house.  Lind and Kmatz both testified as to the facts and circumstances surrounding the static 911 call from Martinez' telephone and the initial sweep of his home.  See Tr. at 46:5-93:25 (Rees, Lind); id. at 173:11-188:25 (Torrez, Kmatz).  They testified generally that they were responding to a 911 call and that the call, the lack of an answer when they knocked and announced their presence, the disheveled condition of the house's interior, and the presence of an unlocked back door were the factors that they believed created exigent circumstances and warranted a warrantless search of the home.  See id. at 100:5-109:24 (Bregman, Lind); id. at 188:10-19 (Torrez, Kmatz).  Both officers conceded that (i) if there had been no unlocked door, they would not have entered the home; and (ii) that officers are trained that, any time a 911 call is accompanied by an unlocked door, the officers may enter the home to ensure the safety of anyone inside.  See id. at 109:15-110:4 (Bregman, Lind); id. at 197:6-199:8 (Bregman, Kmatz); id. at 202:4-14 (Bregman, Kmatz).  Lind also conceded that they treated all 911 calls, including hang-up and static 911 calls, equally, see id. at 161:8-12 (Lind), so no matter what type of 911 call they receive, if they also find an unlocked door in the home, they believe they are authorized to enter the home.  Hartsock first testified about what Lind and Kmatz had done, based on what Lind and Kmatz told him they had done.  See id. at 212:17-218:4 (Rees, Hartsock).  Next, he testified about the conversation that he had with Martinez wherein Martinez waived his Miranda rights, and confessed to the presence of marijuana, cocaine, and child pornography inside

-19-

his home.  See id. at 218:5-221:24 (Rees, Hartsock).  He then testified about the process of obtaining the search warrant and executing the warrant-authorized search of Martinez' house.  See id. at 221:22-223:4 (Rees, Hartsock).  Finally, he testified that, after doing independent research, he discovered that the April 14, 2009 call was the first 911 call to originate from 10 Dairy Lane since the year 2000.  See id. at 223:5-23 (Rees, Hartsock).

During the hearing, counsel for Martinez objected to testimony from Hartsock about his involvement in the whole incident.  See id. at 208:10-23 (Bregman).  Martinez appears to ask this Court to make its decision based solely on whether the initial sweep of Martinez' home was constitutional.  Moreover, Brad Hall, attorney for Martinez, insisted that the Court should not pass upon the propriety of Martinez' conversation with Hartsock.  See id. at 218:12-15 (Hall).  Mr. Hall told the Court that he expected to file another series of motions seeking to exclude that conversation. See id. at 218:23-219:2 (Hall).  For that reason, the Court will, for the purposes of this motion only, assume that there is no concern as to the legality of Martinez' conversation with Hartsock.

After the hearing, the parties submitted a series of letters.  The first, dated November 2, 2009, was from Ms. Rees.  It directed the Court's attention to the recently decided case of Herring v. United States, 129 S. Ct. 695 (2009), and suggests that this case changes the standard by which the Court should review the United States' argument that the good-faith exception to the exclusionary rule applies to this case.  See Letter from Charlyn Rees to the Court (dated November 2, 2009), filed November 2, 2009 (Doc. 38).  Next are a series of letters regarding static 911 calls originating from the Martinez residence after the initial April 14, 2009 call.  See Defendant's Exhibit H; Letter from Charlyn Rees to the Court (dated November 3, 2009), filed November 3, 2009 (Doc. 39); Rees Letter at 1.  Finally and most recently, Eric Loman, attorney for Martinez, submitted a letter brief and a recent news report regarding the prevalence of "phantom 911 calls" originating

from homes in the East Mountains, where Martinez' house is located.  Loman Letter at 1.

## RELEVANT LAW OF SEARCH AND SEIZURE

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled by Mapp v. Ohio, 367 U.S. 643 (1961).

"[T]he Fourth Amendment protects people, not places," and the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the particular place searched is a "constitutionally protected area."  Katz v. United States, 389 U.S. at 351.  Rather, the inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable.  See Katz v. United States, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); id. at 361 (Harlan, J., dissenting)("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").  There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from

unreasonable governmental intrusion.'"")(quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)); <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."); <u>Manzanares v. Higdon</u>, 575 F.3d 1135, 1142-43 (10th Cir. 2009); <u>United States v. Najar</u>, 451 F.3d 710, 713-14 (10th Cir. 2006).

### 1.   **Timing of the Warrant Requirement: Before the Search.**

In most cases, the Fourth Amendment's core requirement of reasonableness is a determination of probable cause by a neutral and detached magistrate, and the issuance of a warrant "particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's warrant guarantee is not absolute, but a warrant is generally required to enter a house unless police reasonably believe an emergency exists that makes it infeasible to obtain a warrant.  <u>See</u> <u>United States v. Gambino-Zavala</u>, 539 F.3d 1221, 1225 (10th Cir. 2008).  In other words, as the United States Court of Appeals for the Tenth Circuit has recently put it, the Fourth Amendment's warrant requirement is to "buffer[] investigatory zeal with judicial oversight."  <u>United States v. Najar</u>, 451 F.3d 710, 714 (10th Cir. 2006).  It is only in very particular circumstances that a search without a warrant is deemed reasonable.

Furthermore, where a warrant is necessary -- which is, again, in most cases -- the police must obtain it <u>before</u> the challenged search, not afterwards:

> Searches conducted without warrants have been held unlawful notwithstanding facts unquestionably showing probable cause, for the Constitution requires that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police.  Over and again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.

<u>Katz v. United States</u>, 389 U.S. at 356-57.  The Supreme Court has commented that allowing an

after-the-fact analysis of the facts and circumstances to determine whether there was probable cause supporting a warrantless search or seizure "bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment."  Katz v. United States, 389 U.S. 347, 358 (1967)(quoting Beck v. Ohio, 379 U.S. 89, 96 (1964)); Wong Sun v. United States,  371 U.S. 471, 481-82 (1963) ("The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause.").

The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. 347, 357 (1967)); Payton v. New York, 445 U.S. at 586 ("Searches and seizures inside a home without a warrant are presumptively unreasonable.").

## 2.   The Exigent-Circumstances/Emergency-Aid Exception to the Warrant Requirement.

Over time, courts have recognized the changing role of law enforcement.  Law enforcement is no longer tasked with the sole function of conducting criminal investigations.  Police are now also "expected to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, and individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and

provide other services on an emergency basis." W. Lafave, <u>Search and Seizure: A Treatise On the</u>

<u>Fourth Amendment</u> § 6.6, at 451 (4th ed. 2004). As then-Judge and later Chief Justice Warren

Burger recognized, police officers must be given the authority and flexibility to act quickly when

performing their duties, even on limited information, when human life is at stake:

> [A] warrant is not required to break down a door to enter a burning home to rescue
> occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an
> injured person. The need to protect or preserve life or avoid serious injury is
> justification for what would be otherwise illegal absent an exigency or emergency.
> Fires or dead bodies are reported to police by cranks where no fires or bodies are to
> be found. Acting in response to reports of 'dead bodies,' the police may find the
> 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But
> the business of policemen and firemen is to act, not to speculate or meditate on
> whether the report is correct. People could well die in emergencies if police tried to
> act with the calm deliberation associated with the judicial process. Even the
> apparently dead often are saved by swift police response.

<u>Wayne v. United States</u>, 318 F.2d 205, 212 (D.C. Cir. 1963). That no victims are found, or that the

information ultimately proves to be false or inaccurate, should not render police action any less

lawful in these circumstances. <u>See</u> <u>id.</u> at 212.

To lawfully enter a home, police officers need either a warrant or some exception to the

warrant requirement. One important exception to the warrant requirement is the presence of exigent

circumstances, such as the presence of evanescent evidence or an emergency requiring the officer's

aid. <u>See</u> <u>Kirk v. Louisiana</u>, 536 U.S. 635, 638 (2002) (holding that, to enter a home, "police officers

need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry

into a home."); <u>Manzanares v. Higdon</u>, 575 F.3d at 1142-43 (10th Cir. 2009) ("[E]ven when a felony

has been committed and there is probable cause to believe that incriminating evidence will be found

within a home, police may not enter without a warrant absent exigent circumstances.")(citing <u>Groh</u>

<u>v. Ramirez</u>, 540 U.S. 551, 559 (2004))(internal quotes omitted). The government generally bears

the burden of proving the court should apply the exigent-circumstances exception to the warrant

requirement.  See United States v. Najar, 451 F.3d at 717 (citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citing United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)).  Furthermore, what constitutes an exigent circumstance is "highly circumscribed."  Manzanares v. Higdon, 575 F.3d at 1142-43 (citing Georgia v. Randolph, 547 U.S. 103, 117 n.6 (2006)).

In Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court instructed: "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  Mincey v. Arizona, 437 U.S. at 392.  The Tenth Circuit, in United States v. Najar, set forth a two-part test for determining whether there are exigent circumstances present in an emergency-aid situation: "[O]ur test is now two-fold, whether (1) the officers have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  451 F.3d at 718.  See Bringham City, Utah v. Stuart, 547 U.S. 398, 403, 406 (2006); Mincey v. Arizona, 437 U.S. at 392 (1978); United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004.  In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause.  See United States v. Najar, 451 F.3d at 718.

