# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                        No. CR 09-2439 JB

JOSEPH MARTINEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress and Supporting Brief, filed December 1, 2009 (Doc. 46). The Court held an evidentiary hearing on October 29, 2009. The primary issues are: (i) whether Defendant Joseph Martinez' statements were attenuated from the taint of the Fourth-Amendment violation and were not a fruit of the poisonous tree; (ii) whether the evidence found within Martinez' house would have inevitably been discovered notwithstanding the Fourth-Amendment violation; and (iii) whether the good-faith exception to the exclusionary rule applies. The Court finds that the taint of the illegal search was not attenuated at the time that Martinez made his confession, that the police would not have inevitably discovered Martinez's confession or the evidence from his home if not for the illegal search, and that the good-faith exception does not apply when law enforcers violate the constitution and then pass off the illegally acquired information to another officer to put into the search warrant that is eventually found invalid. The Court will thus grant Martinez' motion to suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P.

12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269-70 (10th Cir. 1982), <u>cert. denied</u>, 461 U.S. 916 (1983). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. <u>See</u> Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. <u>See</u> <u>United States v. Merritt</u>, 695 F.2d at 1269-70.

## A.    **THE INITIAL SWEEP.**

1.    The Court incorporates by reference its factual findings in the Memorandum Opinion and Order which resolved Martinez' first motion to suppress. <u>See</u> Memorandum Opinion and Order at 2-18, filed November 16, 2009 (Doc. 43); Transcript of Hearing at 4:3-24 (taken January 21, 2010)(Court, Rees, Bregman)("Jan. 21 Tr.")(stipulating to the testimony and exhibits proffered as evidence in the prior motion to suppress).[1]

2.    Sergeant Robert Lind (#208) and Deputy Nathan Kmatz (#252) were both with the Bernalillo County Sheriff's Office ("BCSO"). <u>See</u> Jan. 21 Tr. at 119:1-12 (Bregman, Hartsock).

3.    According to the Computer Aided Dispatch ("CAD") sheet and Lind's and Kmatz' testimony, Lind and Kmatz entered Martinez' residence at 2:00 p.m. and exited at approximately 2:05 p.m. <u>See</u> Government Exhibit 2 ("CAD Sheet") at 1 (dated September 9, 2009); Transcript of

---

[1] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

Hearing at 63:3-65:3 (taken October 29, 2009)(Rees, Lind)("Oct. 29 Tr."); Oct. 29 Tr. at 180:19-181:3 (Torrez, Kmatz).

4.      Lind and Kmatz gained entry into Martinez' house by opening an unlocked sliding glass door on the second-story balcony.  See Oct. 29 Tr. at 58:3-13 (Rees, Lind); id. at 86:11-12 (Rees, Lind); Government Exhibit 16.

5.      Lind and Kmatz secured Martinez' residence, and, at approximately 2:26 p.m., asked for a detective to respond to the residence.  See CAD Sheet at 1 (". . . 14:26  208 [Lind] . . .PER S10. CONTACT SVU AND HAVE THEM 21 @ CELL").

6.      Lind and Kmatz based their entry and search on what they believed were exigent circumstances.  See Oct. 29 Tr. at 64:17-65:3 (Rees, Lind).

**B.      DETECTIVES ARRIVE TO INVESTIGATE.**

7.      Detective Kyle Hartsock (#201) is a BCSO employee.  See Jan. 21 Tr. at 7:6-12 (Rees, Hartsock).

8.      Since the October 29, 2009 hearing on Martinez' first motion to suppress, Hartsock has changed assignment within the BCSO from working with the Special Victims Unit to working for the Regional Computer Forensics Lab, a task force run jointly with the Federal Bureau of Investigation and local law-enforcement agencies.  See Jan. 21 Tr. at 7:6-18 (Hartsock).

9.      Before Hartsock arrived, Lind told him by telephone about the entry into the house, the reasons for the entry, the contraband items that Lind and Kmatz had seen inside, and where they had seen those items.  See Oct. 29 Tr. at 82:5-83:16 (Rees, Lind); id. at 212:17-213:12 (Rees, Hartsock).

10.     Hartsock arrived at the residence to take a physical description for purposes of a search-warrant application at approximately 3:42 p.m.  See Jan. 21 Tr. at 12:8-11 (Rees, Hartsock);

CAD Sheet at 1 ("15:42  Stat  SO/201 [Hartsock] . . . Loc[ation]: 10 DAIRY LN").

11.     When Hartsock arrived, he went up to the balcony of Martinez' home, where the sliding glass door that Lind and Kmatz used to gain entry to Martinez' house was still standing open. See Jan. 21 Tr. at 12:23-13:10 (Rees, Hartsock); id. at 134:8-23 (Court, Hartsock).

12.     While on the balcony of Martinez' home, Hartsock could smell marijuana while standing by the open sliding glass door.  See Jan. 21 Tr. at 12:23-13:10 (Rees, Hartsock); id. at 134:24-135:2 (Court, Hartsock)("THE COURT: And from that position of being outside the open door you could smell marijuana?   THE WITNESS: I could smell marijuana standing right there.").

13.     From the smell of marijuana at the doorway, Hartsock could have, and would have, gone and acquired a search warrant to search Martinez' house for illicit drugs and paraphernalia. See Jan. 21 Tr. at 13:2-14:10 (Rees, Hartsock).

14.     If officers had searched the house looking for illicit drugs and drug paraphernalia, they would have found the photographs of child pornography during the search.  See Jan. 21 Tr. at 15:8-16:17 (Rees, Hartsock); id. at 50:17-20 (Rees, Hartsock).

**C.     THE ARRIVAL AND INVESTIGATION OF MARTINEZ' TRUCK.**

15.     Hartsock and other officers later -- but before any contact with Martinez -- noticed a suspicious truck parked in a dead-end, separate cul-de-sac west of Martinez' property.  See Jan. 21 Tr. at 16:24-18:16 (Rees, Hartsock); id. at 145:19-147:4 (Torrez, Dudewicz).

16.     The location of the truck was not near any houses and had an advantageous vantage point over the officers.  See Jan. 21 Tr. at 21:4-14 (Hartsock); id. at 31:12-22 (Hartsock); id. at 123:5-24 (Rees, Hartsock); id. at 238:24-239:7 (Rees, Gaitan).

17.     The officers had not seen this truck upon their arrival, did not know to whom the truck belonged, and became concerned for their safety because of the truck's location.  See Jan. 21

Tr. at 19:19-20:5 (Rees, Hartsock)(Hartsock testifying that he did not know whom the driver of the truck was nor where the truck belonged); id. at 27:6-28:11 (Rees, Hartsock); id. at 66:11-22 (Bregman, Hartsock); id. at 145:19-147:4 (Torrez, Torres); id. at 166:11-167:17 (Torrez, Dudewicz); id. at 237:7-24 (Rees, Gaitan).

18.     Hartsock believed that the truck was somehow connected to the Martinez' residence. See Jan. 21 Tr. 66:8-67:21 (Bregman, Hartsock).

19.     The truck's windows were not tinted, and the interior of the truck is visible from the outside, if one can get up high enough.  See Jan. 21 Tr. at 90:10-24 (Bregman, Hartsock).

20.     To ensure their safety, and not knowing who, if anyone, was in the vehicle, Hartsock and other officers approached the truck in a crouch and opened the door with guns drawn, based on what they believed were exigent circumstances and on officer safety concerns, concerned that someone was inside who could do them harm.  See Jan. 21 Tr. at 27:2-30:8 (Rees, Hartsock); id. at 31:20-22 (Hartsock)("So absolutely my gun is drawn and Detective Gaitan's gun is drawn as we approached the car."); id. at 36:5-14 (Hartsock); id. at 125:8-126:9 (Rees, Hartsock); id. at 237:25-238:23 (Rees, Gaitan).[2]

21.     The officers did not obtain a search warrant before opening the door of the truck and looking inside.  See Jan. 21 Tr. at 69:9-11 (Bregman, Hartsock).

_____

[2] Hartsock told Ms. Rees:

Q:     . . . . What was your feeling?

A:  That I needed to open that door to make sure no one was inside that was potentially going to harm me, harm themselves, harm our other deputies, that they weren't in the commission of a crime, like in an active one like a sexual assault crime, or that they weren't preparing for one or trying to leave one.

Jan. 21 Tr. at 36:16-38:25 (Rees, Hartsock).

22.     The officers, approaching in a crouch, did not attempt to look in the window before opening the truck's door to look inside.  See Jan. 21 Tr. at 90:25-91:24, 92:16-93:8 (Bregman, Hartsock).

23.     The officers did not request radio silence -- a so-called "10-3" -- when approaching the truck as Lind and Kmatz did before sweeping Martinez' house. Jan. 21 Tr. at 87:9-16 (Bregman, Hartsock); CAD Sheet at 1.

24.     The officers did not perceive approaching the truck to be as dangerous as doing a sweep of the house, and there were fewer officer-safety concerns justifying entry into the truck than there were justifying entry into the house.  See Jan. 21 Tr. at 87:17-18, 89:2-90:9 (Bregman, Hartsock)(Hartsock admitting that he did not perceive approaching the truck to be as dangerous as doing a sweep of the house and that there were fewer officer-safety concerns justifying entry into the truck than there were justifying entry into the house).

25.     The officers did not contact dispatch to report their investigation of the truck.  See Jan. 21 Tr. at 87:20-88:3 (Bregman, Hartsock); CAD Sheet at 1.

26.     Officers are aware of a high number of officer-involved shootings in the East Mountains area of Albuquerque, New Mexico.  See Jan. 21 Tr. at 30:17-31:12 (Hartsock).

27.     Hartsock believes that there were officer-safety concerns on every police call in which he has been involved.  See Jan. 21 Tr. at 72:24-25 (Hartsock).

28.     Hartsock assumed there was someone inside the truck because: (i) the truck seemed to arrive after the officers; (ii) the officers did not see the driver anywhere else nearby; and (iii) Hartsock always assumes that there is someone inside a vehicle until he is able to disprove that fact. See Jan. 21 Tr. at 135:3-136:5, 138:9-139:3 (Court, Hartsock).  See also Jan. 21. Tr. at 239:16-241:1 (Rees, Gaitan).

29.     Hartsock did not believe someone was in the vehicle; he assumed that there was someone in it.  See Jan. 21 Tr. at 135:8-136:5 (Court, Hartsock).

30.     As the officers approached the pick-up truck, because of its height and size, they could not determine whether anyone was inside.  See Jan. 21 Tr. at 31:23-32:6 (Rees, Hartsock); id. at 239:14-21 (Rees, Gaitan).

31.     Upon opening the door to the vehicle, Hartsock and other officers immediately smelled marijuana inside the truck.  See Jan. 21 Tr. 39:1-13 (Rees, Hartsock); id. at 240:7-241:4 (Rees, Gaitan)("Q:  What, if anything, did you notice upon opening that door?   A: The strong odor of marijuana.").

32.     Based on the fact of him smelling marijuana inside the truck, Hartsock would have applied for, and would have acquired, a warrant to search the truck.  See Jan. 21 Tr. at 41:3-19 (Rees, Hartsock).

33.     The officers ran the truck's license plate in an attempt to identify the driver.  See Tr. at 35:7-36:1 (Rees, Hartsock); id. 39:16-40:12 (Hartsock); id. at 241:16-22 (Rees, Gaitan).

34.     The vehicle was registered to a company called Accustripe.  See 4/14/2009 Police Report at 3 ("Defendant Exhibit A").

35.     Shores (#339) was assigned to watch the truck at approximately 4:17 p.m.  See Jan. 21 Tr. at 122:3-8 (Bregman, Hartsock).

36.     Inside the truck, upon later execution of a search warrant, officers found drug paraphernalia and a quantity of marijuana.  See Jan. 21 Tr. at 42:24-44:17 (Rees, Hartsock); Government Exhibits 83-86.

37.     Based upon Hartsock's training and experience, he believed that he could also have sought a warrant to search for drugs and drug paraphernalia at the driver's residence.  See Jan. 21

Tr. at 44:20-46:18 (Rees, Hartsock).

38.     It is unlikely that Hartsock would have taken the steps to search Martinez' residence based solely on discovering marijuana and drug paraphernalia in Martinez' vehicle.  See Jan. 21 Tr. at 130:13-131:4 (Bregman, Hartsock).[3]

39.     Before the officers had contact with Martinez, Hartsock left to draft a search warrant for the house at approximately 4:17 p.m.  See Jan. 21 Tr. at 242:1-15 (Rees, Gaitan); CAD Sheet at 1.

**D.     THE BCSO OFFICERS ENCOUNTER MARTINEZ NEAR HIS TRUCK.**

40.     Shores (#339), assigned to park his patrol vehicle behind the truck, encountered the driver when he returned to the truck at approximately 4:34 p.m.  See Jan. 21 Tr. at 147:5-22 (Torrez, Torres); CAD Sheet at 1 ("16:33  MALE GREY SHIRT/JEANS . . . 16:34  339 [Shores] . . . CUL DE SAC TO WEST OF 10 DAIRY . . .").

41.     The driver of the truck was identified as Martinez.  See Jan. 21 Tr. at 147:5-148:16 (Torrez, Torres).

42.     Martinez indicated that he was associated with the truck and the house.  See Tr. at 169:2-171:5 (Torrez, Dudewicz).

_____

[3] Hartsock testified on direct examination that he "would have asked permission" to search Martinez' home based upon smelling marijuana in Martinez' truck and that, if necessary, he "would of just got a search warrant to do it."  Jan. 21 Tr. at 49:6-50:13 (Rees, Hartsock).  On cross-examination, however, Hartsock conceded that it is the "very rare minority" of cases "where [an officer] smell[s] pot in a car and then go[es to] get a search warrant for the house."  Jan. 21 Tr. at 130:13-131:4 (Bregman, Hartsock).  In deciding this motion, the Court is trying to determine what would have happened if there had been no illegal search on April 14, 2009.  The Court will thus credit Hartsock's testimony that it is the minority of cases in which an officer finds marijuana in a vehicle and then acquires a warrant to search that person's house.  His testimony that he would have done so in this case, the Court finds, is more likely an assertion colored by hindsight and the fact that Hartsock now knows that there were drugs and child pornography to be found in the house.