Application of the exigent-circumstances exception, which justifies an officer's entry, should be judged on a case-by-case basis.  See Graham v. Connor, 490 U.S. 386, 397 (1989)(commenting that, for Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in the particular circumstances confronting the officer at the time); Brigham City, Utah v. Stuart, 547 U.S. 398,  404 (2006)("An action is 'reasonable' under the Fourth Amendment, regardless of the

individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'")(quoting <u>Scott v. United States</u>, 436 U.S. 128, 138 (1978)).  The standard for determining whether entry was justified is one of objective reasonableness -- the officers' subjective intent is not controlling.  <u>See Brigham City, Utah v. Stuart</u>, 547 U.S. at 404

     For instance, in <u>Bringham City, Utah v. Stuart</u>, officers observed an altercation breaking out through a closed screen door.  <u>See</u> 547 U.S. at 400.  The officers saw two adults attempting to restrain a juvenile.  <u>See id.</u>  When the juvenile broke free, he punched one of the adults in the face, causing the adult to spit blood into a nearby sink.  <u>See id.</u>  At that time, one officer opened the screen door and announced his presence.  Nobody noticed, so the officer stepped inside and again, more loudly, announced his presence.  <u>See id.</u>  At that time the altercation slowed and eventually ceased.  <u>See id.</u>  The Supreme Court of the United States held that, "regardless of the individual officer's state of mind, . . . the officers' entry here was plainly reasonable under the circumstances," because "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning."  <u>Id.</u> at 405-06.  Furthermore, the officer's "manner of . . . entry was . . . reasonable."  <u>Id.</u> at 406.  In making this determination, the Supreme Court considered the officers' primary motivation, which was a desire to save lives and property.  <u>See id.</u> at 404.  The Supreme Court also determined the officers' manner of entry was reasonable because they announced their presence through the screen door, which the Court found equivalent to knocking to alert the occupants of their presence.  <u>See id.</u> at 406-07.

     **3.     911 Calls as an Exigent Circumstance Demonstrating that Someone Needs Emergency Aid.**

     Many courts recognize the unique importance of 911 calls when assessing whether law enforcement was authorized to enter a residence under the exigent-circumstances/emergency-aid

exception.  As the Untied States Court of Appeals for the Eleventh Court has noted: "911 calls are the predominant means of communicating emergency situations."  United States v. Holloway, 290 F.3d 1331, 1339 (2002)(citing United States v. Richardson, 208 F.3d 626, 640 (7th Cir. 2000)("A 911 call is one of the most common and universally recognized means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.")).  "Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior."  United States v. Holloway, 290 F.3d at 1339.

        a.      **Non-binding cases.**

Some courts have held that a hang-up or open-line 911 call is a legitimate justification for entry into a residence under the emergency-aid exception.  The parties directed the Court to two cases that the Court has found to be particularly analogous and worthy of individual treatment. Hanson v. Dane County, 599 F. Supp. 2d 1046 (W.D. Wis. 2009), provides the most liberal example. There, the Honorable Barbara B. Crabb, United States District Judge for the Western District of Wisconsin, recognized that, "[b]y itself, a 911 call may be enough to support a warrantless search under the exigent circumstances exception."  Id. at 1053.  Hanson v. Dane County involved a hang-up call to a 911 dispatcher in Dane County, Wisconsin.  See id. at 1051.  The dispatcher tried to call the number back, but nobody answered.  See id.  At that point, the dispatcher sent officers to the address from which the call came to investigate.  See id.  When the officers arrived, the garage was open, and the officers entered the garage and spoke with the plaintiff, who said that he had an argument with his wife and that she dialed 911.  See id.  When the officers talked with the wife, she admitted to calling 911 but stated that she could not remember what the fight with her husband was about.  See id.  The officers testified that the wife appeared nervous and upset.  See id.  When the wife mentioned that there were two children in the house, the officers insisted on checking on them.

See id. at 1051.  After about an hour of questioning, the plaintiff told the officers that his wife might

have called 911 because he "bumped" her in the kitchen during their argument.  Id. at 1051-52.  At

that point, the officers arrested the plaintiff for domestic violence.  See id. at 1052.

The plaintiff, Mr. Hanson, sued Dane County and the deputy sheriffs under 42 U.S.C.

§ 1983, asserting various constitutional violations, including unlawful entry into his home.  Hanson

v. Dane County, 599 F. Supp. 2d at 1049-50.  Judge Crabb agreed with Dane County that the totality

of the circumstances would "lead a reasonable and experienced law enforcement officer to believe

that someone inside the premises required immediate assistance," and that "the undisputed facts

show that exigent circumstances existed to allow a warrantless entry into plaintiff's home."  Id. at

1053.  Judge Crabb reasoned:

> In this case[,] defendants did not have specific information about the call, but that
> did not diminish their need to investigate further.  If anything, a 911 hang-up call
> with an unanswered return call from the 911 dispatcher may present even more
> reason to believe that someone inside the residence is in immediate need of
> assistance.  An unanswered 911 return call suggests that someone in the residence
> is injured or otherwise incapacitated so as to be unable to answer the return call.

Hanson v. Dane County, 599 F. Supp. 2d at 1053.  She therefore concluded that the "defendants

were justified in entering plaintiff's home, even before they learned that plaintiff had an argument

with his wife and that his wife had dialed 911."  Id.

In United States v. Jenkins, 329 F.3d 579 (2003), the United States Court of Appeals for the

Seventh Circuit found that a warrantless entry and protective sweep was authorized because of a 911

call.  See 329 F.3d at 582.  United States v. Jenkins, however, included additional factors.  First of

all, the 911 call was ambiguous whether the emergency was an assault that had already occurred or

was an assault in progress; the officer thus reasonably treated the situation as an assault in progress.

See id. at 580.  Furthermore, when the officer arrived at Jenkins' home, the door was open about

eight inches and the officer heard a noise coming from inside "like a person standing up and falling down." Id. The Seventh Circuit found that "exigent circumstances justified the entry." Id. at 581. "Police received a 911 emergency call of an assault, possibly in progress. Such calls, by themselves, can be enough to support warrantless searches under the exigent circumstances exception, particularly where the caller identified himself." Id. It therefore appears that, in the Seventh Circuit, a 911 call notifying the police of an assault in progress might be sufficient to justify application of the exigent-circumstances exception, but an assault in progress call plus an open door and a mysterious sound definitely is.

### b.  The Tenth Circuit -- United States v. Najar.

The most recent decision from the Tenth Circuit on 911 calls and the exigent-circumstances exception to the warrant requirement is United States v. Najar. In United States v. Najar, a police dispatcher received a hang-up 911 call. See 451 F.3d at 712. The dispatcher made several attempts to call back, but, each time, the call was answered and then hung up again without a word. See id. Officers were dispatched to the address and, when they arrived, they knocked and announced their presence. See id. Nobody answered. See id. One of the officers, however, could see that there was a person moving around inside that would walk to the door, see who was outside, but not answer. See id. Eventually, the officers convinced that person -- the homeowner, Richard Najar -- to open the door. See id. He denied making the 911 call and said that nobody else was in the home. See id. at 712. Concerned that Najar was lying and that somebody inside the home needed their assistance, the officers entered the home over Najar's objection. See id. While inside, the officers found an unharmed woman on the bedroom floor and a shotgun leaning against the wall. See id.

The United States charged Najar with being a felon in possession of a firearm. He sought to suppress the evidence based on the officers' illegal entry. See id. The district court denied the

motion, and Najar appealed.  See id.  The Tenth Circuit set down a two-part test for determining

when police officers can enter a home, without probable cause or a warrant, based on the exigent

circumstance that someone inside is in need of emergency assistance.  In analyzing "whether the risk

of personal danger created exigent circumstances," a court should ask "whether (1) the officers have

an objectively reasonable basis to believe there is an immediate need to protect the lives or safety

of themselves or others, and (2) the manner and scope of the search is reasonable."  Id. at 718.  In

determining whether the officers were faced with an "immediate need" for their assistance, a court

is to be "'guided by the realities of the situation presented by the record' from the viewpoint of

'prudent, cautious, and trained officers.'"  Id. at 718-19 (quoting United States v. Anderson, 154

F.3d 1225, 1233 (10th Cir. 1998)).  The Tenth Circuit then implied that a search is reasonable in

manner and scope if the officers "d[o] not attempt to search any place beyond the locations where

a victim might likely be found" and "confine[] the search to only those places inside the home where

an emergency would reasonably by associated."  United States v. Najar, 451 F.3d at 720.  The Tenth

Circuit found that the officers in United States v. Najar had the necessary reasonable basis to believe

someone inside needed their help, and that they executed a search that was reasonable in manner and

scope.  See id. at 720.

Also noteworthy is that, generally, a warrantless entry under the exigent-circumstances

exception requires probable cause and exigent circumstances.  See Kirk v. Louisiana, 536 U.S. at

638; Manzanares v. Higdon, 575 F.3d at 1142-43.  The Tenth Circuit, however, appears to have

recognized a subset of exigent-circumstances cases -- what the Court refers to as "emergency-aid"

cases -- that do not require probable cause.  See United States v. Najar, No. CR 03-0735, 2004 WL

3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.) aff'd 451 F.3d 710 (10th Cir. 2006)("For

probable cause in the usual [evidence-of-crime] sense not to be needed, the police must be

responding to a true emergency rather than a crime, <u>and</u> the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury.")(emphasis in original).  In the Tenth Circuit's opinion in <u>United States v. Najar</u>, the Tenth Circuit held that the exigent-circumstances exception to the warrant requirement authorized a warrantless police entry in an emergency-aid situation without a showing of probable cause.  In so doing, the Tenth Circuit noted that the Supreme Court in <u>Brigham City, Utah v. Stuart</u>, which was determining "whether the risk of personal danger created exigent circumstances," did not "require probable cause in <u>this type</u> of exigent circumstances."  <u>United States v. Najar</u>, 451 F.3d at 718 (emphasis added).  The following year, the Tenth Circuit again expressed that the general rule is that an officer needs exigent circumstances plus probable cause to make a warrantless entry into a private home, unless the exigent circumstance is the need for emergency aid:

> [T]he sole question in this case is, viewing the record testimony without the affidavit, whether the officers had <u>both</u> probable cause and exigent circumstances justifying not only their warrantless entry but also their seizure. The Supreme Court has made clear, however, that police may enter a home without a warrant where they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.