43.     Detective Amy Dudewicz (#178) has worked for the BCSO for the past eight years and has worked for the Special Victim's Unit of the BCSO since April of 2006.  See Jan. 21 Tr. at 157:13-23 (Torrez, Dudewicz); id. at 162:5 (Dudewicz).

44.     Dudewicz told Martinez that his house had generated a 911 call, that BCSO officers had responded to the call, that the officers had found an unlocked door on the second-floor balcony, and that they had entered his house to confirm that nobody inside was in need of immediate assistance.  See Jan. 21 Tr. at 170:11-25 (Dudewicz); id. at 221:18-222:19 (Court, Dudewicz).

45.     Dudewicz told Martinez that detectives were called out because the officers, while inside his house, found some items about which they were concerned.  She also told him that "this was currently an active investigation."  Jan. 21 Tr. at 170:22-25 (Dudewicz).  See id. at 221:18-222:19 (Court, Dudewicz)("THE WITNESS:  I'd explained to Mr. Martinez . . . [t]hey found some items that they needed to further investigate and that's why detectives had been called out. . . .  I didn't elaborate on that.").

46.     Knowing that he had drugs and child pornography in his home, Martinez was more likely than not concerned about what Dudewicz was insinuating when she told him that officers found items about which they were concerned inside his house.

## E.     OFFICER DUDEWICZ TRANSPORTS MARTINEZ DOWNTOWN.

47.     Before transporting Martinez, Dudewicz asked Martinez if he would be willing to go to the main station for an interview.  See Jan. 21 Tr. at 148:1-12 (Torrez, Torres); id. at 170:10-171:5 (Torrez, Dudewicz).

48.     Martinez agreed.  See Jan. 21 Tr. at 148:1-12 (Torrez, Torres); id. at 171:1-5 (Torrez, Dudewicz).

49.     If Martinez had asked to go inside his house before being transported to the main

station in downtown Albuquerque, New Mexico, his request would have been refused.  See Jan. 21 Tr. at 183:23-184:3 (Torrez, Dudewicz).

50.     The CAD Sheet lists Martinez as being "in custody" before being transported to the main station.  Jan. 21 Tr. at 101:2-25 (Bregman, Hartsock); id. at 171:25-172:15 (Torrez, Dudewicz)("And then there's another comment [in the CAD Sheet] that says 178 which is my man number will 21 201 [Hartsock] and advise him, which means basically I was willing to give him a phone call and let him know that we had the homeowner currently in custody."); id. at 231:1-10 (Court, Dudewicz); CAD Sheet at 1 (". . . 16:36  208 [Lind] . . . CONTACT 201 [Hartsock] . . . HAVE HOMEOWNER IN CUSTODY . . .").

51.     Dudewicz and Detective Doreen Torres transported Martinez to the John Price Law Enforcement Center in Albuquerque, New Mexico for an interview with Hartsock at approximately 5:08 p.m.  See Jan. 21 Tr. at 149:13-150:25 (Torrez, Torres); CAD Sheet at 2 ("17:08   SO/178 [Dudewicz] . . . Loc[ation]: MAIN 1X12 . . . . 17:08   Disposition     CHANGED . . . 17:09  178 [Dudewicz] ENR[OUTE TO] MAIN 1X12 SM 1173.9 . . . .").

52.     The CAD Sheet states that Martinez rode as a passenger (code "12") in Dudewicz' vehicle.  He sat in the front seat, free of handcuffs, while in route to the main station.  Jan. 21 Tr. at 149:13-151:10 (Torrez, Torres); id. at 173:2-24 (Torrez, Dudewicz); CAD Sheet at 2.

53.     After Martinez was placed in Dudewicz' vehicle and was being transported downtown, he asked Dudewicz how he would get home.  Dudewicz responded that they "would make arrangements for him to get back, if that was necessary."  Jan. 21 Tr. at 174:3-9 (Torrez, Dudewicz).

54.     Martinez arrived at the main station at approximately 5:36 p.m. for an interview.  See CAD Sheet at 2 ("17:36 Stat SO/178 [Dudewicz] . . . Loc[ation]: Main 1X12").

-10-

55.     Martinez was held alone in the interrogation room for approximately thirty minutes before Hartsock arrived to talk with him.  See Jan. 21 Tr. at 108:19-109:11 (Bregman, Hartsock).

## F.     MARTINEZ' INTERVIEW WITH HARTSOCK.

56.     Hartsock first saw Martinez in the interrogation room at the main BCSO station, at which point Hartsock considered Martinez to be in custody and not free to leave.  See Jan. 21 Tr. at 107:17-108:2, 108:13:18 (Bregman, Hartsock)("Q: You . . . nowhere in this Miranda on Exhibit 3 do you advise him that he is free to leave if he doesn't want to talk to you?  A: Correct.  Q: And as you said that's because he wasn't, right?   A: He was not free to leave.").

57.     Hartsock, Gaitan and Dudewicz, at various times, participated in this interview, but Hartsock asked the majority of relevant questions.  See Government Exhibit 87 ("Video Interview") at 18:07:30-19:33:30.

58.     At the beginning of the interview, Martinez indicated that he did not know that officers had entered his house or why he was at the police station.  See Video Interview at 18:13:00-18:14:00; Government Exhibit 88 ("Interview Tr.") at 8:24-11:4.[4]

59.     Hartsock advised Martinez of his Miranda[5] rights before Martinez made any statements.  See Jan. 21 Tr. at 53:3-14 (Rees, Hartsock); Video Interview at 18:10:00-18:13:00; Interview Tr. at 4:21-5:16; Government Exhibit 3.

60.     At approximately 6:18 p.m., after being advised of his Miranda rights, Martinez indicated that he did not want an attorney and was willing to speak with Hartsock.  See Jan. 21 Tr.

---

[4] During the interview, Hartsock asked Martinez: "[D]o you know what -- do you know how -- why we're here today?"  Martinez responded: "No.  They said that my alarm -- my phone called 911 or something.  I have no idea what happened."  Interview Tr. at 8:24-9:2.

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

at 53:3-14 (Rees, Hartsock); Video Interview at 18:10:00-18:16:00; Interview Tr. at 4:21-6:16; Government Exhibit 3.

61.     Martinez indicated, before his interview, through his signature, that he understood his Miranda rights and agreed to waive them.  See Government Exhibit 3.

62.     During the interview, which began at approximately 6:00 p.m., Hartsock informed Martinez only that the officers were investigating potential drug trafficking and made no mention of pornography or child pornography until 6:25 p.m.  See Video Interview at 18:25:00-18:30:00; Interview Tr. at 4:8-13 (Q: Okay.  Check it out.  Kind of lean in here with me a little bit.  Right now the crime that we're investigating is trafficking of a controlled substance, narcotics.  Okay?").

63.     Hartsock informed Martinez that officers entered his apartment and saw marijuana. See Interview Tr. at 10:16-11:5.[6]

64.     Once he had been transported to the BCSO main station, had been left in a windowless room for approximately thirty minutes, was told that the officers were investigating drug trafficking, was read his Miranda rights, and was told that officers had entered his home and seen drugs, a reasonable person in Martinez' position would have felt he was not free to leave or disengage from the police-citizen encounter.

65.     After being told that officers had already seen drugs in his house, Martinez admitted

---

[6] At the beginning of Martinez' interview, Hartsock told Martinez:

Q: . . . [The officers] open[ed] [the back door] and they yelled, sheriff's department. Anyone inside?  Which is, I'm telling you, very typical procedure.  They didn't hear anyone so they just walked through the residence to make sure that no one is laying unconscious or semi-unconscious and they found some drugs laying around.  They found some marijuana mostly laying around.  Do you know what I'm talking about?

Interview Tr. at 10:16-11:5

that he had the drugs in his house for personal use, and that the officers would find approximately two ounces of marijuana and a small amount of cocaine. See Interview Tr. at 10:16-11:14 (Q: . . . . I mean, there was a -- from what they're saying, a decent amount of marijuana inside the house. I mean, is this all -- A: Yeah.  Yeah, personal, personal."); id. at 13:6-11 ("Q: How much would you -- how much marijuana would you say is in the house, like your best guess?  A:  Maybe an ounce or two.  I think there is a couple of bags --"); id. at 14:3-15:10.

66.     Even after Hartsock told Martinez that officers had entered Martinez' house and seen marijuana inside, Martinez resisted confessing to using any other kinds of narcotics in his house until Hartsock told him that the officers had also seen a substance that they believed to be cocaine. See Interview Tr. at 13:25-14:16.

67.     Before Martinez admitted anything regarding pornography, Hartsock told Martinez that officers had found lots of pornography lying around Martinez' house and suggested that it might include child pornography. See Interview Tr. at 22:10-23:11 ("Another thing [the searching officer] noted is that a fairly, you know, in kind of plain view, amount of pornography laying out. . . . Some of it with, you know, suggestive younger aged males.").

68.     Hartsock then asked Martinez if he had ever engaged in sex with minors. See Interview Tr. at 24:13-25:10.

69.     After about fifteen minutes of further questioning, Martinez first admitted to having one or two Polaroid pictures of himself engaging in sex acts with a person that was "[p]robably 17 or 18" years old.  Video Interview at 18:30:00-18:46:00; Interview Tr. at 42:6-22.

70.     Hartsock then told Martinez that the officers were going to get a search warrant, and that therefore Martinez should tell him if there was any child pornography inside the house because the officers would find it if it was there, implying that Martinez' punishment would be less severe

if he confessed.  See Interview Tr. at 43:24-44:20.[7]

71.     Martinez stated the he also had dozens of pornographic videotapes and as many as four that involved him having oral sex with a sixteen-year-old male approximately twenty years ago. See Interview Tr. at 22:10-28:25; id. at 42:6-52:11.

72.     Martinez confessed to having child pornography in his house only after being told that BCSO was going to search his home and would find any if it were present.  See Interview Tr. at 22:10-28:25; id. at 43:24-44:20; id. at 42:6-52:11.

73.     Martinez provided a false name for the sixteen-year-old male. See Tr. at 58:25-59:17 (Rees, Hartsock); Interview Tr. at 51:17-53:22 (Martinez)(telling the officers that the name of the juvenile in both movies is Eric).

74.     After his confession, Martinez said to Hartsock: "You can look at every tape." Interview Tr. at 59:14-15.

75.     Hartsock used information that he received from Lind's and Kmatz' illegal search to pressure Martinez to confess details that Martinez otherwise would not have disclosed.

---

[7] Hartsock stated to Martinez:

Joseph, just we'll cut -- we'll cut to the chase here.  You know, we're -- we're going to do a search warrant on your house. . . . Are we going to find any pornography with people, you know, under the age of 18.  And it doesn't mean that you purchased it. I mean, in any form or fashion, photographs, videos.  Because, before you answer, you know, so far you've said no, besides the 17 or 18 year old in a Polaroid from whatever 15, 20 years ago.  Besides me -- you know, now is the time to tell us about it because, you know, once we find it, if it's there, we have nothing to talk to you about.  We -- we have nothing else to talk about.  Like we haven't searched your house.  We're at the point where we had -- we haven't gone in your door besides those deputies when they were checking the 911 call. . . . We're going to go in there now.  Are we going to find any of that?  And now is the time to be honest about it because we're going to find it if it's there.

Interview Tr. at 43:24-44:20.

### G.   **HARTSOCK OBTAINS A SEARCH WARRANT FOR MARTINEZ' HOUSE.**

76.     Using the information he collected from speaking with Lind and Kmatz, and from interviewing Martinez, Hartsock finished his warrant and supporting affidavit.  See House Warrant and Affidavit (dated April 14, 2009)(United States Exhibit 4).

77.     A Deputy District Attorney reviewed Hartsock's search warrants before submission to a judge.  See Tr. at 61:13-62:9 (Rees, Hartsock).

78.     The Honorable Albert S. "Pat" Murdoch, Second Judicial District Judge, Division XIX, Bernalillo County, State of New Mexico, authorized search warrants.  See Tr. at 62:10-19 (Rees, Hartsock); House Warrant and Affidavit  at 1, 6; Truck Warrant and Affidavit at 1, 6 (dated April 21, 2009)(United States' Exhibit 78).

79.     The search warrants permitted seizures of drugs, drug paraphernalia, and videotapes and photographs containing child pornography from Martinez' residence and the truck.  See House Warrant and Affidavit at 2-3; Truck Warrant and Affidavit at 2-3.

80.     Pursuant to the warrants, the officers seized mini-cassettes, VHS tapes, camcorders, Polaroid pictures, marijuana, pipes, and other drug paraphernalia from the residence, and marijuana and drug paraphernalia from the truck.  See House Warrant and Affidavit at 7 (Return and Inventory from execution of the warrant).

81.     Hartsock reviewed the evidence and discovered ten VHS videotapes, twelve 8mm videotapes, four mini DVDs, and twenty-nine Polaroid photographs depicting a minor engaged in sexually explicit conduct.  See Transcript of Hearing at 24:7-34:8 (taken October 14, 2009)(Rees, Hartsock).

82.     Hartsock later identified one of the photographed children and interviewed him regarding his sexual relationship with Martinez that occurred for eleven years.  See Oct. 29 Tr. at

37:24-39:17 (Rees, Hartsock).

83.    None of the warrant affidavits that Hartsock swore out during his investigation of Martinez mentioned: (i) his officer-safety concerns regarding the mysterious truck; (ii) the officers' approaching the truck with guns drawn; (iii) opening the door to the truck; or (iv) Hartsock smelling marijuana inside the truck.  See Jan 21 Tr. at 70:12-86:2 (Bregman, Hartsock); Defendant Exhibit A-E; Government Exhibit 4, 78.

84.    Hartsock made at least five warrant affidavits -- one to search Martinez' house, two to search AccuStripe, one to search Martinez' truck, and one to arrest Martinez.  See Defendant Exhibits A-E; Jan. 21 Tr. at 69:12-70:24 (Bregman, Hartsock)(listing the four search warrant affidavits he had made).