<u>West v. Keef</u>, 479 F.3d 757, 758 (10th Cir. 2007)(emphasis added).  In other words, if the officers are able to establish an objectively reasonable basis to believe that someone inside the home is in need of their assistance, the officers need not also have probable cause to justify entry.

## THE EXCLUSIONARY RULE

If the police acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an exception to the exclusionary rule applies.  <u>See</u> <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a

criminal proceeding against the victim of the illegal search and seizure.").  The rule also demands exclusion of evidence that was obtained as a but-for result of the illegal search, unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no longer clings to it.  See Wong Sun v. United States, 371 U.S. at 484 ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").  But, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct. 695, 702 (2009).  Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements," suppression is not automatic and "any marginal deterrence" from suppression is often insufficient.  Id. at 702, 704.  "Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  United States v. Leon, 468 U.S. 879, 906 (citing Illinois v. Gates, 462 U.S 212, 223 (1983))(internal quotes omitted).

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920)).  The Tenth Circuit has acknowledged the rule as follows:

> [A] defendant may . . . suppress any . . . evidence deemed to be "fruit of the poisonous tree," (i.e., evidence discovered as a direct result of the unlawful activity),

by showing the requisite factual nexus between the illegality and the challenged evidence. Once the defendant meets this burden, the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree. According to the Supreme Court, the overriding issue in "fruits" cases is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006)(internal citations omitted).

Though the rule is simply stated, courts have been trying to hash out its scope for many years.

Obviously, there exists a great tension in the rule. The illegal search often results in reliable, probative, and otherwise-unobtainable evidence of the individual's guilt. Sometimes the result is that all evidence in a case must be suppressed, even though the defendant's guilt is almost certain, because all of the evidence is tainted by the unconstitutional search. In such circumstances, the individual often cannot be convicted of the crime of which he is clearly guilty. The Supreme Court has recognized time and time again, however, that limiting the powers of law enforcers and the concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth Amendment's protections. As Justice Stevens noted in his concurring and dissenting opinion in United States v. Leon:

It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt. But that price is one courts have often been required to pay to serve important social goals. That price is also one the Fourth Amendment requires us to pay, assuming as we must that the Framers intended that its strictures "shall not be violated."

United States v. Leon, 468 U.S. at 979 (Stevens, J., concurring and dissenting). See Kolender v. Lawson, 461 U.S. 352, 355 (1983)("The price of [law-enforcement] effectiveness, however, is intrusion on individual interests protected by the Fourth Amendment."); United States v. Leon, 468

-33-

U.S. at 941 (Brennan, J., dissenting)("It is the loss of that evidence that is the 'price' our society

pays for enjoying the freedom and privacy safeguarded by the Fourth Amendment.").

> [The exclusionary] rule is based upon very strict requirements designed to narrow
> the occasions upon which officers can make searches and seizures without judicial
> warrant.  Unquestionably its application will now and then permit a guilty person to
> escape conviction because of hasty or ill-advised action on the part of enforcement
> officers.  But the same may be said of the requirements of the Fourth Amendment
> which the exclusionary rule was fashioned to implement.  The framers of the Fourth
> Amendment must have concluded that reasonably strict search and seizure
> requirements were not too costly a price to pay for protection against the dangers
> incident to invasion of private premises and papers by officers, some of whom might
> be overzealous and oppressive.

United States v. Rabinowitz, 339 U.S. 56, 67-68 (1950)(Black, J., dissenting), overruled in part by

Chimel v. California, 395 U.S. 752 (1969).  While each person is entitled to their own opinion

whether, in a given fact situation, the police have a right to enter a home, the Constitution of the

United States and the case law interpreting it reveal that the government's right to interfere in the

lives of its citizens is highly circumscribed.  The exclusionary rule is strictly enforced to ensure that

governmental agents do not overstep those bounds.

At one point it appeared as though the exclusionary rule was part and parcel of the Fourth

Amendment, mandated by the language of the amendment itself.  See Mapp v. Ohio, 367 U.S. at

650-51 (discussing the exclusionary rule, "which decades before had been posited as part and parcel

of the Fourth Amendment's limitations upon federal encroachment of individual privacy"); Weeks

v. United States, 232 U.S. 383, 393 (1914)("If letters and private documents can . . . be seized and

held and used in evidence against a citizen accused of an offense, the protection of the 4th

Amendment, declaring his right to be secure against such searches and seizures, is of no value, and,

so far as those thus placed are concerned, might as well be stricken from the Constitution.").  The

Supreme Court corrected that misconception in later cases, explaining that the exclusionary rule was

a judicially created remedy to punish and deter police misconduct in the only effective way -- by eliminating the incentive to cross constitutional boundaries in search of evidence.  See United States v. Calandra, 414 U.S. 338, 348 (1974) ("In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.").  With the exclusionary rule declared a judicially created remedy, the Supreme Court was free to craft exceptions in cases where it concluded that the exclusion of the challenged evidence would not further the rule's deterrent function.

      **1.**      **The Good-Faith Exception to the Exclusionary Rule.**

At this point, there are a number of exceptions to the exclusionary rule, but only one that is relevant to this case -- good-faith reliance on a warrant that is later determined to be invalid. In United States v. Leon, the Supreme Court was faced with the question whether to create an exception to the exclusionary rule when a police officer obtained evidence through the use of a warrant that he or she mistakenly thought was supported by probable cause.  See United States v. Leon, 468 U.S. at 905.  In short, the Supreme Court noted that excluding evidence that was obtained pursuant to a warrant that the officer reasonably thought to be valid would not deter police misconduct, because the officers affected were attempting to comply with the Fourth Amendment. See 468 U.S. at 918-19.  It further noted that, when a warrant is issued on something less than probable cause, the person whose conduct the law wishes to deter is that of the issuing judge, and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See id. at 916-17.  The Supreme Court therefore concluded that a court need not suppress evidence seized pursuant to a facially valid warrant that later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See id. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a

warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant.  See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).  "[T]he suppression of evidence obtained pursuant to a warrant should be ordered only in those unusual cases in which exclusion will further the purposes of the exclusionary rule[.] Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).

**2.      Warrants Based on Illegally-Obtained Information.**

When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception.  Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed.  If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).

-36-

3.      United States v. Herring.

Last term, the Supreme Court decided a case that may have changed the standard for the good-faith exception to the warrant requirement.  In Herring v. United States, 129 S. Ct. 695 (2009), officers arrested Herring pursuant to an arrest warrant listed in the Dale County warrant database. See 129 S. Ct. at 698.  In the search incident to that arrest, officers found drugs and a gun on Herring's person.  See id.  Herring was then indicted on federal gun and drug possession charges. See id. at 699.  It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had never been updated to reflect that.  See 129 S. Ct. at 698.  So, asserting that it was found as a result of an unlawful arrest, Herring sought to suppress the evidence found in the search.  See id. at 699.  The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed.  See id.

The Supreme Court likewise affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule.  The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.  See Herring v. United States, 129 S. Ct. at 700.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Id. at 701 (citing United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct.

at 702.

The Supreme Court in <u>Herring v. United States</u> then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  <u>Herring v. United States</u>, 129 S. Ct. at 703-04. Thus, it appears that, if the police make a negligent administrative error that results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

## <u>ANALYSIS</u>

Martinez argues that the Court should suppress all evidence seized from his home because Lind and Kmatz violated his Fourth Amendment rights when they entered his home on April 14, 2009.  He contends that, because the officers did not have a reasonable basis for believing that someone on the inside was injured or otherwise in need of assistance, they unlawfully entered his home. <u>See</u> Martinez' Brief at 2-3, 6-7.  He further argues that, if Lind's and Kmatz' entry into his home was constitutional, they exceeded the permissible scope of a search under the exigent-circumstances exception to the warrant requirement. <u>See id.</u> at 3-6.  The United States insists that Lind and Kmatz were justified in entering the home because they reasonably believed that someone inside was in need of emergency assistance based on: (i) the static 911 call; (ii) the observation that the home was messy; and (iii) the unlocked second-story back-door. <u>See</u> Response at 6-14.  It also asserts that the scope of the search, once Lind and Kmatz were inside, was reasonable. <u>See id.</u> at 14-19.  The United States further insists that the search in which it obtained its evidence was pursuant to a warrant that appeared to be based on probable cause, that the search was therefore

lawful under United States v. Leon, and that the Court should admit all of the evidence, even if the search warrant was defective.  See Response at 17-19 (citing United States v. Leon). Because the Court finds that the officers did not have an objectively reasonable basis for believing that there was an immediate need to protect the lives or safety of someone in Martinez' home, the officers' entry into the house was unconstitutional.  Because, however, the affidavit of Detective Hartsock in support of the search warrant, even with the information obtained by Lind and Kmatz excluded,  still establishes probable cause, the Court will not exclude the United States' evidence at this time.[9]

## I.   THE OFFICERS HAD INSUFFICIENT EVIDENTIARY BASIS TO CONCLUDE THAT THE EXIGENT-CIRCUMSTANCES EXCEPTION TO THE WARRANT REQUIREMENT APPLIED.