85.    The first warrant affidavit that Hartsock wrote was for the warrant to search Martinez' house, dated April 14, 2009.  See Government Exhibit 4; Defendant Exhibit E.

86.    Hartsock made three of the four other affidavits after the initial affidavit to search Martinez' house, as well as his April 29, 2009 police report, largely by cutting and pasting the contents of the first affidavit into the subsequent documents.  See Defendant Exhibits A-E; Jan. 21 Tr. at 77:2-11 (Bregman, Hartsock)("This is copied and pasted from my report . . . .").[8]

87.    Hartsock's method of cutting and pasting from his affidavit for the warrant to search Martinez' house caused the absence of any mention in Hartsock's other warrant affidavits and police report of: (i) his officer-safety concerns regarding the truck; (ii) the officers' approaching the truck with guns drawn; (iii) opening the door to the truck; and (iv) Hartsock smelling marijuana inside the

_____

        [8] The second affidavit regarding AccuStripe does not appear to be in the record.  The Court, however, has no reason to believe that it was not also made by cutting and pasting from the affidavit regarding Martinez' house.  Furthermore, there were no challenges made to that affidavit.

truck were the result of Hartsock's mistake and inadvertence.  See Jan 21 Tr. at 70:12-86:2 (Bregman, Hartsock).[9]

88.     If Lind and Kmatz had not entered Martinez' house when they responded to the static-only open-line 911 call at approximately 2:00 p.m. on April 14, 2009, it is more likely than not that they would have left the property before Martinez returned home at 4:30 p.m. that day.

89.     If Lind and Kmatz had not entered Martinez' house when they responded to the static-only open-line 911 call at approximately 2:00 p.m. on April 14, 2009, no BCSO officer would have seen the truck parked in the cul-de-sac west of Martinez' property, and thus no BCSO officer would have investigated it and smelled marijuana inside it.

90.     If Lind and Kmatz had not entered Martinez' house when they responded to the

_____

[9] At the hearing, there was some discussion of the facts regarding the "investigative sweep" of the truck by Hartsock and the other officers. Sam Bregman, Martinez' attorney, pointed out that, although Hartsock testified at some length about his safety concerns, the officers' cautious approach to the truck, opening the truck's door, and smelling marijuana inside the truck, none of these facts were present in Hartsock's police report or any of the warrant affidavits that he swore out. See Jan. 21 Tr. at 69:5-85:12 (Bregman, Hartsock); Defendant Exhibit B. Hartsock admitted this omission was a significant oversight and had no explanation other than inadvertence. See Jan. 21 Tr. at 80:22-81:15 (Bregman, Hartsock)("Q: And you think you did that [give the state judge all important available facts when swearing out a warrant affidavit] in this instance? A: Reviewing this, especially this warrant based on the truck, that absolutely should have been included in my affidavit and it's not."). While Hartsock perhaps should have been more careful with cutting and pasting from one document to another, it is credible that Hartsock did not find those facts particularly relevant when he wrote the first document -- the search warrant for the house. See Jan. 21 Tr. at 126:11-128:17 (Rees, Hartsock). It is clear from reading the five documents -- one warrant affidavit for AccuStripe, one for Martinez' house, one for Martinez' truck, the arrest warrant for Martinez, and Hartsock's police report -- that Hartsock largely copied and pasted from the warrant affidavit for the house when writing the others. See Defendant Exhibits A-E; Jan. 21 Tr. at 77:2-11 (Bregman, Hartsock)("This is copied and pasted from my report . . . ."). Hartsock likely did not contemplate whether he should add other facts, relevant to the subsequent search warrants, to subsequent affidavits or to his report. While this approach may be sloppy, the Court also understands the time constraints and other pressures that might have caused Hartsock to cut corners in this way. In short, the Court will credit his in-court testimony, even if that testimony contains facts not in his affidavits.

static-only open-line 911 call at approximately 2:00 p.m. on April 14, 2009, no BCSO officer would

have smelled marijuana inside Martinez' truck, nor inside his house, and thus would have had no

basis for procuring a search warrant to search the truck or the house.

91.     If Lind and Kmatz had not entered Martinez' house when they responded to the

static-only open-line 911 call at approximately 2:00 p.m. on April 14, 2009, Hartsock would not

have been called out to 10 Dairy Lane and would not have otherwise sought out Martinez. <u>See</u> Jan.

21 Tr. at 106:7-107:14 (Bregman, Hartsock).

## PROCEDURAL BACKGROUND

A federal Grand Jury indicted Martinez with two counts of Production of a Visual Depiction

of a Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2251(a) and 2256.

<u>See</u> Indictment at 1-2, filed August 25, 2009 (Doc. 1).[10]  On September 9, 2009, Martinez asked the

Court to suppress all evidence seized in his home because the "protective sweep" that Lind and

Kmatz performed, which formed part of the basis of a subsequent, warrant-authorized search of

---

[10] There is currently a parallel state criminal prosecution of Martinez.  It is likely, however, that the United States has brought this federal prosecution to avoid the greater citizen protections of the New Mexico Constitution.  <u>See</u> <u>State v. Ryon</u>, 137 N.M. 174, 108 P.3d 1032 (2005) (articulating a more stringent, three-pronged test for an emergency-aid entry, including that "the search must not be primarily motivated by intent to arrest and seize evidence." and that "there must be some reasonable basis, <u>approximating probable cause</u>, to associate the emergency with the area or place to be searched.")(emphasis added, internal alterations omitted). <u>See</u> <u>also</u> <u>State v. Bomboy</u>, 144 N.M. 151, 155, 184 P.3d 1045, 1049 (2008)("Under the New Mexico Constitution, we continue to provide greater protection regarding automobile searches than that provided under the United States Constitution."); <u>Montoya v. Ulibarri</u>, 142 N.M. 89, 96-97, 163 P.3d 476, 483-84 (2007)("[T]he provisions at issue in this case, Article II, Section 18, ensuring due process, and Article II, Section 13, prohibiting cruel and unusual punishment, have been interpreted as providing greater protection than their federal counterparts."); <u>New Mexico Right to Choose/NARAL v. Johnson</u>, 126 N.M. 788, 975 P.2d 841, 850-51 (1998)(declaring a more robust guarantee of equal protection of the law than that provided by the federal constitution).  It is likely that, if this evidence is not admissible in federal court, it will not be admissible in New Mexico state court, and it is probable that, even if admissible in federal court, the evidence would not be admissible in state court.

Martinez' home, was an unconstitutional entry without probable cause.  See Defendant's Motion to Suppress, filed September 9, 2009 (Doc. 17).  The Court agreed that the search was unconstitutional, but declined to suppress the evidence because the warrant affidavit, even with the information gleaned from the unlawful entry excised, still established probable cause.[11]  See Memorandum Opinion and Order at 65-66, filed November 16, 2009 (Doc. 43)("[E]xcluding the information obtained during that illegal entry, the warrant pursuant to which officers searched Martinez' home was supported by probable cause.  The Court therefore finds that suppression of the seized evidence is not warranted at this time.").

1.     **The Briefs.**

Martinez now attacks the remainder of the basis for probable cause in the search warrant -- a statement, made by Martinez to Hartsock, in which Martinez confesses to having child pornography in his house.  See Motion at 1.  Martinez again moves the Court to suppress all evidence seized inside his home, contending that his statement was fruit of the illegal search of his home and thus cannot provide probable cause for the warrant. See id.  He argues that, but for the illegal entry and search, the officers would not have spoke to Martinez nor elicited his confession. See id. at 1, 5.

The United States asks the Court to deny Martinez' motion, and mounts a series of arguments why Martinez' statement was not a fruit of the poisonous tree and why, even if the statement was illegally obtained, the evidence should nevertheless be admitted.  See United States Response to Defendant's Motion to Suppress (Doc. 46) at 1, filed December 15, 2009 (Doc. 52)

_____

[11] The Court declined to rule on the issue whether Martinez' statement was constitutionally obtained because it was under the impression that the parties wished to have an opportunity to brief that issue separately from the issue of the illegal entry.  See Memorandum Opinion and Order at 20, 39 n.9 (Doc. 43).  This motion asks the Court to resolve the issue that it reserved in its prior opinion.

("Response").  First, the United States argues that, even if there is a "but-for" causal connection

between Lind and Kmatz' illegal entry, and the statement that Martinez made to Hartsock, any taint

from the initial illegality has been attenuated by the passage of time and intervening facts and

circumstances.  Response at 6-11.  The United States next asserts that the inevitable-discovery

exception to the exclusionary rule applies to this case, and that Martinez' confession would

inevitably have been obtained, even if there had been no illegal entry.  See Response at 12-15.

Finally, the United States argues that the Court should apply the good-faith exception because the

officers believed, in good faith, that the warrant they used to search Martinez' house was based on

probable cause, even if the Court finds that it was invalid.  See Response at 15-17.

Martinez replies to the United States' arguments first by alleging that the record does not

support the United States' recitation of the facts.  See Defendant's Reply to Government's Response

to Defendant's Second Motion to Suppress at 1-3, filed January 8, 2010 (Doc. 60)("Reply").  He

then argues that, if it were not for the illegal search of Martinez' home, the BCSO officers would

never have discovered the truck and so the truck cannot be an intervening circumstance breaking

the chain of causation between the illegal search and Martinez' confession.  See Reply at 3.  Next,

he argues that Hartsock committed another constitutional violation when he opened the door to the

pickup truck without a warrant.  See id. at 4.  Finally, Martinez argues that neither the good-faith

exception nor the inevitable-discovery exception applies under the facts of this case.  See id. at 4-6.

### 2.    The January 2010 Suppression Hearing.

At the hearing, after a brief opening statement by Mr. Bregman, Charlyn Rees, Assistant

United States Attorney, and Mr. Bregman stipulated to admission of the testimony and exhibits

proffered in the first motion to suppress.  See Jan. 21 Tr. at 2:16-3:7, 4:3-24 (Court, Rees,

Bregman).[12]   The United States then called its first witness: Hartsock.   See Jan. 21 Tr. at 6:2-3
(Rees).   Hartsock gave extensive factual testimony, recounting the details of his arrival on Martinez'
property, the arrival of the mysterious truck, and the subsequent interview of Martinez at the main
BCSO station in Albuquerque, New Mexico.   The United States' next witness, Torres, testified
about the arrival of Martinez' truck, about encountering Martinez, and about transporting him to the
station downtown.   See id. at 143:6-155:18 (Torrez, Bregman, Torres).   Dudewicz, the United
States' third witness, testified primarily about how she did not enter Martinez' home until after the
officers obtained a search warrant.   See id. at 161:21-165:17 (Torrez, Dudewicz).   She also testified
about her encounter with Martinez and the circumstances involved in transporting him downtown.
See id. at 166:11-175:9 (Torrez, Dudewicz).   The United States' last witness was Detective Adam
Gaitan, who testified as to tactics that a SWAT team would use to approach a potentially dangerous
vehicle.   See id. at 234:20-235:19 (Rees, Gaitan).   Gaitan admitted, however, that the approach of
the truck was not a SWAT situation.   See id. at 245:14-18 (Bregman, Gaitan).   Gaitan also testified
as to how the officers approached and opened Martinez' truck, and whether those tactics were
normal.

　　　　After the testimony, the parties argued their respective positions.   Eric Loman argued for
Martinez, taking the position that a confession which is acquired as a result of a constitutional
violation should be excluded unless the United States can show some intervening event that breaks
the chain of causation.   See id. at 251:9-17 (Loman).   Mr. Loman argued that the Court should apply
the factors outlined in Brown v. Illinois, 422 U.S. 590 (1975), and find that the taint of the
constitutional violation had not become so attenuated that the evidence may be allowed.   See Jan.

_____

　　　　[12] As a result, the Court has incorporated by reference its factual findings from the
Memorandum Opinion and Order ruling on the prior motion.

21 Tr. at 251:18-257:2 (Court, Loman).  He also argued that the search of the truck, rather than being an intervening event justifying the interview of Martinez, was a separate constitutional violation, and thus the United States cannot rely upon that event to break the chain of causation between the evidence and the unconstitutional search of Martinez' home.  See id. at 257:3-267:4 (Court, Loman).  Mr. Loman also argued against the United States' inevitable-discovery and good-faith arguments.   See Transcript of Hearing at 6:8-11:2 (taken January 22, 2010)(Court, Loman)("Jan. 22 Tr."); Jan. 22 Tr. at 11:3-13:1 (Court, Loman).

Ms. Rees argued to the contrary, asserting that the Illinois v. Brown factors, primarily the lapse-of-time factor, weigh in favor of finding that the taint of the unlawful search had become attenuated.  See Jan. 22 Tr. at 13:18-14:14 (Court, Rees).  Ms. Rees also argued vigorously that Martinez was not in "custody" or "detained" when he was brought to the main BCSO station, and when Hartsock questioned him.  Id. at 17:25-21:1 (Court, Rees).  She argued

> that it doesn't matter what Detective Hartsock thought, whether the defendant was free to go or not.  It matters what a reasonable person in Mr. Martinez's situation would believe.  And I would submit to, Your Honor, that all of the circumstances of that day would lead a reasonable person to believe that they were not in custody. The fact that Miranda warnings were given does not create a custodial setting, the fact -- there's case law on point -- the fact the questioning may have taken place in a coercive environment, such as a police station, doesn't change it into a custodial setting.

Id. at 19:17-20:2 (Rees).  She also argued that the investigation of the truck was wholly independent of the investigation of Martinez' house, and thus can act as an intervening event that breaks the causal chain between the illegal entry into Martinez' house and Martinez' interrogation.  See Jan. 22 Tr. at 22:11-23:25 (Court, Rees). Ms. Rees then reminded the Court how dangerous a police officer's job is, and how the officers' protective sweep of the truck was made based on concerns for the officers' safety, which they honestly believed to be in jeopardy.  See id. at 24:21-26:5 (Court,

Rees).  She next argued that, even if Martinez was in custody when he was at the BCSO station, his confession could nevertheless be voluntary.  See id. at 32:17-36:19 (Court, Rees).  Finally, she reiterated many of her arguments in the context of the inevitable-discovery and good-faith exceptions to the exclusionary rule.  See id. at 36:20-39:19 (Court, Rees).