The United States submits that the officers in this case lawfully entered Martinez' residence pursuant to the exigency-circumstances/emergency-aid exception to the warrant requirement.  "As long as the officers reasonably believe an emergency exists, whether through a 911 call or some alternative source, that necessitates a warrantless search and their actions should be upheld as constitutional."  Response at 9.  The Court does not disagree with that legal principle.  The circumstances confronting the officers at 10 Dairy Lane, however, did not provide them with an objectively reasonable basis to conclude that someone was in the house, nor that someone in the house was in need of immediate protection or aid.  Moreover, the officers did not, in getting to the house, treat the situation as if someone was in immediate need of aid.  Accordingly, the United States has not established that the exigent-circumstances exception justified a warrantless entry into the house.

---

[9] The Court again notes that Martinez requested that the Court not decide whether the conversation between Hartsock and Martinez -- which, in itself, establishes probable cause to issue a search warrant for the child pornography found inside -- was constitutional.  See Tr. at 218:12-15 (Hall); id. at 218:23-219:2 (Hall).

A.    THE UNITED STATES MUST PROVE THAT THE ENTRANCE AND
      SEARCH FALL WITHIN AN EXCEPTION TO THE WARRANT
      REQUIREMENT.

Analysis begins with a recognition that the police entered Martinez' home without a warrant. The United States thus bears the burden of proving that the Court should apply the exigent-circumstances exception to the warrant requirement.  "That burden is especially heavy where the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citing United States v. Anderson, 981 F.2d at 1567).  Furthermore, what constitutes an exigent circumstance is "highly circumscribed."  Manzanares v. Higdon, 575 F.3d at 1142-43 (citing Georgia v. Randolph, 547 U.S. at 117 n.6).  Bernalillo County Sheriff's Department found the evidence that underlies the charges against Martinez when they entered and searched his home without a warrant.  There is no dispute that the deputies did not have a warrant.  Without a warrant, a Fourth Amendment search is reasonable only if some exception to the otherwise-mandatory warrant requirement applies.  In this case, the United States relies on the emergency-aid exception, a subset of the "exigent circumstances" exception.  The emergency-aid exception does not apply in this case because there is inadequate evidence of the necessary exigency.

The Fourth Amendment exists to limit the degree to which, and circumstances under which, government agents can infringe upon one's person, home, and goods.  See U.S. Const. amend. IV. Particularly in the context of the home, the Supreme Court has taken the Fourth Amendment's protection most seriously.  Generally speaking, the Constitution prohibits searches of a person's home without a warrant that is based on probable cause.  See United States v. Najar, 451 F.3d at 713-14; U.S. Const. amend. IV.  The analysis in this case thus begins with the principle that police officers generally must have a validly issued warrant before entering a person's home.

That prohibition, however, is not without exceptions. See United States v. Najar, 451 F.3d

at 713-14 & n.1.  The Tenth Circuit has determined that there is an "emergency aid" component to the exigent-circumstances exception to the warrant requirement.  See id. at 714-15.  For that exception to apply and for officers to enter a dwelling without a warrant, the investigating officers (i) must have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others; and, (ii) once inside the home, must execute a search that is reasonable in both manner and scope.  See id. at 718.  See also Mincey v. Arizona, 437 U.S. at 392.  "The test is whether the circumstances, viewed objectively, justify the action."  United States v. Najar, 451 F.3d at 715.

**B.     A 911 CALL IS NOT ENOUGH -- STANDING ALONE -- TO ESTABLISH EXIGENT CIRCUMSTANCES.**

The 911 system is a way in which residents of the community can quickly and effectively contact emergency services -- police, firefighters, EMS -- when they need emergency assistance.  The parties agree, however, that the call itself cannot suffice to be the exigency that allows police to enter the home without a warrant.  There are too many other explanations for a telephone call to a 911 dispatcher in which the caller does not speak -- accident, prank, electrical anomaly, etc. -- to justify holding that a police officer may enter a person's home if the 911 dispatcher receives any call, no matter the surrounding circumstances.  See United States v. Najar, 451 F.3d at 720 n.7 ("This is not to say that a response to a 911 call will always justify a warrantless entry upon the arrival of law enforcement.");  United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000)("While we do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer, this is not that case.").

Reported judicial decisions in which officers respond to a hang-up or static 911 call are few.

But, when courts address the issue, some have suggested that the existence of an open-line 911 call may -- without more -- be enough to justify application of the exigent-circumstances exception to the warrant requirement.  See United States v. Taylor, 458 F.3d 1201, 1205 n.1 (11th Cir. 2006) (commenting in dicta that a hang-up 911 call and two call-backs in which the phone was answered and again hung up might justify warrantless entry, citing authority regarding a 911 call reporting gun shots and arguing)(citing United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002)); Hanson v. Dane County, 599 F. Supp. 2d at 1053.  Other courts, however, do not appear to have gone that far.  See Nail v. J.C. Gutierrez, No. 08-3872, 2009 WL 2240922, at *3 (7th Cir. July 28, 2009)(stating that "the [hang-up] 911 call gave the officers all the exigent circumstances they needed," but explaining the additional circumstances that truly justified entrance onto the plaintiff's curtilage); United States v. Cohen, 481 F.3d 896, 899-901 (6th Cir. 2007)(analogizing a silent 911 hang-up call to an anonymous tip and holding that such call did not create reasonable suspicion for an investigatory stop);  Johnson v. Town of Vail, Colo., No. 08-cv-00464-LTB-MJW, 2009 WL 1394263, at *5 (D. Colo. May 19, 2009)(holding that "information about a 911 hang-up, as well as a suspicious follow-up call by the dispatcher" was not sufficient to justify warrantless entry under the exigent-circumstances exception); United States v. Parker, No. CR 05-0505-PHX-NVW, 2006 WL 163562, at *3 (D. Ariz. Jan. 20, 2006)("There is no bright-line rule that any 911 call, much less a hang-up call, always justifies a warrantless emergency entry to prevent harm. The circumstances matter.").  See also Bailey v. Kennedy, 349 F.3d 731, 740 (4th Cir. 2003)(holding that a 911 call by a neighbor reporting that the plaintiff was home, intoxicated, and suicidal did not give officers probable cause to enter his home and seize him for mental evaluation, even after verifying plaintiff was home and intoxicated); Thacker v. City of Columbus, 328 F.3d 244, 254 n.2 (6th Cir. 2003)(stating that 911 call reporting an emergency justified a police response but did not necessarily

justify warrantless entry into a private home).  Moreover, not even the officers in this case thought that a single open-line 911 call was enough to justify entry into a residence.  See Tr. at 45:4-46:4 (Rees, Lind).  The Tenth Circuit has acknowledged that some 911 calls will not "justify a warrantless entry upon the arrival of law enforcement." United States v. Najar, 451 F.3d at 720 n.7.

Rather than creating a bright-line rule that all 911 calls provide a basis for an exigent-circumstances entry, the Tenth Circuit has indicated that officers must evaluate the totality of the circumstances.  Even in 911 cases, the Tenth Circuit has not said the 911 call was sufficient alone, but has indicated that it is one of the factors that the court must consider in the mix that makes up the totality of circumstances.  Instead of a bright-line rule, the Tenth Circuit has indicated that "the officers [must] have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others . . . ." United States v. Najar, 451 F.3d at 718. Thus, in the Tenth Circuit, the focus in a 911 case is not on the call, but on the officers' belief or basis of the belief that there is a need to protect lives or peoples' safety.  The Court therefore concludes that the existence of a 911 call in this case, alone, is not sufficient to provide a basis for the exigent-circumstances exception.

### C.    ALL 911 CALLS SHOULD NOT BE TREATED EQUALLY.

The range of 911 calls lie on a spectrum.  At one end of the spectrum are those frantic calls from a person inside a home who is able to say someone is attacking him or her, or a member of the family.  Such a call alone might be enough to provide a basis for the exigent-circumstances exception.  See West v. Keef, 479 F.3d at 759 ("The 911 call from Plaintiff's twelve-year-old son, which included his belief that his mother was 'going crazy,' that she was '[t]rying to kill herself,' that she was 'trying to cut her[self] with a knife' and other statements to the same effect, are, standing alone and in context, sufficient to justify the warrantless entry.").  At the other end of the

spectrum is a 911 call where there is no identifiable caller nor specified emergency.[10]  The Court believes that this latter category of calls, in which there is no identifiable caller nor specified emergency, is the least likely to justify a warrantless entry.

At probably the very limit of this spectrum is the static-only open-line call, where no one speaks and there is only static.  A static-only call is unlike a hang-up call or a call where the individual is unable to give a complete explanation of his emergency.  In the latter situation, the dispatcher and the dispatched police have a firmer basis for concluding someone at the residence called 911.  In a static-only call, however, there are other, equally plausible explanations for the call.  Bad weather or bad telephone lines are as likely to place such calls as is a person in immediate need of aid to protect his or her life.  See Tr. at 165:17-23 (Court, Lind).  The evidence is in equipoise.  The burden is thus on the United States -- and ultimately on the police at the scene -- to show that there is something more than an open-line 911 call to establish exigent circumstances.  The Court believes that static open-line 911 calls -- as opposed to hang-up calls or incomplete-information calls -- fall into the category of calls to which the Tenth Circuit alluded in United States v. Najar that do not, standing alone, justify a warrantless entry.  Thus, regardless whether other 911 calls may, in other cases, alone establish exigent circumstances, the Court does not believe the open-line 911 call in this case, without more, provides a sufficient basis for the exigent-circumstances exception.