## RELEVANT LAW REGARDING SEIZURE[13]

The Fourth Amendment protects a person's right to be secure against unreasonable search and seizure:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "[T]he rights of privacy and personal security protected by the Fourth Amendment 'are to be regarded as of the very essence of constitutional liberty; and . . . the guaranty of them is as important and as imperative as . . . the guaranties of the other fundamental rights of the individual citizen.'"  Harris v. United States, 331 U.S. 145, 150 (1947), overruled in part by Chimel v. California, 395 U.S. 752, 768 (1969)(quoting Gouled v. United States, 255 U.S. 298, 304 (1921)).  The Supreme Court has found "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."  United States v. Mendenhall, 446 U.S. 544,

---

[13] The protections of the Fourth Amendment are incorporated into the Fourteenth Amendment and therefore restrict the conduct of state actors just as they restrict federal actors.  See California v. Minjares, 443 U.S. 916, 921 (1979)("In Wolf v. Colorado, 338 U.S. 25 . . . (1949), the Court held that the Fourth Amendment was applicable to the States by incorporation through the Fourteenth Amendment.  This was, and remains, a thoroughly defensible proposition."); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").

554 (1980).  Where the individual could not or would not want to leave, even absent police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991).

<div align="center"><u>**LAW REGARDING THE EXCLUSIONARY RULE**</u></div>

When evidence is obtained in violation of a person's constitutional rights, the police will be prohibited from using that evidence in a criminal prosecution of that person.  <u>See</u> <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974).  For the exclusionary rule to apply, the defendant need show only, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.  <u>See</u> <u>United States v. Torres-Castro</u>, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.  <u>See</u> <u>id.</u>

1.      <u>**Judicial Rationale of the Exclusionary Rule.**</u>

The exclusionary rule introduces into the criminal justice system a tension between the court's need to find the truth by using all relevant evidence and the societal desire to deter illegal police conduct by excluding otherwise probative evidence.  An illegal search often results in reliable, probative, and otherwise-unobtainable evidence of an individual's guilt.  Sometimes the result of applying the exclusionary rule is that all evidence in a case is suppressed, even though the defendant's guilt is almost certain, because the unconstitutional search taints all of the evidence. In such circumstances, the individual often cannot be convicted of the crime of which he is clearly guilty.  The Supreme Court of the United States has found, however, that limiting the powers of law enforcers and the concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth Amendment's protections.  As Justice Stevens noted in his concurring and dissenting

<div align="center">-24-</div>

opinion in <u>United States v. Leon</u>, 468 U.S. 897 (1984): "It is of course true that the exclusionary rule

exerts a high price -- the loss of probative evidence of guilt.  But that price is one courts have often

been required to pay to serve important social goals."  468 U.S. at 979 (Stevens, J., concurring and

dissenting).  <u>See</u> <u>Kolender v. Lawson</u>, 461 U.S. 352, 355 (1983)("The price of [law-enforcement]

effectiveness, however, is intrusion on individual interests protected by the Fourth Amendment.").

> [The exclusionary] rule is based upon very strict requirements designed to narrow
> the occasions upon which officers can make searches and seizures without judicial
> warrant.  Unquestionably its application will now and then permit a guilty person to
> escape conviction because of hasty or ill-advised action on the part of enforcement
> officers.  But the same may be said of the requirements of the Fourth Amendment
> . . . .  The framers of the Fourth Amendment must have concluded that reasonably
> strict search and seizure requirements were not too costly a price to pay for
> protection against the dangers incident to invasion of private premises and papers by
> officers, some of whom might be overzealous and oppressive.

<u>United States v. Rabinowitz</u>, 339 U.S. 56, 67-68 (1950)(Black, J., dissenting), <u>overruled in part by</u>

<u>Chimel v. California</u>, 395 U.S. 752 (1969).  The Constitution of the United States and the case law

interpreting it reveal that the government's right to interfere in the lives of its citizens is highly

circumscribed.  For the present time,[14] the Supreme Court has determined that the purpose of the

exclusionary rule "is to deter -- to compel respect for the constitutional guaranty in the only

---

[14] There are powerful arguments against the exclusionary rule.  Both scholars and judges
have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price
to pay for the unknown degree of deterrence that exclusion achieves.  <u>See</u>, <u>e.g.</u>, Christopher
Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 369-70, 442-
43 (1999); Akhil Reed Amar, <u>Fourth Amendment First Principles</u>, 107 Harv. L. Rev. 757, 795-800
("[I]f deterrence is the key, the idea is to make the government pay, in some way, for its past
misdeeds, in order to discourage future ones. But why should that payment flow to the guilty? Under
the exclusionary rule, the more guilty you are, the more you benefit."); Hon. Malcolm Richard
Wilkey, <u>A Call for Alternatives to the Exclusionary Rule</u>, 62 Judicature 351 (1978-1979); Hon.
Malcolm Richard Wilkey, <u>The Exclusionary Rule: Why Suppress Valid Evidence?</u>, 62 Judicature
214 (1978-1979).  The Court, however, is not free to disregard the Supreme Court's or the United
States Court of Appeals for the Tenth Circuit's law, and must apply faithfully the exclusionary rule
as those judicial bodies have dictated.

effectively available way -- by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206 (1960).

      **2.**      **Distinction between Finding of a Constitutional Violation and Applying of the Exclusionary Rule.**

      "Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." United States v. Leon, 468 U.S. at 906 (citing Illinois v. Gates, 462 U.S. 212, 223 (1983))(internal quotes omitted). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 129 S. Ct. 695, 702 (2009). Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements," suppression is not automatic, and "any marginal deterrence" from suppression is often insufficient. Id. at 702, 704.

      **3.**      **Exclusionary Rule Prohibits Indirect Uses of Tainted Evidence.**

      Nevertheless, if the police acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an exception to the exclusionary rule applies. See United States v. Calandra, 414 U.S. at 347 ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule demands exclusion of evidence that was obtained as a but-for result of the illegal search unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no

longer clings to it.  Wong Sun v. United States, 371 U.S. 471, 484 (1963)("The exclusionary

prohibition extends as well to the indirect as the direct products of such invasions.").

> The essence of a provision forbidding the acquisition of evidence in a certain way
> is that not merely evidence so acquired shall not be used before the Court but that it
> shall not be used at all. Of course this does not mean that the facts thus obtained
> become sacred and inaccessible. If knowledge of them is gained from an independent
> source they may be proved like any others, but the knowledge gained by the
> Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251

U.S. 385, 392 (1920)).  The Tenth Circuit has acknowledged the rule as follows:

> [A] defendant may . . . suppress any . . . evidence deemed to be "fruit of the
> poisonous tree," (i.e., evidence discovered as a direct result of the unlawful activity),
> by showing the requisite factual nexus between the illegality and the challenged
> evidence.  Once the defendant meets this burden, the Government may still avoid
> suppression by proving that the contested evidence is not fruit of the poisonous tree.
> According to the Supreme Court, the overriding issue in "fruits" cases is whether,
> granting establishment of the primary illegality, the evidence to which instant
> objection is made has been come at by exploitation of that illegality or instead by
> means sufficiently distinguishable to be purged of the primary taint.

United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006)(internal citations omitted).

Though the exclusionary rule is simply stated, courts have been trying to hash out its scope for many

years.

### 4.       Relevant Exceptions to the Exclusionary Rule.

The exclusionary rule has exceptions.  If illegally obtained evidence is somehow purged of

the taint of the unconstitutional conduct, it can be admitted.  "The Government can establish that

a particular item of evidence has been purged of the primary taint by demonstrating that the evidence

would have been inevitably discovered, was discovered through independent means, or was so

attenuated from the illegality as to dissipate the taint of the unlawful conduct."  United States v.

Olvares-Rangel, 458 F.3d at 1109.  See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he

government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.").

> ### a.    Attenuation of the Taint.

When determining whether evidence constitutes fruit of the poisonous tree subject to the exclusionary rule, a court must determine, based upon the unique facts of each case, "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."   United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Wong Sun v. United States, 371 U.S. at 448).  See United States v. Carson, 793 F.2d 1141, 1156-57 (10th Cir. 1986)("The issue is not whether the officers 'would not have requested consent but for the first illegal search,' but rather whether the officers exploited the fruits of their illegal activity in such a way that Carson's consent to the search was involuntary under the Fourth Amendment.").  In Brown v. Illinois, the Supreme Court listed three factors for courts to consider when analyzing fruits of the poisonous tree and determining whether the causal chain is sufficiently attenuated: (i) the time elapsed between the constitutional violation and the acquisition of evidence; (ii) the presence of intervening facts, and (iii) the purpose and flagrancy of the official misconduct. See 422 U.S. at 603-04.  See also United States v. Torres-Castro, 470 F.3d at 999 ("In considering whether evidence seized is so attenuated from the illegality as to dissipate any taint, we balance the 'temporal proximity of the Fourth Amendment violation,' any 'intervening circumstances,' and the 'purpose and flagrancy of the official misconduct.'")(quoting United States v. King, 990 F.2d at 1563-64).

The Tenth Circuit has stated that "[t]he implication of the Supreme Court's decision in

Brown v. Illinois is that in order for incriminating statements to be purged of the taint of an underlying Fourth Amendment violation, [the] defendant's consent must meet the voluntariness standard of the Fourth Amendment." United States v. Carson, 793 F.2d at 1151.  Furthermore, "[i]f Government officials use the fruits of their illegal conduct to 'cajole' the consent [to search] an unwitting citizen, then the evidence [obtained in that search] is obtained by exploitation of the primary illegality and is not obtained by means sufficiently distinguishable from the illegality to be purged of the primary taint." Id. at 1157.  At least in the context of the officers' motivation for requesting consent to search, "the inquiry turns on whether the evidence is obtained by means, although influenced by prior illegal police actions, which are different enough from the prior illegality to be 'sufficiently distinguishable.'" Id. at 1149 (emphasis added).

> **(i)     The origin of the attenuation doctrine: Wong Sun v. United States.**

Wong Sun v. United States is often considered the origin of the attenuation doctrine.[15]  In it, police arrested a man named Hom Way, who was found in possession of heroin.  See Wong Sun v. United States, 371 U.S. at 473.  When questioned, he told the officers that he bought the drugs from a man named "Blackie Toy," proprietor of a laundry establishment.  See id.  The officers found a laundry -- "Oye's Laundry" -- which they believed to be the one to which Hom Way referred.  Id. at 473-74.  An officer knocked on the laundry's door at 6:00 a.m., two hours before it opened for business, and attempted to gain entry.  See id. at 474.  When the man who answered the door refused to let the officer in, the officer identified himself as a federal narcotics agent, which prompted the

---

[15] The Supreme Court in Wong Sun v. United States cites to Nardone v. United States, 308 U.S. 338 (1939), for the phrase "become so attenuated as to dissipate the taint."  Wong Sun v. United States, 371 U.S. at 487.  Nardone v. United States, however, dealt with the use of evidence obtained through illegal wire-taps in light of the federal wire-tapping law, see 308 U.S. at 340 (citing 47 U.S. § 605), and its analysis is thus not on point for Fourth Amendment cases.

man to slam the door on the officer and begin running down the hall.  See id.  The officers broke open the door and followed the man to his living quarters in back of the laundry, apprehending and handcuffing him.  See id.  The man's name was James Wah Toy, and the Supreme Court noted a lack of evidence in the record whether James Wah Toy was the "Blackie" of whom Hom Way spoke.  See id.  Toy told the officers he did not sell heroin to Hom Way, but that he knew someone named "Johnny" who sold heroin and described the house in which Johnny lived.  See id. at 474-75. The officers entered the house that Toy described and found a man named Johnny Yee, who, after a brief discussion, surrendered himself and his stash of heroin to the officers.  See id. at 475. Yee told the officers that he bought the drugs from Toy and another man -- Wong Sun.  See id.

The officers went to Wong Sun's house and knocked on the door.  See id.  Wong Sun's wife told the officers that Wong Sun was sleeping in the back room, so the officers went into the back room and arrested him.  See id.  No narcotics were found in his home or on his person.  See id. Wong Sun was brought up on drug-trafficking charges, arraigned, and released on his own recognizance.  See id.  Several days later, Wong Sun voluntarily returned to the police station to make a statement, in which he confessed to participating in heroin transactions.  See id. at 490.

Wong Sun sought to have the confession suppressed as fruit of the poisonous tree.  See id. The district court, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court all declined to suppress the statement. See id. at 477, 490.  The Supreme Court agreed with the Ninth Circuit that the arrest of Wong Sun was unlawful because it was not based on probable cause.  See id. at 490.  Logically, if Wong Sun had never been arrested, there is no reason to believe that he would have come to the police to confess his involvement in any crime.  Thus the confession was a but-for result of the unlawful arrest.  The Supreme Court held, however, that, because "Wong Sun had been released on his own recognizance after a lawful arraignment, and had voluntarily returned

several days later to make the statement," "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint'" of the illegal arrest.  371 U.S. at 477, 490 (quoting Nardone v. United States, 308 U.S. at 340).

<blockquote>

(ii)     <strong>The Supreme Court breaks the doctrine of</strong> Wong Sun v. United States <strong>into a multi-factor analysis in</strong> Brown v. Illinois.

</blockquote>

Twelve years after the Supreme Court decided Wong Sun v. United States, the Court took the opportunity to clarify the meaning of the case and elaborate on the considerations that go into the attenuation analysis.  In Brown v. Illinois, police officers investigating the murder of a man named Roger Corpus illegally entered defendant Richard Brown's apartment and searched it.  See 422 U.S. at 592.  When Brown came home at 7:45 p.m., the officers, lacking probable cause or a warrant, arrested him at gunpoint.  See id. at 593-94.  The officers then transported him to the police station, placed him in an interrogation room, and left him alone for a several minutes.  See id. at 594. When the officers returned, they read Brown his Miranda rights and, after the officers made some statements indicating they might have evidence of Brown's complicity in the murder, Brown waived his Miranda rights and made a statement confessing to his role in Corpus' death.  See 422 U.S. at 594-95.  Brown gave this first statement at about 8:45 p.m., an hour after his initial arrest.  With Brown's help, the officers eventually tracked down Jimmy Claggett, the man that Brown implicated as the actual shooter in Corpus' murder.  See id. at 595.  Shortly thereafter, Assistant State's Attorney Crilly spoke with Brown, again giving Brown his Miranda warnings and telling Brown that the state was going to charge him with murder.  See id.  In response, Brown made another, similar statement. See 422 U.S. at 595-96.