### D.   THERE IS NO EVIDENCE IN THE RECORD THAT LIND AND KMATZ THOUGHT THAT THEIR LIVES OR SAFETY WERE IN ANY DANGER.

The Tenth Circuit in United States v. Najar stated that the exigent-circumstances exception

---

[10] The Court's spectrum excludes calls in which the caller reports an "emergency" that is not truly time-sensitive and therefore does not require immediate response.  Those are not genuine emergency calls and could not justify a warrantless entry into the caller's home under the exigent-circumstances exception to the warrant requirement.

could apply if the officers' lives or safety were in danger.  Here, the United States did not offer any evidence that the officers believed that their own lives or safety were in danger.  Neither Lind nor Kmatz testified that they felt threatened before they went inside Martinez' house.  Nor has the Court, after a careful review of the record, seen any evidence that the officers' could have had an objectively reasonable basis to believe that there was an immediate need to enter the house to protect their lives or safety.  Accordingly, the Court will analyze the applicability of the exigent-circumstances exception solely from the perspective whether the officers had an objectively reasonable basis to believe that there was an immediate need to protect the lives or safety of someone in the house.

### E.   LIND AND KMATZ DID NOT HAVE AN OBJECTIVELY REASONABLE BELIEF THAT THERE WAS A PERSON INSIDE THE HOME.

As a preliminary matter, it may seem elemental, but to be concerned about the life or safety of someone in a house, the officers must have a reasonable belief that someone is in the house.  The Court does not believe that Lind and Kmatz had an objectively reasonable belief that someone was inside the house.  From the facts known to Lind and Kmatz when they decided to enter and search the house, they could not have formed an objectively reasonable belief that anyone was inside.  The Court therefore finds that their entry into Martinez' home was unconstitutional.

When Lind and Kmatz were dispatched to 10 Dairy Lane, they were told that they were responding to an address from which the dispatcher received a 911 call that was only static.  They were also informed that the dispatcher attempted to call the number back, got no answer, and heard only more static.  Lind conceded during the hearing on this motion that he was familiar with "static 911 calls," and that he knew such calls could occur because of line problems or inclement weather, without any human action at all.  See Tr. at 99:11-22 (Bregman, Lind).  Lind also conceded that

roughly half of the open-line or hang-up 911 calls to which he has been dispatched turned out to involve no emergency.  See Tr. at 165:17-23 (Court, Lind).  From this testimony, the Court does not believe that an open-line or hang-up 911 call, standing alone, establishes an objectively reasonable basis to believe that someone is inside the home.

The Court would be more comfortable with its conclusion if Lind or Kmatz could have answered for the Court how many static -- as opposed to hang-up -- 911 calls turn out to involve no emergency.  See Tr. at 163:4-8 (Court, Lind).  The Court is confident, however, that a static 911 call is less indicative of a person placing the call than a hang-up call.  In a hang-up call, it is more clear that a human being placed the call in the first place.  No such assurance is present with static 911 calls.  That an electrical or weather anomaly can cause such calls -- and, more importantly, that it is common knowledge among officers and 911 dispatchers that electrical or weather anomalies can cause such calls -- decreases the probative value of the call in this case.  Again, the evidence is in equipoise, and the burden of proof is on the United States.

When Lind and Kmatz arrived at Martinez' home at approximately 1:56 p.m. -- in the middle of a workday when houses are often empty -- nobody was outside, and the gate to the property was closed.  See Tr. at 50:20-25 (Lind).  When they approached the front door, they repeatedly knocked and announced their presence, but nobody answered the door.  See Tr. at 56:6-23 (Rees, Lind); id. at 104:6-105:15 (Bregman, Lind); id. at 177:4-178:9 (Kmatz).  They walked around the home and peered in windows, but saw no signs of forced entry nor any people inside the home.  See Tr. at 101:17-102:25 (Bregman, Lind).  At this point, the officers still had no reasonable basis to believe that anyone was inside.

Again, the evidence was in equipoise.  It does not point clearly in one way or another.  The Court does not believe that an officer could have reached an objectively reasonable conclusion that

-46-

anyone was in the house.

The only other signs to which the officers can point to support a finding that there was "an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of . . . others," United States v. Najar, 451 F.3d at 718, came when they climbed the stairs to the second-floor deck, at the back of the house, and found a sliding-glass door. They noticed: (i) that the house appeared disheveled from the officers' view through the glass, and (ii) that the sliding glass door was unlocked, unlike every other door and window that they had thus far encountered.

These two additional facts, in the Court's view, do not provide the necessary objectively reasonable basis to believe that someone was inside the house. The Court has reviewed numerous pictures of the interior of the house, taken at a more advantageous vantage than the officers had from outside. Those images do not convince the Court that the inside of Martinez' home appeared "ransacked" or as though any sort of struggle had occurred. Although some people might think that those who keep an untidy home need assistance, officers cannot justify warrantless entry on the fact that a home appears unkempt or cluttered. The condition of Martinez' home, viewed from the outside, does not substantially increase the reasonableness of the officers' belief that someone was inside.

Similarly, that a door is unlocked does not substantially increase or decrease the likelihood that someone is on the inside. Undoubtedly, many homeowners make sure to lock all of their doors before they leave the house, concerned that some opportunistic miscreant will test the handle, realize that the door is unlocked, come in, and make off with his or her goods. On the other hand, some people -- particularly those who live in more rural or suburban areas -- feel that their neighborhood is relatively safe and do not always lock the doors when they do not expect to be gone long. And even among those who generally lock all of their doors, sometimes one gets in a hurry and forgets

to check one or more doors, one of which is unlocked.  It seems particularly likely that a second-floor balcony sliding-glass door -- which may be opened and closed more often than other doors during spring in the beautiful east mountains of Albuquerque -- would be one left unlocked.

The Court acknowledges that the fact that the door is unlocked and the house is messy, combined with the 911 call, allows for someone being present in the house.  But the facts point equally to someone not being present, especially in the middle of a work day.  With the possibilities being equal, the Court does not believe that a reasonable police officer could have formed a belief that someone was in the house when they opened the door.

    **F.**    **THE OFFICERS DID NOT FORM, NOR COULD THEY HAVE FORMED, AN OBJECTIVELY REASONABLE BELIEF THAT THERE WAS AN IMMEDIATE NEED TO ASSIST ANYONE IN THE HOUSE.**

Even if the officers could have formed a belief that someone was in the house, they did not have an objectively reasonable basis to believe that there was an immediate need to assist anyone in the house.  Indeed, the Court does not believe that the officers had a subjective belief that there was an immediate need to assist anyone in the house.  The officers did not treat the 911 call as a priority call.  They traveled to Martinez' home at the speed limit, obeyed traffic laws, and did not use their lights or sirens.  Then, when the officers got to the house, they knocked on the door and went around the perimeter of the two-story home.  The Court does not believe, on the record before it, that the officers had a subjective belief that anyone in the house was in immediate need of assistance or protection.  Rather, the officers believed that they could not eliminate the possibility that someone in the house needed immediate assistance.

Repeatedly in argument and examinations, Ms. Rees would talk about whether certain facts convinced the officers that an emergency did not exist.  See Tr. at 27:24-25 (Rees)("We have a 911 call [and] we cannot confirm that an emergency does not exist."); id. at 28:2-3 (Rees)("Still, they

-48-

are unable to confirm that an emergency does not exist."); <u>id.</u> at 28:20-21 (Rees)("They still receive no response verifying that an emergency does not exist."); <u>id.</u> at 46:24-47:1 (Rees)("Anything about the information you were given about the call, the fact that it was . . . static, make you believe no emergency existed?"); <u>id.</u> at 56:24-57:2 (Rees, Lind)("Q: . . . did you know if an emergency existed or not.  A:  No ma'am.  We at that point have to continue checking the house and assume that someone might still need aid inside the house."); <u>id.</u> at 61:8-9 (Rees, Lind)("A:  We did not hear anything.  Q:  Anything about that make you believe that an emergency doesn't exist?"); <u>id.</u> 69:3-6 (Rees)("Does the fact that you didn't see a phone off the hook, did that mean based on your training and experience that an emergency doesn't exist?"); Letter from Charlyn Rees to the Court at 2 (dated November 10, 2009)("Upon arrival, the Deputies . . . could not confirm an emergency did not exist when they knocked on the door and looked through the windows."); id. at 4 ("Based upon . . . the inability of 911 to confirm an emergency did not exist . . . entry . . . was necessary and reasonable under the emergency circumstances exception.").  The form of Ms. Rees' questioning reflects a shift of the burdens in this case -- an approach similar to that which the officers used.  The United States appears to assert that, in applying the exigent-circumstances exception to the warrant requirement, a 911 call creates a possibility that someone inside the residence requires immediate protection or aid, and that the officers are justified in entering unless and until they are somehow able to dispel that possibility.  That justification -- that the officers must enter to eliminate all possibility of emergency -- is not how the exception works.  The burden is on the United States and the officer on the scene to establish that the exigent-circumstances exception applies, and not to assume it applies and show the Court that no facts justify <u>not</u> applying it.  The Court concludes that the facts established by the evidence are insufficient to create an objectively reasonable belief that someone inside the Martinez home was in need of immediate aid, and that the search was therefore

unconstitutional.