The State of Illinois, by a Grand Jury, indicted both Brown and Claggett for Corpus' murder. See id. at 596.  Brown sought to have the statements that he made suppressed as fruit of his illegal

arrest and detention.  See 422 U.S. at 596.  The state trial court denied the motion.  See id.  The Supreme Court of Illinois affirmed, holding that the arrest and detention were illegal, but that the issuance of Miranda warnings rendered the statements "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  422 U.S. at 597 (quoting the Supreme Court of Illinois).

The Supreme Court of the United States granted Brown's request for a writ of certiorari and reversed.  The Supreme Court held primarily that, because Miranda warnings do not adequately protect the interests that the Fourth Amendment is intended to safeguard, the waiver of Miranda rights does not, by itself, show that the resulting statement is "sufficiently an act of free will to purge the primary taint."  422 U.S. at 600-03.  "It is entirely possible, of course . . . that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality," the Supreme Court said, "[b]ut Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."  422 U.S. at 603 (emphasis in original).  Rather, "[t]he question of whether a confession is the product of free will under Wong Sun [v. United States] must be answered on the facts of each case.  No single fact is dispositive."  Id.

The Supreme Court then discussed the factors that a court should consider when analyzing whether a confession is "sufficiently the product of free will" to say that the taint of the initial illegality has become attenuated.  "The Miranda warnings are an important factor," as are "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct."  Id. at 603-04.  It clarified, however, that "[t]he voluntariness of the statement is a threshold requirement[,] [a]nd the burden of showing admissibility rests, of course, on the prosecution."  Id. at 604.  Ultimately, the Supreme Court in Brown v. Illinois found that the defendant's statement was a fruit of the poisonous tree

because "Brown's first statement was separated from his illegally arrest by less than two hours, and there was no intervening event of significance whatsoever." 422 U.S. at 604. It reinforced this holding with the fact that "[t]he illegality here, . . . had a quality of purposefulness." Id. at 605.

### (iii)    United States v. Ceccolini.

In United States v. Ceccolini, 435 U.S. 268 (1978), the Supreme Court found that the taint of an illegal search had become attenuated. Officer Ronald Biro was spending his break at Ceccolini's place of business, the Sleepy Hollow Flower Shop, talking with Lois Hennessey, an employee. See id. at 269-70. During the conversation, Biro noticed an envelope with money in it, picked up the envelope, and discovered that it also contained policy slips -- evidence of illegal gambling. See 435 U.S. at 270. Without letting Hennessey know that he had inspected the envelope, Biro asked her to whom the envelope belonged, to which she answered that it belonged to Ceccolini. See 435 U.S. at 270. Biro later told another detective what he learned, and that detective told Lance Emory, an agent of the Federal Bureau of Investigation. See id. Four months later, Emory went to Hennessey's home, telling her only that he knew she worked for Ceccolini, and asked her for "any information regarding [Ceccolini's] activities that [Hennessey] had acquired in the shop." Id. at 272. Hennessey was willing to testify to Ceccolini's involvement in gambling. Id. Because Ceccolini had testified that he had never had any such involvement, the United States indicted him for perjury. See id.

The trial court, although initially finding Ceccolini guilty of the charged offense, set aside its finding of guilt after granting a motion to suppress Hennessey's testimony as fruit of the poisonous tree. See id. at 272-73. The United States Court of Appeals for the Second Circuit affirmed, see id. at 273, but the Supreme Court reversed, finding that the taint of the illegality had become attenuated, see id. Emory would not have spoke to Hennessey if not for the information

illegally obtained from the initial police officer's "search" of a suspicious-looking envelope.  The Supreme Court reiterated, however, that "[t]he issue cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements as well."  435 U.S. at 274.  The Supreme Court found that Hennessey's testimony, though causally related to the illegal search, had become sufficiently attenuated because: (i) the free will that the witness exhibited made it more likely that she would eventually have come forth on her own, see id. at 276-77, 279; (ii) the Supreme Court is less willing to exclude live-witness testimony than to exclude inanimate documents or objects, see id. at 277; (iii) the slips were not used in questioning Hennessey, see 435 U.S. at 279; (iv) "substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness," and "between [the contact with the witness] and the testimony at trial," id.; and (v) it did not appear that the officer entered the flower shop with the intent of seeking out evidence, id. at 280.  "Application of the exclusionary rule in this situation," the Supreme Court concluded, "would not have the slightest deterrent effect on the behavior of an officer such as Biro."  Id.  The Supreme Court admitted that "no mathematical weight can be assigned to any of the factors which we have discussed."  Id.

> **b.      The Inevitable-Discovery Doctrine.**

Another exception to the exclusionary rule is the inevitable-discovery doctrine.  The doctrine permits courts to admit unconstitutionally obtained evidence "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  See United States v. Torres-Castro, 470 F.3d at 999. "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred."  United States v. Cunningham, 413

F.3d 1199, 1203 (10th Cir. 2005).  The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct" -- "it is possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997).  See United States v. Cunningham, 413 F.3d at 1204 n. 1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham).  "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible."  United States v. Griffin, 48 F.3d at 1151 (internal citations and quotations omitted).

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53.  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  Rejecting the government's position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could

have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153.  United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation.

### c.     The Good-Faith Exception.

Another exception to the exclusionary rule is the investigating officer's "good-faith."  In United States v. Leon, the Supreme Court faced the question whether to create an exception to the exclusionary rule when a police officer obtained evidence through the use of a warrant that he mistakenly thought probable cause supported.  See 468 U.S. at 905.  The Supreme Court noted that excluding evidence which was obtained pursuant to a warrant that the officer reasonably thought to be valid would not deter police misconduct, because the affected officer had taken all steps in their power to comply with the Fourth Amendment.  See 468 U.S. at 918-19.  It further noted that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge, and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court thus concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See id. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant.  See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).  "[T]he suppression of evidence obtained pursuant to a warrant should be ordered only in those unusual cases in which exclusion will further the

purposes of the exclusionary rule[.]  Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).

### (i)    Warrants based on illegally obtained information.

When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception.  Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed.  If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."); United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.").  The apparent rationale for this rule is that one officer

cannot execute a warrant "in good faith" if it contains information that he or a fellow officer obtained illegally.  See United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)("Leon's good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.")

<div align="center">(ii)      <strong>Herring v. United States.</strong></div>

Last term, the Supreme Court decided a case that may have changed the standard for the good-faith exception to the warrant requirement.  In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County warrant database.  See 129 S. Ct. at 698.  In the search incident to that arrest, officers found drugs and a gun on Herring's person.  See id.  Herring was then indicted on federal gun and drug-possession charges.  See 129 S. Ct. at 699. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall.  See 129 S. Ct. at 698.  Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See id. at 699.  The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed.  See id.

The Supreme Court likewise affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule.  The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.  See Herring v. United States, 129 S. Ct. at 700.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Id. at 701 (citing United States v. Leon,

468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct. at 702.

The Supreme Court in Herring v. United States then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 129 S. Ct. at 703-04. Thus, it appears that, if the police make a negligent administrative error which results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

The Tenth Circuit has recently analyzed Herring v. United States, indicating how it believes the case has modified the standard for finding the good-faith exception applies.  In United States v. McCane, 573 F.3d 1037 (10th Cir. 2009), the Tenth Circuit described Herring v. United States as extending the exception to "good faith reliance upon the negligent mistake of a fellow law enforcement employee."  573 F.3d at 1043.  "In Herring[ v. United States], the [Supreme] Court applied the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee."  573 F.3d 1043  "[T]he good-faith inquiry 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances."  Id. at 1044 (quoting Herring v. United States, 129 S. Ct. at 703).  As the

Supreme Court stated: "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."  United States v. Herring, 129 S. Ct. at 701.  See United States v. McCane, 573 F.3d at 1044 ; United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009)("An officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."); United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009).

## ANALYSIS

By his motion, Martinez asks the Court to exclude all evidence obtained in a warrant-authorized search of his home on the grounds that all of the information set forth in the warrant affidavit which establishes probable cause was obtained by unconstitutional means.  In response to his first motion, the Court has already determined that the initial sweep performed by Lind and Kmatz was unlawful, and has effectively struck the information obtained from that sweep from the warrant affidavit.  In that Memorandum Opinion and Order, however, the Court concluded that there existed other information from which Judge Murdoch could find that probable cause existed to search Martinez' home.  Martinez' current motion seeks to have the Court find that the unconstitutional search tainted the other information -- Martinez' statement to Hartsock confessing to the presence of child pornography in his home.  Martinez argues his statement was the result of the unconstitutional entry and search of his home, and so the United States cannot rely on it to establish probable cause.  Thus, he argues, with both the information from the search and information about his statement struck from the warrant affidavit, the affidavit does not establish probable cause to search his home, and thus the search was unconstitutional, requiring exclusion of the evidence.

I.     **THE COURT WILL ASSUME, FOR PURPOSES OF THIS MOTION, THAT THE INITIAL ENTRY INTO MARTINEZ' HOUSE BY LIND AND KMATZ WAS AN UNLAWFUL SEARCH IN VIOLATION OF THE FOURTH AMENDMENT.**

In its response, the United States does not concede the initial entry into Martinez' house by Lind and Kmatz was an unlawful search in violation of the Fourth Amendment. The United States maintains that the deputies based the initial entry into Martinez' residence upon exigent circumstances and that the manner of their search, once inside the residence, was reasonable. See Response at 7 n.2. The United States did not, however, move the Court to reconsider its prior decision, present new evidence on the prior motion to suppress, or argue that the Court should reconsider or change its prior decision. Accordingly, the Court will assume, for purposes of this motion, that the initial entry was an unlawful entry and search.[16] This opinion deals only with whether, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Olvares-Rangel, 458 F.3d at

---

[16] The United States' Response, in its discussion of attenuation of the taint, draws the Court's attention to the Supreme Court's recent decision in Michigan v. Fisher, 130 S. Ct. 546 (2009). See Response at 7 n.3. Michigan v. Fisher does not discuss the attenuation doctrine, and the United States' citation to it appears to be an effort to put before the Court new case law relevant to Martinez' prior motion to suppress. The case does not, however, support finding that Lind's and Kmatz' entry into Martinez' home was lawful. In Michigan v. Fisher, the police arrived at Fisher's house to find

> a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside. The officers also noticed blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house.

130 S. Ct. at 547. The officers also saw "[t]hrough a window, . . . Jeremy Fisher, inside the house, screaming and throwing things." Id. These facts gave the officers in Michigan v. Fisher cause to believe someone inside the house is in immediate need of their assistance. See id. at 548-49. None of these facts were present in this case.

1109.  Ultimately, the Court finds that Martinez' statements were "come at by exploitation of [the] illegality," and not by "means sufficiently distinguishable to be purged of the primary taint."  Id.

## II.   THE TAINT OF THE ILLEGAL SEARCH IS NOT SUFFICIENTLY ATTENUATED FROM MARTINEZ' STATEMENTS.

The United States argues that Martinez' statements to Hartsock were sufficiently attenuated from the illegality of the search of his residence to dissipate any taint from unlawful conduct. Notably, the United States' brief cites only two cases in which a court applied the doctrine of attenuation and found that a piece of evidence was admissible on that basis.  See Motion at 5-11. The United States also cited Brown v. Illinois, Johnson v. Louisiana, 406 U.S. 356 (1972), United States v. Peters, 10 F.3d 1517 (10th Cir. 1993), United States v. King, United States v. Maez, 872 F.2d 1444 (10th Cir. 1989), and United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988), overruled in part by United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995), all of which declined to find attenuation, as well as other cases not discussing the attenuation doctrine.  See id.  The cases that the United States cited in which attenuation was found are Wong Sun v. United States, which the Court has already discussed at length, and United States v. Carson.  Subsequent Tenth Circuit opinions have found that United States v. Carson, by indicating that voluntariness is the only test, blurred what is a two-step analysis in consent-to-search cases: that the consent be voluntary and that there be "sufficient independence from the prior illegal arrest to purge the taint of that arrest." United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994).  United States v. Carson, if it is still good law, now stands only for the proposition that a truly voluntary consent to search, not influenced by the prior illegality nor coerced in any way, is sufficient to break the causal chain between the illegality and the subsequent search.  See 793 F.2d at 1155-56 ("There is no evidence in the record showing that the officers used information obtained in the prior illegal search to coerce

Carson into consenting to the subsequent search.  Carson waived his Fourth Amendment rights by voluntarily consenting to a search, independent of the prior police activity of which he did not know.").

The facts of this case do not lead the Court to the conclusion that the taint of the illegal entry has become attenuated.  The factors the Court is to consider are "the 'temporal proximity of the Fourth Amendment violation,' any 'intervening circumstances,' and the 'purpose and flagrancy of the official misconduct.'"  United States v. Torres-Castro, 470 F.3d at 999 (citations omitted).[17] Careful consideration of each factor, and the United States' other arguments relating to this doctrine, indicate that the underlying search tainted Martinez' subsequent statement.

### A.    THE LAPSE OF TIME BETWEEN THE ILLEGAL SEARCH AND MARTINEZ' STATEMENTS DOES NOT WEIGH IN FAVOR OF FINDING ATTENUATION.

The first factor in Brown v. Illinois is "the temporal proximity of the arrest and the confession."  422 U.S. at 603.  The United States argues that the lapse of time between the illegal entry and the confession weighs in favor of finding that the taint of the illegality has become attenuated.  See Response at 6.  Martinez disagrees.  See Motion at 3-5.  The Court is without substantial guidance on what constitutes a significant amount of time, such that the taint of an illegality might become attenuated, or what events should bookend the Court's lapse-of-time.  See, e.g., United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 951 (9th Cir. 2010)("[T]here is no 'bright-line' test for temporal proximity in an attenuation analysis.")(quoting United States v. Reed, 349 F.3d 457, 463 (7th Cir. 2003))(internal quotations omitted); United States v. Lopez-

---

[17] The giving of Miranda warnings, as was done in this case, was one of the factors the Supreme Court in Brown v. Illinois recognized weighs in favor of finding attenuation.  See 422 U.S. at 603-04.