The Court also concludes that the officers could not have an objectively reasonable basis to believe that there was a need to protect anyone in the house. The evidence did not point any more toward someone being in danger in the house than it did to someone being in the house at all. The exigent-circumstances exception requires more than a possibility; it requires an objectively reasonable basis to believe that there is a need to protect someone in the house. That objectively reasonable basis does not exist in this case.

### G. THE OFFICERS DID NOT HAVE AN OBJECTIVELY REASONABLE BASIS TO BELIEVE THAT THERE WAS AN IMMEDIATE NEED TO PROTECT THE LIFE OR SAFETY OF SOMEONE IN THE HOUSE.

For similar reasons, the Court concludes that the officers did not have a subjective belief that there was an immediate need to protect the life or safety of someone in the house, or that there was an objectively reasonable basis for such a belief. Traveling to the house and before they found the unlocked door, they did not act like anyone was in peril. The Court does not believe the messy house and unlocked door made them conclude that a person in the house was in need of assistance. The officers did not enter the house to assist someone whom they believed needed immediate assistance or to protect that person's life or safety, but to eliminate the possibility that such a situation existed.

The Court also does not believe that these officers could have had an objectively reasonable basis to believe that there was an immediate need to protect the life or safety of someone in the house. At best, the evidence was in equipoise that anyone in the house needed immediate assistance because his or her life or safety was in danger -- or, again, that anyone was in the house at all. The police must have more than a possibility; they must have an objectively reasonable basis to believe that someone in the house was in immediate need of protection of his or her life or safety. That

objectively reasonable basis for belief was not present when the officers entered Martinez' house.

The officers therefore did not have a right to lawfully enter Martinez' residence under the exigent-circumstance exception to the Fourth Amendment's search-warrant requirement.  This case is not like United States v. Najar, where officers observed a person inside the home who appeared to be avoiding police contact and who, once contact was made, denied that there was anyone else inside the home and denied making the call.  Instead, in this case, every observable fact from the outside of the home was consistent with the house being empty.  It was the middle of the day on a weekday, nobody answered when the officers knocked on the door, and the officers could not see any movement through any of the house's windows.  Furthermore, the officers were told as they were responding to the call that it was a static-line call, in which no person spoke to the dispatcher.  They knew a bad line or bad weather could cause such calls.  Nor is this case like United States v. Jenkins, where the officer was responding to a call reporting an assault in progress -- a violent crime in the midst of being committed.  The call here was nothing but static with no human voices. Although one can dream up any number of terrible emergencies that need immediate attention, the fact of the matter is that the officers had no facts upon which they could base a reasonable belief that such an emergency existed.  As Lind testified, static calls are equally likely to be nothing as they are to be an emergency.  See Tr. at 165:17-23 (Court, Lind).

What if, one might hypothesize, an assailant entered the home through the unlocked door and was able to subdue the homeowner just as he was making the 911 call?  Such a scenario is a possibility, but the Court does not believe that the facts of a static 911 call and an unlocked door justifies the investigating officers in imagining such a scenario, entering the home through that unlocked door, and sweeping the whole house for signs of human life.  The Court does not believe the ability to conjure up such possible scenarios is enough justification to enter a house without a

warrant.  Accordingly, the exigent-circumstances exception to the warrant requirement did not apply to the officers' entry into Martinez' residence.

### H.    THE OFFICERS USED A BRIGHT-LINE RULE RATHER THAN FOLLOWING COUNTY PROCEDURE OR THE FOURTH-AMENDMENT LAW REGARDING THE EXIGENT-CIRCUMSTANCES EXCEPTION.

The police must act consistent with Tenth Circuit law for entering a residence pursuant to the exigent-circumstances exception to the warrant requirement.  As the Tenth Circuit has stated, the inquiry is fact-intensive, so it must be analyzed on a case-by-case basis.  See United States v. Najar, 451 F.3d at 716.  Also, the officers did not follow their own written, internal policy about exigent circumstances.  Instead, the officers here employed an *ad hoc* bright-line rule in deciding to enter Martinez' home.  Their rule was to enter any house where: (i) there was any kind of 911 call, whether it be communicative, hang-up, or static-only; (ii) no one could be roused and brought to the door by knocking or yelling; and (iii) there was at least one unlocked door.  When pressed, both officers admitted that it was more or less a categorical rule that an open-line 911 call plus an unlocked door meant that the officers could enter to do an investigative sweep to look for persons in need of assistance.  See Tr. at 109:12-110:4, 112:8-11 (Bregman, Lind); id. at 198:21-199:5 (Bregman, Kmatz).  Lind admitted that he has, on numerous occasions, entered a residence based on a 911 static call and an unlocked door.  See Tr. at 148:15-23 (Lind).  That is not what the Tenth Circuit's rule nor the Bernalillo County Sheriff's Department policy requires.

The Tenth Circuit has eschewed bright-line rules in this area of Fourth Amendment law, and requires the officers to look at the totality of the circumstances.  Moreover, even the County's written policy avoids a bright-line rule and fairly stated the exigent-circumstances exception.  The rule allowed Deputies to enter a building when they "have a good reason to believe it is necessary to save a life or prevent injury . . . ."  Response Exhibit B, at 1, filed September 21, 2009 (Doc. 23-

3). The examples that the County gave to its Deputies of when they have a good reason -- "cries for help from inside of a building, assisting the Fire Department on a fire, to check on the welfare of the suspected abused child" -- are circumstances with heightened indicia of an emergency than are a 911 call and an unlocked door.

The Court believes that the County and, more importantly, the Supreme Court and the Tenth Circuit interpreting the Fourth Amendment, have indicated that the Deputies may not fall back on bright-line rules based on only a few factors, but must make nuanced decisions based on the totality of the circumstances.  The Court does not minimize the usefulness of bright-line rules for the police and the Court in Fourth Amendment cases, but because the exigent-circumstances exception is a highly circumscribed exception to the warrant requirement, the exception must remain flexible to address the multitude of circumstances that police face, without becoming so large that the exception swallows or seriously encroaches on the clearly textual warrant requirement.  The Court also does not minimize the burden that the lack of a bright-line rule imposes on police doing an already difficult job.  It is far easier to second guess the police in the calm of chambers after weeks of reflection than it is to be the police responding to the unknowns of a 911 call.  Nevertheless, with the honor of being a police officer is a heavy responsibility, and the two are closely related.  Officers must be indeed "prudent, cautious, and trained . . . ."  United States v. Anderson, 154 F.3d at 1233. To avoid the loss of Fourth-Amendment protections for all, police must make a nuanced analysis that takes in all of the circumstances.  As long as the police focus on the County's police and the exigent-circumstances exception's precise limitations, the Court is confident they will be able to respond to true emergencies without running afoul of the Fourth Amendment.

I.    **THE UNITED STATES CONSTITUTION HAS ALREADY STRUCK THE BALANCE BETWEEN SAFETY AND FREEDOM FROM UNREASONABLE SEARCH AND SEIZURE.**

There are, no doubt, those who would willingly sacrifice their freedom from government entry into their homes when there is an open-line 911 call, messy house, and unlocked door, if it meant an elderly or very young member of the family was rescued by police from some emergency. There is no doubt the Court's holding in this case may chill some officers from entering a house where some emergency is taking place.  There may be a loss of security in a world where police must operate within a highly circumscribed exigent-circumstances exception rather than a broader one.  Nevertheless, neither the Deputies nor the Court is free to make the balance between safety and freedom differently than do the United States Constitution and the Supreme Court.  The United States Constitution has already made that balance for the nation, and that balance is decisively in favor of the sanctity of the home, free from police entry without a warrant, except in narrow circumstances.  In cases like this one, it is often well to remember what Benjamin Franklin remarked 250 years ago, during the founding of our nation: "They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety."   J. Bartlett, Bartlett's Familiar Quotations at 227 (c). Morley & Everett eds., 1951)(citing Benjamin Franklin, Historical Review of Pennsylvania (1759)).

II.    **THE COURT NEED NOT DECIDE WHETHER, ONCE INSIDE THE RESIDENCE, THE OFFICERS EXCEEDED THE FOURTH AMENDMENT'S LIMITATIONS.**

The requirement of an objectively reasonable basis for believing that someone inside the home is in need of immediate assistance is only the first hurdle in executing a search pursuant to the emergency-aid exception to the warrant requirement.  The reasonable belief justifies entering the home, but the officer must still act appropriately once inside.  In other words, the search must be

executed in an appropriate manner and must be restricted to the appropriate scope. <u>See</u> <u>United States v. Najar</u>, 451 F.3d at 718. In this case, because the Court has concluded that the necessary reasonable belief did not justify Lind's and Kmatz' investigative sweep, the Court need not decide whether the scope of the search was excessive.

To execute a search that is not excessive in scope, officers must generally "not attempt to search any place beyond the locations where a victim might likely be found" or "where an emergency might reasonably be associated." <u>Id.</u> at 720. There are indications that Kmatz' and Lind's search was not reasonable in scope. The Court does not doubt that a five-minute sweep of a house the size of Martinez' is relatively swift, and that the officers must not have dilly-dallied long during that initial sweep. Nevertheless, the evidence and testimony presented during the hearing raises concerns that Lind and Kmatz did not appropriately restrict their search of the house.