Garcia, 565 F.3d 1306, 1316 (11th Cir. 2009)("[T]here is no hard-and-fast rule for determining how much time must have passed before the link between an unlawful arrest and a confession can be considered sufficiently attenuated."); United States v. Najjar, 300 F.3d 466, 478 (4th Cir. 2002) ("[T]he mere passage of time cannot serve to make tainted physical evidence admissible.  Rather, the temporal aspect can inform the attenuation analysis, for instance, by providing a context to the government's further investigations.").  Nevertheless, the Court finds that the four or five hours between Lind's and Kmatz' illegal entry, and Martinez' confession, do not weigh in favor of finding attenuation.

The two cases that seem to provide something of a spectrum upon which to place the lapse-of-time element are Wong Sun v. United States and Brown v. Illinois.  In Wong Sun v. United States, in which the Supreme Court found attenuation, Wong Sun was released on his own recognizance and, several days later, returned voluntarily to give a statement.  See 371 U.S. at 490. By contrast, in Brown v. Illinois, only about one hour separated the police officers' unlawful arrest of Brown, at gunpoint, from his confession.  See 422 U.S. at 592, 594.  That amount of time was apparently insufficient.  See id. at 605.  In United States v. Ceccolini, in which attenuation was found, the illegal search of Ceccolini's envelope occurred four months before the FBI agent went to speak with Ceccolini's employee.  See 435 U.S. at 272.  In Taylor v. Alabama, 457 U.S. 685 (1982), a case very similar to Brown v. Illinois, the Supreme Court found that a six-hour gap between an illegal arrest and a confession, when weighed with the other Brown v. Illinois factors, was not sufficient to attenuate the taint of the arrest.  See 457 U.S. at 690-91.  In United States v. Carson, attenuation was found based on Carson's voluntary consent to the search that turned up the challenged evidence, see 793 F.2d at 1155, so temporal proximity was not considered.  Other cases come to different conclusions based on the presence of other Brown v. Illinois factors.  See Mosby

v. Senkowski, 470 F.3d 515, 522 (2d Cir. 2006)(citing New York state law and finding that, when all other factors also weighed in favor of attenuation, five hours is sufficient to break the causal chain); United States v. Pina-Aboite, 109 Fed. Appx. 227, 237 (10th Cir. 2004)(finding "a matter of minutes" to be an insufficient lapse of time to purge taint of illegality from a consent to search); United States v. Reed, 349 F.3d at 463 (appearing to find that five to six hours, in the absence of significant intervening circumstances, did not weigh in favor of attenuation); United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994)(finding that, when "only a few minutes" separate the illegality and the grant of consent, the temporal proximity factor "weigh[s] heavily against finding the taint cleansed"); United States v. George, 883 F.2d 1407, 1416 (9th Cir. 1989)("As best we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours."); United States v. Maez, 872 F.2d at 1447, 1455 (holding that, after forty-five minutes elapsed, "the proximity of the arrest and Mrs. Maez' consents clearly indicate that taint of the Payton[18] violation was not purged").

The only circuit-court case that the Court has found in which the court finds attenuation where a period of as little as five hours elapsed between the constitutional violation and the acquisition of evidence is Mosby v. Senkowski.  In Mosby v. Senkowski, Mosby was arrested in his home by officers with probable cause to arrest, but without authority to enter his home -- thus resulting in a Payton violation.  See 470 F.3d at 517.  At trial in state court, Mosby moved to suppress the confession, but the trial judge denied the motion because it found that Mosby lacked Fourth-Amendment standing.  See id. at 518.  Mosby raised the Fourth-Amendment issue by way

---

[18] A Payton violation, named after the Supreme Court case of Payton v. New York, 445 U.S. 573 (1980), refers to the Fourth-Amendment violation that occurs when police officers "effect[] a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." New York v. Harris, 495 U.S. 14, 16 (1990).

of an application for a writ of habeas corpus, alleging that his appellate counsel's failure to raise the issue on appeal constituted ineffective assistance.  See 470 F.3d at 518.  In analyzing whether raising that issue on appeal would be meritorious, the United States Court of Appeals for the Second Circuit quickly found that the confession would not be suppressed under federal law because the Supreme Court has held that state courts need not exclude confessions taken after an arrest that was unlawful only because the officers violated the principles of Payton v. New York.  See Mosby v. Senkowski, 470 F.3d at 521 (citing New York v. Harris, 495 U.S. 14, 19-21).  The Second Circuit then sought to determine whether Mosby's confession might have been suppressed under New York state law, finding that New York would apply an attenuation analysis, rather than the doctrine of New York v. Harris.  See Mosby v. Senkowski, 470 F.3d at 522-23.

The Second Circuit found that "[a]ll four [Brown v. Illinois] factors -- administration of Miranda warnings, temporal proximity of the arrest and statement, intervening circumstances, and the purpose and flagrancy of the official misconduct -- suggest that the link between Mosby's arrest and confession was sufficiently attenuated so as not to require suppression."  Mosby v. Senkowski, 470 F.3d at 522.  Specifically as to temporal proximity, the Second Circuit held that "New York courts have found custodial statements given after Miranda warnings and similar passages of time sufficiently attenuated to break the causal chain from an unlawful arrest."  Id. at 522.  The Second Circuit also found "significant intervening circumstances between the warrantless arrest and the confession," that the police misconduct was not flagrant, and that suppression would "be unlikely to deter future police misconduct."  Id. at 522-23.  The Court is not swayed in its analysis by Mosby v. Senkowski because: (i) federal law, rather than New York law, applies in this case; (ii) the remaining Brown v. Illinois factors do not weigh so heavily in favor of attenuation in this case; (iii) Second Circuit law is not binding on this Court; and (iv) the posture of Mosby v. Senkowski --

reviewing whether a legal issue, if raised on appeal, would have been meritorious -- may have caused the Second Circuit to be more generous in apply the attenuation analysis.

Attenuation generally is found where a period of multiple days elapses between the illegality and the challenged statement, such that it is clear that the statement is a product of free will.  In this case, there is a gap of approximately four hours between the illegal entry at 2:00 p.m. and the interrogation at about 6:00 p.m., and almost five hours between the entry and the confession at 6:50 p.m.  This time period is more than elapsed in Brown v. Illinois, but substantially less than elapsed in Wong Sun v. United States or United States v. Ceccolini.  The time elapsed here is less time, however, than elapsed in Taylor v. Alabama, wherein the Supreme Court did not find attenuation. See 457 U.S. at 691 (holding that the taint had not become attenuated after six hours "where, as here, petitioner was in police custody, unrepresented by counsel and he was questioned on several occasions, fingerprinted, and subjected to a lineup").

The Court is also concerned whether it should consider the entire four- or five-hour time period between the illegality and the confession, or consider only the period of time from when Martinez encountered the BCSO officers and learned that they had entered his house to the time of the confession -- about two hours and twenty minutes.  This latter period seems to best reflect the purpose of the factors in Brown v. Illinois to determine whether Martinez' confession was "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  Wong Sun v. United States, 371 U.S. at 487.  "The voluntariness of the statement is a threshold requirement." Brown v. Illinois, 422 U.S. at 604.  It seems irrelevant whether there are two hours, two days, or two weeks between an illegal entry and a subsequent confession, if the defendant is unaware that there has been a seizure of evidence until shortly before the question seeking his or her confession.  The only lapse of time that could impact whether a confession is "sufficiently an act of free will" is that

between when the defendant learns of seizure of evidence, and when he or she confesses.  See United States v. Mendoza-Salgado, 964 F.2d 993, 1012 (10th Cir. 1992)("The threshold inquiry of the taint analysis centers on the voluntariness of the party's stated consent," and "the proximity of the agents' entry to Mrs. Garcia's consent reveals little about whether the thirty to forty-five minutes that elapsed had any effect on her decision to permit the search.")(emphasis added).

The cases that the Court has reviewed, both from its own research and from those that the parties cite, do not give a clear indication whether the Court should consider, in the temporal-proximity analysis, time during which Martinez was unaware of Lind's and Kmatz' entry into his home.  Most of the cases deal with illegal arrests, about which the defendant could not help but be aware.  United States v. Mendoza-Salgado implies heavily that the court should consider only that lapse of time which might have an effect on the defendant's mindset – thus, only that time during which he or she knew of the police conduct that was unconstitutional.  See 964 F.2d at 1012.  See also United States v. Myers, 335 Fed. Appx. 936, 939 (11th Cir. 2009)(analyzing the temporal proximity factor by the length of time "after [the defendant] was told about" the officers' illegal search).  Even if the Court considered the full four-hour and fifty-minute period, however, the Court would not find that lapse of time significant under the attenuation analysis that the Supreme Court and the Tenth Circuit have so far developed.  No Tenth Circuit law has come to the Court's attention that has found attenuation in so short a time without some intervening event of significance, and Martinez spent much of the four-hour and fifty-minute period unaware that police had entered his home.  The Court finds no intervening event of significance, and the degree to which Martinez' confession was an act of free will is not substantially impacted by passage of time in which he did not know of the officers' conduct.  Based largely on Martinez' lack of knowledge of the entry into his home during the period of time, the temporal proximity factor does not weigh in favor of

attenuation.

**B.      THE SEARCH OF MARTINEZ' TRUCK IS NOT AN INTERVENING CIRCUMSTANCE THAT CAUSED THE TAINT OF THE ILLEGAL SEARCH OF MARTINEZ' HOUSE TO BECOME ATTENUATED.**

As an initial matter, the Court assumes, but does not find, that the officers' act of opening the door of the truck to see if someone dangerous was inside was not a constitutional violation.[19] With that assumption in place, the Court agrees with the United States that, based upon the circumstances surrounding the truck, the officers had probable cause to detain the driver of that truck for a controlled-substance violation and to obtain a search warrant for the truck, which resulted in discovery of marijuana and drug paraphernalia inside the truck.  The Court cannot, however, reasonably find that these circumstances alone constituted an intervening circumstance.

The United States contends that Martinez' statements were not a fruit of the poisonous tree because the search of his truck was an intervening circumstance justifying his detention.  The intervening circumstances, however, should be distinct and distinguishable from the initial illegality. Here, the alleged intervening circumstance was come at because of the initial illegality.  The absence of the sweep of the truck in Hartsock's report indicates to the Court that it was not a substantial factor in deciding to bring Martinez in, and certainly not the primary factor above and beyond the illegal search of Martinez' house.  The search of the vehicle, in all likelihood, would not have

---

[19] The Court need not address the challenging constitutional question of the validity of the officers' search of the truck because the answer is not necessary to the Court's resolution of this motion.  Federal courts are to avoid rendering decisions on constitutional questions unless reasonably necessary.  See Nw. Austin Mun. Util. No. One v. Holder, 129 S. Ct. 2504, 2508 (2009)(Roberts, C.J.)("Our usual practice is to avoid the unnecessary resolution of constitutional questions. "); Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1267 n.7 (10th Cir. 2004)("Our usual practice is to avoid the unnecessary resolution of constitutional questions.")(quoting Alltel Comm., Inc. v. City of Macon, 345 F.3d 1219, 1221 n. 2 (11th Cir. 2003)); United States v. Hardman, 297 F.3d 1116, 1135-36 (10th Cir. 2002)(expressly reaching its conclusion on statutory grounds "to avoid constitutional issues.").

occurred if there were no illegal search of the house, because there is no reason to believe the officers would have remained outside Martinez' house for two-and-a-half hours in response to a static-only open-line 911 call if they had not entered the house and seen contraband.  Finally, the sweep of the truck did not significantly affect the probability that the officers would choose to ask Martinez to come to the station, given that the officers did not detect anything in the truck that they had not already detected, in substantial quantities, in Martinez' house.

The Court concludes that finding and searching the truck was not an intervening circumstance, but rather was part of the investigation that Lind's and Kmatz' illegal entry into Martinez' house initiated.  The search of the house caused the search of the truck, and the search of the truck did not uncover anything that changed the officers' motivations or thought processes.  The United States has not proposed any other intervening circumstances except that Martinez agreed to go downtown to the BCSO station, which the Court does not find to be significant because it, even more than the search of the truck, was a continuation of the investigation that the illegal search prompted.  As the Supreme Court stated in Oregon v. Elstad, 470 U.S. 298 (1985):

> Where a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

470 U.S. at 306 (internal citations omitted).  The Court therefore finds that there were no intervening events of significance between the illegal search of Martinez' home and his confession, and thus this factor weighs against finding attenuation.

## C.  THE OFFICERS' ACTIONS DO NOT CONSTITUTE FLAGRANT MISCONDUCT.

The third factor in Brown v. Illinois is "the flagrancy of the official misconduct."  Brown

v. Illinois, 422 U.S. at 604.  In this case, the officers did not engage in flagrant misconduct when entering Martinez' house.  Although the Court finds that the officers should have known that their conduct was not in conformance with the Fourth Amendment, the officers acted in a manner they subjectively believed was lawful.  Hartsock also did not engage in flagrant misconduct in acquiring admissions and incriminating statements from Martinez.  When he questioned Martinez, Hartsock knew only of the facts of Lind's and Kmatz' entry into Martinez' home, but was not subjectively aware that the entry constituted a Fourth Amendment violation.  His use of the information gained during that entry did not make the violation any more flagrant.  The Court addressed the legality of Lind's and Kmatz' entry into Martinez' house at length in its Memorandum Opinion and Order, and it took detailed analysis to determine whether they committed a violation.  See Memorandum Opinion and Order at 39-54 (Doc. 43).  Thus, the flagrancy-of-the-official-misconduct factor weighs in favor of attenuation.  Because Hartsock used the fruits of the illegal search in interrogating Martinez, however, the Court cannot find that the taint of the illegal entry was attenuated.