The photographic evidence presented during the hearing, in conjunction with the officers' testimony, suggests that the officers took more than a passing glance at some of the items in the house. The officers were able to recall the titles of some of the DVDs found lying about and noticed, from their covers, and that they were pornographic in nature. They also recalled the titles of some of the DVDs found in the box on Martinez' bed, and noted that the titles indicated that they were pornographic and might have contained child pornography. Most telling, from a "glance" into a box, in which they had to lean over, they were able to see "in plain view," a Polaroid picture.[11] And they testified that, from that glance, they were able to identify that picture as an older man

---

[11] Lind admitted that he could not see the photographs in the bottom of the box without leaning over the box to peer inside. <u>See</u> Tr. at 142:16-20 (Bregman, Lind). Kmatz testified to being 6' 2" tall, the same height as Lind, <u>see</u> <u>id.</u> at 207:8-9 (Court, Kmatz), and that he could see the photographs without leaning over, <u>see</u> <u>id.</u> at 207:1-7 (Court, Kmatz). The Court finds that the officers needed to lean over to clearly see the photograph at the bottom of the box.

performing oral sex on a minor.  See Tr. at 75:15-20 (Lind); Tr. at 183:3-184:6 (Rees, Kmatz).

Again, after reviewing the photographic evidence, the Court is not convinced that a simple glance

at this photograph, given its lack of clarity and its position at the bottom of the box of DVDs, would

indicate to a viewer that it depicted any sexual content at all.  Perhaps an officer with superior visual

acuity would be able to tell that the picture depicted people or even naked people.  The Court is

concerned, however, that it might not have been obvious from a quick glance into the box that the

picture depicted two people engaging in oral sex, much less one old person and one young person,

or, more specifically, one old person and one minor.[12]  The Court is concerned that the officers may

have examined the contents of the box more closely than their testimony would lead one to believe,

and such extended investigation is outside the scope of a permissible investigative sweep under the

emergency-aid exception.  Nevertheless, because the Court has already determined that the entry

into the house was unconstitutional, the Court does not believe it is necessary to determine the other

constitutional issue presented -- whether the Deputies exceeded the permissible scope of a protective

sweep.  See Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105 (1944)("If there is one doctrine

more deeply rooted than any other in the process of constitutional adjudication, it is that we ought

not to pass on questions of constitutionality -- here the distribution of the taxing power as between

the State and the Nation -- unless such adjudication is unavoidable.").  As Justice Brandeis stated

in his concurring opinion in Ashwander v. Tennessee Valley Auth., 297 U.S. 288 (1936):

      The Court will not "anticipate a question of constitutional law in advance of the

---

[12] Although Government Exhibit 30 and 31 ostensibly both depict the box of DVDs on Martinez' bed in the state that Lind and Kmatz found it, the Polaroid photograph in the two pictures differ, as does the orientation of the photographs.  In Government Exhibit 30, the photograph appears to be propped up higher and the younger male depicted is oriented with his head toward the right-hand side of the box, whereas in Government Exhibit 31, the photograph appears to be lying flat and oriented with the younger male's head oriented toward the left-hand side of the box.

> necessity of deciding it."  Liverpool, N.Y. & Phila. Steamship Co. v. Emigration
> Commissioners, 113 U.S. 33, 39 . . . ; Abrams v. Van Schaick, 293 U.S. 188 . . . ;
> Wilshire Oil Co. v. United States, 295 U.S. 100 . . . .  "It is not the habit of the court
> to decide questions of a constitutional nature unless absolutely necessary to a
> decision of the case." Burton v. United States, 196 U.S. 283, 295 . . . .

297 U.S. at, 346-47.  See Higazy v. Templeton, 505 F.3d 161, 179, n. 19 (2d Cir. 2007)

("[P]rinciples of judicial restraint caution us to avoid reaching constitutional questions when they

are unnecessary to the disposition of a case."); UMG Recordings, Inc. v. Montoya, No. Civ 08-0489

JB/RLP, 2009 WL 1300361, at *3 (D.N.M. Jan. 30, 2009)(Browning, J.)("The federal courts try to

avoid rendering advisory opinions, particularly when they may involve constitutional issues.");

United States v. Fox, No. CR 05-772 JB, 2006 WL 4017485, at *8 n.2 (D.N.M. Oct. 29,

2006)(Browning, J.).

## III.   THERE IS NO FRUIT-OF-A-POISONOUS-TREE EVIDENCE THAT MERITS SUPPRESSION AT THIS TIME.

The Supreme Court determined long ago that one of the only ways to properly and

effectively protect a person's right to be free from unreasonable government intrusion into the home

is to prohibit the government from using the evidence obtained as a result of that unreasonable

search, even if that evidence is extremely probative of the guilt of the accused.  See Mapp v. Ohio,

367 U.S. at 652 ("The obvious futility of relegating the Fourth Amendment of [sic] the protection

of other remedies has, moreover, been recognized by this Court since Wolf.")(citing Irvine v.

California, 347 U.S. 128, 137(1954)).  Implicit in this rule is that to use any other penalty would

leave law-enforcement officials weighing the risk of punishment against the probability of finding

evidence of guilt, gauged by their own intuition or "hunches."  Rakas v. Illinois, 439 U.S. 128,

168-69 (1978)(White, J., dissenting)(explaining that denying suppression to some might result in

"privacy [being] needlessly invaded by officers following mistaken hunches not rising to the level

of probable cause[,] but operated on in the knowledge that [the victim] will probably be unprotected if contraband or incriminating evidence happens to be found.").  And, with these police officers engaged in "the often competitive enterprise of ferreting out crime," <u>Johnson v. United States</u>, 333 U.S. 10, 15 (1948), one might be concerned that officers may knowingly infringe upon an individual's Fourth Amendment rights whenever they felt sufficiently sure that such infringement would result in probative evidence. <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 168-69 (1978)(White, J., dissenting)

Some police officers, zealous about protecting the community and confident -- sometimes justifiably -- of their own instincts, might be willing to accept any other punishment the law could devise to put a criminal behind bars, with or without following the procedures that the United States Constitution demands.  Thus, to protect the civil rights of its citizens, the law attempts to deter those zealous protectors by taking away the benefit gained from their unconstitutional conduct.  <u>See</u> <u>United States v. Najar</u>, 451 F.3d at 714 (commenting on the Fourth-Amendment concerns of "friction between individual liberties and the need for prompt decisive government action" and "buffering investigatory zeal with judicial oversight").  That unfortunately means that even a well-intentioned officer, perhaps not aware that he or she was over-stepping constitutional boundaries, will have evidence excluded when the officer violates the Constitution.  It is all-too-easy for an officer that was cognizant that his or her conduct was unconstitutional to claim ignorance.  If the defense of ignorance was sufficient to render the evidence admissible, the deterrent effect of the exclusionary rule might be largely diminished and the probability that overzealous law-enforcers would risk exclusion to obtain evidence in potentially unconstitutional ways would increase.  It is with this background in mind that the Court must analyze whether, even though Lind and Kmatz were not justified in entering Martinez' home, the Court should nevertheless decline to suppress the

seized evidence.

Martinez has asked the Court to exclude all evidence seized during the search of his home. See Motion at 1; Martinez' Brief at 1; Reply at 4.  The United States has argued that the officers' conduct in this case did not violate the Constitution and that therefore exclusion is unnecessary. Because the Court disagrees with the United States' contention that the officers had a right to enter and search Martinez' house, however, the Court finds Lind's and Kmatz' protective sweep of Martinez' home was unconstitutional.  As a result, the Court must now determine whether the later, warrant-authorized search was permissible.  When the police come upon evidence in the course of a constitutional violation, the exclusionary rule prohibits the government from using that illegally obtained evidence in prosecuting the defendant.  See United States v. Calandra, 414 U.S. at 347; Wong Sun v. United States, 371 U.S. at 484-85; United States v. Olvares-Rangel, 458 F.3d at 1109. Furthermore, when a search is made based on a warrant that contains illegally obtained information, the Court must consider whether the warrant affidavit, with the challenged information excluded, still established probable cause to issue the warrant.  See United States v. Sims, 428 F.3d at 954.

The search warrant in this case was based on both the information provided by Lind and Kmatz, and also the information obtained from Martinez by Hartsock.  Martinez has requested that the Court not pass judgment -- on this motion -- on whether the conversation between Martinez and Hartsock was constitutional or whether it, too, must be excluded.  Thus, even excluding the information in the warrant affidavit that Lind provided, there is still some information from which a reasonable judge could find probable cause to search Martinez' home for child pornography.  In relevant part, the affidavit would still state:

> Joseph was brought to the John Price Law Enforcement Center at 400 Roma Rd NW and affiant spoke with him.  He stated the drugs in the house are for personal use, and that we would find approximately one to two ounces of marijuana, and a very

small amount of cocaine that he had just purchased on Easter Sunday (two days ago). He stated that he has dozens of pornographic VHS tapes that he dubbed from rentals for his personal use, and **owns at least two VHS tapes, and as many as four, that involve him having oral sex with a sixteen year old boy approximately twenty years ago (his age at that time would be approximately thirty).  He stated he also has approximately four photographs of the same sixteen year old boy doing sexual acts with him.**  He states that he has showed one of the tapes to a friend named "Ed" that he associates with at a local bar, Sidewinders, in Albuquerque.  He stated one of the tapes is labeled "STE", which stands for "Show to Ed," and the second tape is marked "ENI", which stands for "Eric and I."  He stated Eric was the name of the sixteen year old.