### D. MARTINEZ' STATEMENTS WERE NOT FREELY MADE SO AS TO PURGE THE TAINT OF THE FOURTH-AMENDMENT VIOLATION, AND MARTINEZ DID NOT CONSENT TO THE SEARCH.

The United States insists that the statements given by Martinez were freely given, and were a product of his own free will, thereby breaking the causal chain between the statement and the prior illegal search.  The Court does not agree.  Martinez was asked to come to the main BCSO station in downtown Albuquerque, but, as a preface to that request, Martinez was told that police officers had responded to a mysterious 911 call from his house, had entered his house, and had seen some items that caused them some concern.  See Jan. 21 Tr. at 170:22-25 (Dudewicz); id. at 221:18-222:19 (Court, Dudewicz).  Next, when Martinez was brought to the station, was left in a windowless room, was read his Miranda rights, and was told that the BCSO was investigating him

for drug trafficking, the Court finds that Martinez was seized in the constitutional sense. Finally, Hartsock used information that he received from Lind's and Kmatz' illegal search to pressure Martinez to confess details that Martinez otherwise would not have disclosed. Accordingly, the Court finds that the confession that Hartsock obtained from Martinez was a fruit of the illegal entry and that the taint of that illegality is not attenuated.

### 1.   Martinez Was Seized When He Made His Statements.

Before his interview with Hartsock at 6:18 p.m., Martinez was contacted at his truck at approximately 4:30 p.m. Martinez arrived home to find several police cars at his house and about six officers wandering around. When Dudewicz explained to him why they were there, she told him that his house had somehow generated a 911 call, that BCSO officers had been dispatched to his house, and that those officers had entered his house. She also told him that the officers had seen some things while inside that concerned them, and then asked Martinez if he would accompany her to the BCSO main station in downtown Albuquerque. At that point, Martinez was likely concerned about what Dudewicz was likely insinuating with her statements, but the Court does not find that he was detained for the purposes of the Fourth Amendment.

Martinez was transported downtown in Dudewicz' police car. Although he was in the front seat, he was curious how he would get home, given that he was leaving his truck behind. Dudewicz told him that, if it was necessary, the BCSO would arrange a ride home for him later. Once at the station, Martinez was placed in an interrogation room, where he sat for thirty minutes before Hartsock and Gaitan entered to question him. When they arrived, Hartsock and Gaitan began by reading Martinez his Miranda rights and telling him that they were investigating possible drug-trafficking charges. Hartsock initiated the questioning by reiterating for Martinez that BCSO officers had been inside his house and specifying that the officers had seen marijuana lying around

the house.  At this point, the Court finds that no reasonable individual would feel that he or she were free to leave the interrogation room or the police station.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall, 446 U.S. at 554; United States v. Reeves, 524 F.3d 1161, 1167 (10th Cir. 2008).

## 2.   **Martinez' Confession Was Not Voluntary By Fourth Amendment Standards.**

The Tenth Circuit has indicated that, for a confession to be voluntary, so as to purge the taint of a prior constitutional violation, the United States must meet the Fourth-Amendment standard of voluntariness under Schneckloth v. Bustamonte, 412 U.S. 218 (1973), rather than the Fifth-Amendment voluntariness standard of Miranda v. Arizona, 384 U.S. 436 (1966).  See United States v. Carson, 793 F.2d at 1151 ("The implication of the Supreme Court's decision in Brown v. Illinois is that in order for incriminating statements to be purged of the taint of an underlying Fourth Amendment violation, [the] defendant's consent must meet the voluntariness standard of the Fourth Amendment.").  In addition, at least in the context of consent to search, even if the consent is voluntary, there must be sufficient independence of the consent from the prior illegality to purge the taint.  As the Tenth Circuit stated in United States v. Melendez-Garcia:

> [N]ot only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was "sufficiently an act of free will to purge the primary taint."

28 F.3d at 1054.  The Court need not address whether this dual requirement applies in cases of confessions -- rather than in cases involving consents to search -- that follow a Fourth-Amendment violation, because it is clear that neither prong of the test is met here.  Martinez' confession was neither voluntary by Fourth-Amendment standards, nor sufficiently separate from the unconstitutional conduct to break the causal chain.

The test set forth in <u>Schneckloth v. Bustamonte</u> appears to be the standard for voluntariness under the Fourth Amendment.  The Tenth Circuit enumerates the elements of that test to be:

> (1) There must be clear and positive testimony that [the confession] was "unequivocal and specific" and "freely and intelligently" given; (2) the government must prove [the confession] was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

<u>United States v. Carson</u>, 793 F.2d at 1150 (quoting <u>United States v. Abbott</u>, 546 F.2d 883, 885 (10th Cir.1977)).  <u>See</u> <u>United States v. Lopez</u>, 777 F.2d 543, 548 (10th Cir. 1985).  The Court finds that this standard is not met in this case.

The Court cannot reasonably find that Martinez' confession was voluntary under the <u>Schneckloth v. Bustamonte</u> standard.  Martinez might have felt that he could have refused to come to the station with Dudewicz initially, but by the time Martinez arrived at the station and was being questioned by Hartsock, the Court finds that no reasonable person would have felt that they were free to disengage from the encounter.  By the time he had reached the station, Martinez: (i) was without a vehicle and approximately forty-five minutes from his home because Dudewicz drove him downtown in her car, <u>see</u> CAD Sheet at 2 (". . . <u>16:48</u>   339 [Shores] . . .   1X MALE 12 TO 66 STATION ON 66 . . . . <u>17:09</u>   178 [Dudewicz] ENR[OUTE] MAIN 1X12 S[TARTING] M[ILEAGE] 1173.9 . . . <u>17:36</u>   Stat SO/178 [Dudewicz] . . . Loc[ation]: MAIN 1X12 . . . <u>17:36</u> E[NDING]M[ILEAGE] 1198.8 . . .")(underlining of time stamps added); (ii) had been kept in a small, windowless room for about thirty-five minutes before Hartsock and Gaitan arrived to question him, <u>see</u> Video Interview at 17:31:00-18:07:00; (iii) had been read his <u>Miranda</u> rights, which would add to the impression that he was being detained, <u>see</u> Interview Tr. at 4:21-5:19; (iv) learned from Hartsock that the officers were investigating drug trafficking, <u>see</u> <u>id.</u> at 8-13; and (v) learned that

officers had already entered his home and saw drugs inside, see id. at 8:24-14:6.  At this point, in an interrogation room at a police station with officers asking him questions, a reasonable person would not have felt free of duress or coercion.  Furthermore, Hartsock testified that Martinez was detained at that point and was not free to leave.  For these reasons, as well as for those discussed below regarding the United States' consent argument, the Court finds that the confession in this case was not voluntary by Fourth-Amendment standards.

### 3.   Martinez' Confession Was a Result of Hartsock's Exploitation of the Illegal Entry into Martinez' House.

Second, the Court finds that Hartsock's mode of questioning was an "exploitation of that illegality."  Unlike United States v. Ceccolini, wherein the witness' testimony was unprompted by any unlawfully acquired information, or Wong Sun v. United States, where Wong Sun's statement was voluntarily made after release on his own recognizance, Hartsock started up his interview by telling Martinez that BCSO officers had already entered his house and had already seen that he had drugs inside.  See Interview Tr. at 10:1-11:5 ("Q:  They didn't hear anyone so they just walked through the residence to make sure that no one is laying unconscious or semi-unconscious and they found some drugs laying around.  They found some marijuana mostly laying around. Do you know what I'm talking about?  A: Yeah.").  Even after telling Martinez that the officers had entered and seen marijuana, Martinez resisted confessing to using any other kinds of narcotics in his house until Hartsock told him that the officers had seen what they thought to be cocaine on the counter:

Q:    Okay.  Do you use any -- any other kind of narcotics?

A:    No.

Q:    No?  Well, I mean, there was a couple of plates that looked like it could be a -- you know, a while -- a white kind of powder or substance on them. You know what I'm hinting at?  Maybe cocaine?

A:      Oh, yeah.

Q:      Okay.  Do you use cocaine sometimes?

A:      Periodically. . . .

Id. at 13:25-14:16.  Hartsock then told Martinez that the officers had found lots of pornography lying

around Martinez' house, and suggested that it might include child pornography, see id. at 22:10-

23:11 ("Another thing [the searching officer] noted is that a fairly, you know, kind of plain view,

amount of pornography laying out. . . . Some of it with, you know, suggestive younger aged

males."), and asked Martinez if he had ever engaged in sex with minors, see id. at 24:13-25:10.

Martinez continued to squirm under questioning for about fifteen minutes before admitting that he

had a photograph of himself having sex with someone that was "[p]robably 17 or 18" years old.

Video Interview at 18:30:00-18:46:00; Interview Tr. at 42:6-22.  Even after this admission, Hartsock

threatened Martinez with the inevitable search of Martinez' house before Martinez admitted that he

might possess two or three videotapes depicting him having sex with a minor.  See Video Interview

at 18:48:00-18:50:00; Interview Tr. at 44:3-20.  Hartsock used the information gained in the illegal

entry to press Martinez during interrogation, and it is only with that unlawfully acquired knowledge

that there was substantial weight to Hartsock's threats that BCSO would soon have a warrant to

search Martinez' house.  The Court finds that this use of information from the illegal entry was an

exploitation of the illegality, vitiating any attenuation that might have occurred between the illegal

entry and the questioning itself.

### 4.    Martinez Did Not Consent to the Subsequent Search of His House.

Finally, the United States argued in a footnote, see Response at 11 n.4, and commented in

the hearing, see Jan. 22 Tr. at 35:9-25 (Court, Rees), that Martinez made statements during his

interrogation that amounted to consent to the search.[20]  The Court is unconvinced.  The <u>Schneckloth</u>

<u>v. Bustamonte</u> standard governs this issue, just as it governed the voluntariness of Martinez'

confession:

> (1) There must be clear and positive testimony that consent was "unequivocal and specific" and "freely and intelligently" given; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

<u>United States v. Carson</u>, 793 F.2d at 1150.  <u>See</u> <u>United States v. Lopez</u>, 777 F.2d at 548.  The United

States has failed to establish these elements.  The statement that Martinez made, "You can look at

every tape," Interview Tr. at 59:14-15, appears unequivocal and specific, but by the time Martinez

made this statement, Hartsock had already coerced Martinez into confessing several facts.  After

informing Martinez that officers had already been in his house and seen his things, Hartsock and

Gaitan asked leading questions that led him to confess to having "three or four" photographs of

himself having sex with someone whom Martinez estimated to be seventeen- or eighteen-years old.

<u>See</u> Interview Tr. at 42:6-24.  Hartsock then told Martinez that the officers were getting a search

warrant to search Martinez' house and asked the following:

> Are we going to find any pornography with people, you know, under the age of 18 [in your house]?  And it doesn't mean that you purchased it.  I mean, in any form or fashion, photographs, videos?  Because, before you answer, you know, so far you've said no, besides the 17 or 18 year old in a Polaroid from whatever, 15, 20 years ago. Besides me [sic] -- you know, now is the time to tell us about it because, you know, once we find it, if it's there, we have nothing to talk to you about.  We -- we haven't gone in your door besides those deputies when they checked the 911 . . . We're going to go in there now.  Are we going to find any of that?  Now is the time to be honest about it because we're going to find it if it's there.

Interview Tr. at 44:3-20.  After that coercive question, the officers still needed to work to pull from

---

[20] The Court assumes the United States is referring to the second, warrant-authorized search, rather than to the first, unconstitutional search.

Martinez the fact that he had any videotapes containing himself engaged in sex acts with a minor. See id. at 44:23-55:25.  In light of the transcript of Martinez' interview, the Court cannot reasonably find that the consent that Martinez apparently gave was "free of duress or coercion," United States v. Carson, 793 F.2d at 1150, so the Court will not find that Martinez consented to the second search of his house.  In sum, Martinez was detained at the time he gave his confession, the confession itself was not voluntary under the Fourth Amendment and thus does not provide an intervening circumstance that breaks the chain of causation between the illegal search and the second, warrant-authorized search, and Martinez did not consent to that second search.

The Court therefore concludes that Martinez' statements are a fruit of the poisonous tree, and cannot lawfully be used to convict him of any crimes or to establish probable cause for the warrant to search his house.  See United States v. Calandra, 414 U.S. at 347.  The Court has now concluded that all indicia of probable cause in the affidavit for the search warrant for Martinez' house are fruit of an illegal search.  The search of Martinez' house, now based on a warrant devoid of facts from which one might establish probable cause, was therefore unconstitutional, and the Court must, under current law, exclude the evidence found therein unless an exception to the exclusionary rule applies.  The Court finds that none of the exceptions proposed by the United States make admissible the evidence found.

## III.    IT WAS NOT INEVITABLE THAT THE OFFICERS WOULD HAVE ACQUIRED MARTINEZ' CONFESSION.

The United States' second argument for admission of Martinez' confession is that the inevitable-discovery doctrine applies.  See Response at 12-15.  The United States suggests that, "[t]o establish inevitable discovery, there must first be an ongoing line of investigation that is distinct from the impermissible or unlawful technique to justify the inevitable discovery doctrine," id. at 13

(citing Nix v. Williams, 467 U.S. 431, 444 (1984)), and that the search of the truck was such a distinct line of investigation, see id. at 13.  The United States then argues that there was a reasonable probability that the permissible line of investigation would have resulted in questioning Martinez and acquiring the same incriminating statements that the illegal investigation disclosed.  See id. at 13-14.

The Supreme Court has held: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received."  Nix v. Williams, 467 U.S. at 444.  The Court is not convinced that a preponderance of the evidence shows that Martinez would have given the incriminating statements if there had been no illegal entry into his home.  First, if Lind and Kmatz had not entered Martinez' house, it is unlikely that any other officers would be called to the scene, or that Lind and Kmatz would have tarried at Martinez' house for two and one-half hours, waiting for Martinez to get home.  Even if they had decided to wait for Martinez to return, it is unlikely that they would have had any heightened suspicion about the arrival of Martinez' truck, and most likely would only have confirmed that Martinez was the homeowner and that there was no emergency.  At that point, no officer would have been able to sniff the car's interior and smell marijuana.

Even if additional officers responded to Martinez' house, saw Martinez' truck, opened the truck's door, and smelled marijuana, Hartsock admitted that it is unlikely that smelling marijuana in the truck would have prompted Hartsock to seek a search warrant for the house.  See Jan. 21 Tr. at 130:13-131:4 (Bregman, Hartsock).[21]  Finally, even if Hartsock had brought Martinez to the main

---

[21] The Court also notes that Tenth Circuit law arguably would not have allowed Hartsock to use the knowledge of drugs in Martinez' truck to justify a search warrant for Martinez' house.  In

station to question him about smelling drugs in Martinez' truck, the video and transcript of Martinez' interview demonstrated that Martinez would not give the officers incriminating evidence until he was cornered.  Without Hartsock having knowledge of the drugs inside the house, there is no sound reason to believe that Martinez would have admitted that there were any.  See Interview Tr. at 10:1-14:16.  Ultimately, the Court concludes that a preponderance of the evidence shows that the officers would not inevitably have acquired Martinez' statements or the physical evidence inside his house.

## IV.   THE GOOD-FAITH EXCEPTION DOES NOT APPLY TO THIS CASE.

The United States' final argument is that, when Hartsock and other officers executed the search warrant on Martinez' home on April 14, 2009, the officers were acting in good faith on a warrant that they reasonably believed to be valid, thus triggering the good-faith exception of United States v. Leon.  Martinez disagrees, relying largely on the Court's prior Memorandum Opinion and Order in this case, arguing that the good-faith exception is inapplicable.  The Court concludes that excluding the evidence in this case furthers the policies underlying the exclusionary rule, and that

---

United States v. Rowland, 145 F.3d 1194 (10th Cir. 1999), the Tenth Circuit stated:

> Because the controlled delivery was made to Rowland's private post office box and not to his residence, . . . establishing probable cause that the delivery would take place does not mean there was probable cause that the video tapes would be at Rowland's residence when the search took place.  Therefore, this court must determine whether the affidavit supporting the anticipatory warrant contained evidence establishing a nexus between the contraband and Rowland's residence.

145 F.3d at 1204.  United States v. Rowland implies that knowing that a defendant has contraband in one place -- here, in his truck -- does not provide probable cause for believing that such contraband is or will be found in his house.  See United States v. Nolan, 199 F.3d 1180, 1183 (10th Cir. 1999)("[W]e have never held that the mere observation of repetitive illegal drug activity outside a suspect's residence by itself is sufficient to establish probable cause for a search of the suspect's residence.").

the officers knew or should have known that Lind's and Kmatz' conduct constituted a constitutional violation. The Court will therefore refuse to apply the good-faith exception.

The Court recognizes that the Supreme Court's decision of Herring v. United States recently changed the landscape of the exclusionary rule with respect to the good-faith exception. As the Tenth Circuit has recognized, the good-faith exception now encompasses situations in which an officer acts in "good faith reliance upon the negligent mistake of a fellow law enforcement employee." United States v. McCane, 573 F.3d at 1043. The Court has reviewed the Tenth Circuit's interpretations of Herring v. United States and finds that, although Herring v. United States changed the legal landscape, it did not change it to the point that exclusion is inappropriate in this case.

### A. THE DETERRENT FUNCTION OF THE EXCLUSIONARY RULE IS SERVED BY EXCLUSION.

The Court largely addressed the issue of good faith in its prior opinion in this case:

> The good-faith exception should not apply to warrants supported by illegally obtained information. Such an application of the good-faith exception would permit the police, as a body, to benefit from their own illegal conduct. One officer could conduct an illegal search and then deliver to another officer information which the second officers then uses to obtain a warrant. The Tenth Circuit has already established the proper procedure to follow when a warrant is based on illegally obtained information. In such situations, "[w]hen a warrant is tainted by some unconstitutionally obtained information, [courts in the Tenth Circuit] uphold the warrant if there was probable cause absent that [illegally obtained] information." United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).

Memorandum Opinion and Order at 63. The Court has performed additional research and reconsidered this issue, but the Court has not changed its conclusion.

As the Court discussed in its prior opinion, the BCSO works under a set of written policies, one of which addressed the standard for the emergency-aid exception to the warrant requirement. See Memorandum Opinion and Order at 7-8, 52-53. The policy allowed officers to:

> make a warrantless entry of anything, whether personal belongings, a vehicle, or building, anytime that Deputies have good reason to believe it is necessary to save a life or prevent injury (i.e., cries for help from inside of a building, assisting the Fire Department on a fire, to check on the welfare of the suspected abused child). However, once the emergency has passed, Deputies may not continue to search without obtaining a warrant.

See id. at 7-8.  As the Court pointed out in its prior opinion, the thrust of Herring v. United States appeared to be to remind lower federal courts that they should apply the exclusionary rule only where the prospective-deterrence function underlying the rule is sufficiently served.  The Court stated:

> The Supreme Court [in Herring v. United States] found that excluding evidence obtained in an unauthorized arrest based on incorrect data in a database would not substantially deter police administrative workers from incorrectly and negligently entering such arrest warrant information.  See [Herring v. United States, 129 S. Ct.] at 703.  By contrast, if the Court excludes evidence obtained by officers when they fail to make a proper analysis whether exigent circumstances exist, officers might be deterred from making hasty exigent-circumstances assessments and/or applying ad hoc rules without performing the necessary analysis.  The Court is not convinced that Herring v. United States stands for the proposition that, any time an officer in the field negligently violates someone's constitutional rights, exclusion of the evidence is not justified.  See id. at 704.  Rather, Chief Justice Roberts specified that "nonrecurring and attenuated negligence is far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place," and that such negligence does not justify exclusion.  Id. at 702 (emphasis added).  The negligent data entry of an administrative employee that causes an unconstitutional seizure is more attenuated from the seizure itself than the negligence of an officer in the field who executes an unconstitutional search based on his own misapplication of the standard for determining whether exigent circumstances exist.  Furthermore, the testimony disclosed that misapplication of the exigent-circumstances standard is recurring and not limited to the officers involved in this case.  See [Oct. 29] Tr. at 109:15-110:4 (Bregman, Lind); id. at 197:6-199:8 (Bregman, Kmatz); id. at 202:4-14 (Bregman, Kmatz).  Thus, the Court concludes that this case demonstrates the "recurring or systemic negligence" that application of the exclusionary rule was meant to, and meaningfully can, deter.  See Herring v. United States, 129 S. Ct. at 702.  In short, the Court does not believe that Herring v. United States expands the good-faith exception to the point that exclusion of evidence would be inappropriate in this case.

Memorandum Opinion and Order at 64-65.  The Court continues to believe that the deterrent function of the exclusionary rule is served by exclusion in this case.

**B.      OFFICERS LIND, KMATZ, AND HARTSOCK SHOULD HAVE KNOWN THAT THEIR CONDUCT WAS UNCONSTITUTIONAL.**

"[T]he good-faith inquiry 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." United States v. McCane, 573 F.3d at 1044 (quoting Herring v. United States, 129 S. Ct. at 703). As the Supreme Court stated: "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." United States v. Herring, 129 S. Ct. at 701. See United States v. McCane, 573 F.3d at 1044 ; United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009)("An officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."); United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009). The Court finds that the officers in this case should have known that their conduct was likely to be unconstitutional.

Again, at all times relevant to this case, the BCSO was working under a set of written policies, one of which dealt with the circumstances under which an officer could make a warrantless entry into a home on the belief that someone inside needed immediate assistance. See Memorandum Opinion and Order at 7-8 (Doc. 43). Those policies required the officer to have "good reason to believe [that warrantless entry] is necessary to save a life or prevent injury," and listed examples of situations in which one might have such "good reason." Id. ("i.e., cries for help from inside of a building, assisting the Fire Department on a fire, to check on the welfare of the suspected abused child"). The officers in this case, however, testified that they were acting on an *ad hoc* general practice of the BCSO wherein an officer would enter a house without a warrant if: (i) 911 dispatch receives an open-line call; (ii) nobody answers the door of the residence from which the call

-63-

originated; and (iii) the officers find any unlocked door to the residence.  See id. ¶ 38, at 8.  The

BCSO policy correctly reflects Tenth Circuit law on emergency-aid/exigent circumstances entries.

The Court found that the *ad-hoc* rule that the BCSO officers used in practice did not satisfy the

Fourth Amendment.  While not important to the Court's Fourth Amendment analysis, the Court also

noted that the officers' entry did not satisfy the BCSO written policies, either.  See Memorandum

Opinion and Order at 52-53 (Doc. 43).  The Court thus finds that, based on their training and the

BCSO written policies of which they should be aware, the officers should have known that their

conduct was going to violate the constitution.

This analysis comports with United States v. Leon and Herring v. United States.  As the

Supreme Court in Herring v. United States reiterated, the Supreme Court United States v. Leon

stated: "It is necessary to consider the objective reasonableness, not only of the officers who

eventually executed a warrant, but also of the officers who originally obtained it or who provided

information material to the probable-cause determination."  United States v. Leon, 468 U.S. at 923.

See Herring v. United States, 129 S. Ct. 699 ("In analyzing the applicability of the [exclusionary]

rule, Leon admonished that we must consider the actions of all the police officers involved.").  The

Supreme Court in United States v. Leon drew a distinction between "[p]enalizing the officer for the

magistrate's error, rather than his own," because the latter "cannot logically contribute to the

deterrence of Fourth Amendment violations."  468 U.S. at 921.  Furthermore, because excluding

from the search warrant information garnered from Lind's and Kmatz' illegal entry into Martinez'

house furthers the deterrent function of the exclusionary rule, allowing officers to circumvent the

exclusionary rule by passing off information to other officers, who then continue the investigation,

would undermine that deterrent effect.  In this case, Hartsock was, or should have been, aware of

the BCSO written policies, was aware of Lind's and Kmatz' entry into Martinez' house, and was

aware of the basis of that entry.[22]  Hartsock, therefore, as much as Lind or Kmatz, should have

known that the entry was unconstitutional.  It would thus be consistent with the deterrent policy of

the exclusionary rule to exclude Martinez' statements, because officers should generally be deterred

from using illegally obtained information in an effort to convince a criminal suspect to confess a

crime.

### C.   THE CASES THE UNITED STATES CITES ARE INAPPOSITE TO A CASE IN WHICH ILLEGALLY OBTAINED INFORMATION TAINTS THE WARRANT-AUTHORIZED SEARCH.

The cases that the United States cites in support of its good-faith-exception argument are

inapposite.  In United States v. Nolan, there was no underlying constitutional violation, but merely

a warrant that lacked a sufficient nexus between the contraband and the house to be searched.  The

Tenth Circuit stated:

> [T]his panel chooses not to decide in this instance whether the affidavit in support
> of the search warrant was sufficient to sustain the magistrate judge's finding that
> incriminating evidence would likely be found inside Defendant Nolan's residence.
> Instead, we exercise our discretion to decide this case under the good-faith exception
> to the exclusionary rule established in United States v. Leon . . . and leave for
> another day the probable cause inquiry.

199 F.3d at 1184.  Likewise, in United States v. McKneely, the district court found that a search of

the defendant's vehicle was made after an unlawful seizure, was not made pursuant to consent, and,

although the search was pursuant to a warrant, the warrant lacked probable cause.  See 6 F.3d at

1448; United States v. McKneely, 810 F. Supp. 1537, 1544-48 (D. Utah 1993).  The Tenth Circuit

---

[22] Lind testified that he told Hartsock, before Hartsock arrived at Martinez' house, all the information to which Lind testified at the October 29, 2009 hearing, including "what contraband items [he] saw," "what rooms [he] saw [them] in," and "why [Lind and Kmatz] entered the house." Oct. 29 Tr. at 82:8-25 (Rees, Lind)("A:  What I told him was that we had a 911 hang-up, we had [not made] contact with anyone at the house, and we found an open door, so we had to clear and sweep the house.").

applied the good-faith exception only after overruling the district court's findings that the underlying seizure and search were unconstitutional, declining to address the issue whether probable cause supported the warrant. See 6 F.3d at 1452-54. In United States v. Coral-Coral, 899 F.2d 927 (10th Cir. 1990), the defendant alleged a prior, warrantless entry that the police executed to prevent destruction of evidence tainted a subsequent, warrant-authorized entry. 899 F.2d at 928-30. The Tenth Circuit, however, found that a legal traffic stop which uncovered cocaine and $298,919.00 in cash, not the warrantless entry, prompted the warrant-authorized search. See id. at 930. It was only in an effort to protect the evidence, which the officers intended to discover when executing the warrant, that they made the illegal entry. The Tenth Circuit thus considered only if the good-faith exception cured the sole illegality of searching pursuant to a warrant that was not supported by probable cause. See id. at 930-40 ("This is not one of those 'unusual' cases where suppression of the evidence is appropriate to deter government misconduct."). See also United States v. Danhauer, 229 F.3d at 1004-05 (holding that the good-faith exception applied where defendant alleged no prior constitutional violation, but only insufficient probable cause for the warrant); United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985)(finding no underlying constitutional violation).

The Court concludes that the good-faith exception to the exclusionary rule should not be applied in a case, such as this one, where officers learn information during an unconstitutional search and give that information to another officer for incorporation into the warrant affidavit. It likewise should not apply where an officer uses illegally obtained information during questioning of the defendant to obtain a confession and then includes that confession in the warrant affidavit. Because the Court has found a constitutional violation and a causal nexus between the constitutional violation and the confession at issue in this motion, and because the Court has found that the United States failed to show that the attenuation doctrine, the inevitable-discovery exception, or the good-

faith exception apply in this case, the Court will grant Martinez' motion to suppress the statements made during his interview with Hartsock and the evidence that the BCSO found in his home when executing the search warrant.

**IT IS ORDERED** that Defendant's Motion to Suppress and Supporting Brief is granted.


_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
   United States Attorney
Presiliano Torrez
Stephen R. Kotz
Charlyn E. Rees
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Brad D. Hall
Albuquerque, New Mexico

-- and --

Sam Bregman
Eric Loman
Bregman & Loman, P.C.
Albuquerque, New Mexico

   *Attorneys for the Defendant*