Affidavit for Search Warrant at 4 (emphasis added).  The Court finds that this paragraph provides probable cause to justify issuance of the search warrant in this case.  Until and unless Martinez seeks to challenge admission of evidence of the conversation he had with Hartsock, the Court finds that the search in which the United States acquired its evidence was based on a warrant that, even excluding that information obtained during Lind's and Kmatz' unlawful sweep, contained probable cause.[13]  See United States v. Sims, 428 F.3d at 954 ("When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.").  The Court therefore  denies Martinez' motion to exclude the evidence.

---

[13] The Court is complying with Martinez' request not to pass judgment on the Martinez/Hartsock conversation at this time because the parties appear to expect to present further briefing and/or evidence on the issue.  The Court, however, notes that, from the record as it now stands, Martinez' talk with Hartsock appears to be a result of the unlawful search and therefore possibly fruit of that poisonous tree.  The question in that future briefing may be whether the Miranda warnings break the causal link between the unconstitutional conduct and the statements, removing any taint from the statements, or if there are some other reasons Martinez' statements may have been voluntary or involuntary.  If the Court eventually holds that Martinez' statements were secured in an unconstitutional manner, the Court will most likely grant the motion to suppress, because the warrant would lack probable cause if the Court were forced to strike the information obtained both from Lind and from the Hartsock/Martinez colloquy.

**IV.    THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE PROBABLY DOES NOT APPLY IN THIS CASE.**

The United States' final argument is that suppression of the evidence is not warranted because the officers who conducted the official search of Martinez' home did so pursuant to a search warrant that appeared to be supported by probable cause.  The United States argues that this fact should cure any deficiency in the warrant itself.  Martinez does not directly respond to this argument in his reply brief.  Although the Court has found that it need not suppress the evidence at this time, the Court expects that Martinez will eventually challenge the admissibility of Martinez' conversation with Hartsock and, at that point, this issue will again arise.  The Court therefore addresses the issue in this opinion.

The Court has difficulty with the United States' argument for two reasons.  First, if the illegally obtained knowledge were not reflected in the warrant affidavit, as would be the case if no illegal entry had occurred initially, then -- ignoring the admissions made by Martinez to Hartsock -- the warrant would lack probable cause.  To ignore this fact would be to allow officers to use their unconstitutional conduct to obtain a warrant and then conduct a "lawful" search that is a direct result of the unlawful one.  The Supreme Court implicitly rejected such a concept in United States v. Murray, 487 U.S. 533 (1988).  Second, the Court cannot be certain that the search warrant would ever have been obtained in the absence of the illegal search, again making the warrant-authorized search a direct result of the illegal one.  The Supreme Court in United States v. Murray also addressed this latter issue.

In United States v. Murray, officers were surveilling Murray pursuant to tips from informants and watched him drive a truck into a warehouse in South Boston, Massachusetts.  See 487 U.S. at 535.  The officers also observed a tractor-trailer rig with a long, dark container inside when Murray

exited the warehouse.  See id.  Based on the tips and their observations, officers forced entry into the warehouse and discovered that the warehouse contained numerous bales of marijuana.  See id. They then left without disturbing the bales and sought a search warrant; in obtaining the warrant, they did not use any of the information obtained during their illegal entry.  See 487 U.S. at 535-36. That evening, with the warrant, the officers entered the warehouse and seized 270 bales of marijuana and a notebook listing the customers that were to buy the bales.  See 487 U.S. at 535-36.

The district court in United States v. Murray denied Murray's motion to suppress, and the United States Court of Appeals for the First Circuit affirmed; both rejected Murray's argument that the warrant was invalid because it was tainted by the illegal entry.  See 487 U.S. at 536.  The Supreme Court analyzed the independent-source doctrine, another exception to the exclusionary rule, to determine whether admitting the evidence obtained in the second, warrant-authorized search was justified.  It stated: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court[,] but that it shall not be used at all."  United States v. Murray, 487 U.S. at 538.  Thus, it appears, evidence obtained illegally cannot be used to acquire a search warrant to then legally obtain that same evidence.  If officers could rely on a warrant that was based solely on evidence from the illegal search, the Court would be allowing them to benefit, albeit circuitously, from the constitutional violation of their fellow officers.  The Court does not believe that United States v. Murray leaves room for that use of the illegally obtained information.

Furthermore, even with the aid of the independent-source doctrine and a warrant based on probable cause that did not rely on any illegally seized evidence, the Supreme Court in United States v. Murray reversed.  See id. at 543-44. The Supreme Court found:

The ultimate question . . . is whether the search pursuant to the warrant was in fact

> a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

Id. at 542. In United States v. Murray, the Supreme Court vacated the judgment of the district court and remanded for a determination "whether the warrant-authorized search of the warehouse was an independent source of the challenged evidence in the sense we have described [in this opinion]." Id. at 543-44. In this case, the United States did not assert that the second, warrant-authorized search was an independent source of the challenged evidence; rather, the United States argued that the warrant-authorized search was made in good-faith reliance on a warrant that appears to be based on probable cause. The outcome, however, should not change. The good-faith exception should not apply to warrants supported by illegally obtained information. Such an application of the good-faith exception would permit the police, as a body, to benefit from their own illegal conduct. One officer could conduct an illegal search and then deliver to another officer information which the second officers then uses to obtain a warrant. The Tenth Circuit has already established the proper procedure to follow when a warrant is based on illegally obtained information. In such situations, "[w]hen a warrant is tainted by some unconstitutionally obtained information, [courts in the Tenth Circuit] uphold the warrant if there was probable cause absent that [illegally obtained] information." United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). The Court does not believe it can properly consider the five italicized paragraphs on pages 3 and 4 of the warrant affidavit. On the other hand, the Court believes that probable cause would exist without that information. See Affidavit for Search Warrant at 3-5. Only if the final two paragraphs of the affidavit were excluded based on some future challenge to the Martinez/Hartsock conversation would the Court find that probable cause did not support the affidavit, at least for a search for the child pornography at issue

as evidence on this motion.  If the Court does eventually so find, however, it will likely also find that the good-faith exception to the exclusionary rule does not apply.

The Court does not believe that the Supreme Court's decision in Herring v. United States changes this analysis.  Herring v. United States dealt with negligent bookkeeping, not negligent performance of the police officers' duties.  The Supreme Court in United States v. Herring was focused on whether exclusion under the circumstances of that case would have a substantial deterrent effect on the complained-of unconstitutional conduct.  See Herring v. United States, 129 S. Ct. at 702.  The Supreme Court found that excluding evidence obtained in an unauthorized arrest based on incorrect data in a database would not substantially deter police administrative workers from incorrectly and negligently entering such arrest warrant information.  See id. at 703.  By contrast, if the Court excludes evidence obtained by officers when they fail to make a proper analysis whether exigent circumstances exist, officers might be deterred from making hasty exigent-circumstances assessments and/or applying *ad hoc* rules without performing the necessary analysis. The Court is not convinced that Herring v. United States stands for the proposition that, any time an officer in the field negligently violates someone's constitutional rights, exclusion of the evidence is not justified.  See id. at 704.  Rather, Chief Justice Roberts specified that "nonrecurring and attenuated negligence is far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place," and that such negligence does not justify exclusion.  Id. at 702 (emphasis added).  The negligent data entry of an administrative employee that causes an unconstitutional seizure is more attenuated from the seizure itself than the negligence of an officer in the field who executes an unconstitutional search based on his own misapplication of the standard for determining whether exigent circumstances exist.  Furthermore, the testimony disclosed that misapplication of the exigent-circumstances standard is recurring and not limited to the officers involved in this case.

-64-

See Tr. at 109:15-110:4 (Bregman, Lind); id. at 197:6-199:8 (Bregman, Kmatz); id. at 202:4-14 (Bregman, Kmatz).  Thus, the Court concludes that this case demonstrates the "recurring or systemic negligence" that application of the exclusionary rule was meant to, and meaningfully can, deter.  See Herring v. United States, 129 S. Ct. at 702.  In short, the Court does not believe that Herring v. United States expands the good-faith exception to the point that exclusion of evidence would be inappropriate in this case.

Furthermore, if the conversation between Martinez and Hartsock is eventually found invalid, the Court is not convinced that any search would have occurred without the illegal entry, because the officers would have known nothing except that a static 911 phone call emanated from the home and the homeowner left a door unlocked.  If the officers had knocked, announced, checked the perimeter of the home, and left after finding no evidence that someone on the premises needed immediate assistance, they probably would not have been motivated to seek a search warrant.  And, if such warrant had been sought, the officers would not have been able to muster probable cause to support that warrant.  As a result, if the Court were to find that the conversation between Hartsock and Martinez was a fruit of the poisonous tree, the Court would find that the search of Martinez' home was unconstitutional and that the good-faith exception to the warrant requirement does not justify admitting the evidence obtained.

On this motion, the Court finds that the initial entry into Martinez' home was unlawful.  But, excluding the information obtained during that illegal entry, the warrant pursuant to which officers searched Martinez' home was supported by probable cause.  The Court therefore finds that suppression of the seized evidence is not warranted at this time.  The Court denies Martinez' motion.

**IT IS ORDERED** that Defendant's Motion to Suppress is denied.


_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Gregory J. Fouratt
   United States Attorney
Presiliano Torrez
Stephen R. Kotz
Charlyn E. Rees
   Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Brad D. Hall
Albuquerque, New Mexico

-- and --

Sam Bregman
Eric Loman
Bregman & Loman, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendant*